**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
THE BROOKLYN UNION GAS COMPANY
d/b/a NATIONAL GRID NY,

                          Plaintiff,                                    **COMPLAINT**

                          v.                                            **Case No.**

CONSOLIDATED EDISON COMPANY OF NEW YORK,
INC.,
THE CITY OF NEW YORK,
THE UNITED STATES OF AMERICA,
THE UNITED STATES DEPARTMENT OF DEFENSE,
THE UNITED STATES DEPARTMENT OF THE NAVY,
THE UNITED STATES DEPARTMENT OF THE ARMY,
THE UNITED STATES COAST GUARD,
THE FEDERAL MARITIME COMMISSION,
THE UNITED STATES POSTAL SERVICE,
THE UNITED STATES GENERAL SERVICES
ADMINISTRATION,
ASTORIA GENERATING COMPANY, L.P.,
BALLANTYNE LEGACY HOLDINGS, LLC,
BAYSIDE FUEL OIL CORPORATION,
BEAZER EAST, INC.,
THE BRINK'S COMPANY,
BROOKLYN IMPROVEMENT COMPANY,
DUN AND BRADSTREET CORP.,
HESS CORP.,
THE KRAFT HEINZ COMPANY,
MCIZ CORP.,
36-2ND J CORP.,
15 SECOND AVENUE LLC,
107 SIXTH STREET LLC,
METROPOLITAN TRANSPORTATION AUTHORITY,
MRC HOLDINGS, INC.,
NEW YORK CITY ECONOMIC DEVELOPMENT
CORP.,
NEW YORK CITY INDUSTRIAL DEVELOPMENT
AGENCY,
NEW YORK CITY TRANSIT AUTHORITY,
NL INDUSTRIES, INC.,
NORTHVILLE INDUSTRIES CORP.,
PHILLIPS 66 COMPANY,
POWER AUTHORITY OF THE STATE OF NEW YORK,
PUGET SOUND COMMERCE CENTER, INC.,
REXAM BEVERAGE CAN COMPANY,
SPX TECHNOLOGIES, INC.,

STAUFFER MANAGEMENT COMPANY,
TDA INDUSTRIES, INC.,
TEXACO, INC.,
UNION OIL COMPANY OF CALIFORNIA,
and
VERIZON NEW YORK INC.,

                   Defendants.

--------------------------------------------------------------------X

Plaintiff The Brooklyn Union Gas Company d/b/a National Grid NY ("Brooklyn Union"), by its undersigned counsel, hereby alleges as follows:

1.     This case is about funding the cleanup of a highly polluted waterway, the Gowanus Canal (the "Canal" or the "Site"), which is located in the heart of a growing and vibrant area of Brooklyn, New York. For more than 150 years, the Canal has functioned as a municipal sewer and dumping ground for industrial and sanitary wastes, creating a liquid and sediment landfill. The Canal was declared a Superfund site and included on the United States Environmental Protection Agency's ("US EPA" or the "Agency") National Priorities List ("NPL") in 2010. The NPL lists those sites that US EPA has determined are the highest priority for cleanup.

2.     Brooklyn Union, a local utility servicing Brooklyn, New York, is committed to addressing the Canal's blight on the community. However, the entire remediation of the Canal is anticipated to cost more than $1 billion, a sum far too large to be disproportionately shouldered by Brooklyn Union and its local Brooklyn customers.

3.     Each of the 40 Defendants in this action is a Potentially Responsible Party ("PRP") for the Site. US EPA documented the responsibility of PRPs for contaminating the Canal and used that history as the basis for issuing general notice letters and unilateral administrative orders ("UAOs") against the vast majority of the Defendants. These general notice letters and UAOs represent US EPA's independent findings that the PRPs named by EPA are jointly and severally

responsible for cleanup costs at the Canal. In addition, Brooklyn Union has discovered several entities that were not included in EPA's original review that are also liable based on their operations that have released hazardous substances to the Canal.

4. In the absence of a group of PRPs willing to respond to EPA's orders, Brooklyn Union alone is spearheading efforts to investigate and clean up contamination at the Site and has been paying more than its fair share for the cleanup of the Canal. For years, Brooklyn Union has attempted to persuade responsible parties—each of whom has released hazardous substances into the Canal—to pay their fair share of costs for the cleanup as well. Although some parties have contributed money to the cleanup without a long term agreement to do so, Brooklyn Union is still paying more than its equitable share of the costs. A few other industrial parties (including ExxonMobil Oil Corporation, Hauck Manufacturing, Inc., and Honeywell International, Inc.) have reached settlements with Brooklyn Union that include financial commitments to help fund the cleanup (the "Contributing Responsible Parties").

5. The remaining responsible parties have refused to pay anything. By their intransigence, the recalcitrant, remaining responsible parties are threatening to undermine the entire effort to clean up the Canal. For this reason, Brooklyn Union seeks the Court's help to ensure that a stable funding stream is established, and the work can continue on schedule.

6. The legal process for right sizing the responsibility for this remedy is through the federal Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). CERCLA is a retroactive statute that requires liable parties to pay the clean-up costs necessary to address their release or threatened release of hazardous substances to the environment. Under the statute, responsible parties may be identified by US EPA as liable for their predecessors' releases even if, as in some cases at the Canal, those releases occurred more

than one hundred years ago. No public or private entity is immune from liability under CERCLA.

7.    Brooklyn Union asks the Court to hold all parties liable for their equitable share so that the burden of funding the cleanup may be divided among all PRPs with each Defendant paying a just and reasonable portion of the total cost. CERCLA affords the Court "broad discretion to balance the equities in the interests of justice," and "does not limit" the Court "to any particular list of factors to consider" when determining each Defendant's financial responsibility for the cleanup. *MPM Silicones, LLC v. Union Carbide Corp.*, 966 F.3d 200, 234 (2d Cir. 2020).

8.    Specifically, Brooklyn Union asks this Court to: (a) determine that each Defendant is strictly, jointly and severally liable for cleanup costs at the Site under CERCLA §§ 107 and 113, 42 U.S.C. §§ 9607 and 9613, (b) award Brooklyn Union cost recovery and contribution for the cleanup costs it has incurred and will incur prior to the entry of judgment in this action pursuant to CERCLA §§ 107 and 113, 42 U.S.C. §§ 9607 and 9613, (c) allocate the financial responsibility of each Defendant for future cleanup costs under CERCLA § 113 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and (d) award related relief under applicable New York statutory law.

## BACKGROUND AND SUMMARY OF THE PARTIES' DISPUTE

9.    As will be demonstrated further below, each Defendant should bear financial responsibility for the cleanup consistent with its contributions to the contaminants in the Canal. Each Defendant's share must be calculated by understanding 1) the Defendant's former operations along the Canal; 2) the hazardous substances used during those operations; 3) the waste streams generated by the Defendant's operations; 4) the pathways for those waste streams

to reach the Canal; and 5) the level of participation in the remedial action. This introduction provides the historical setting for the Defendants' operations along the Canal, while each individual Defendant's specific connection to the Canal is detailed in the section "Defendants' Operations," further below.

10.     This introduction also puts the remedy selected by US EPA in the context of the Canal's history. After the initial investigation into the contamination in the Canal, US EPA issued its Record of Decision ("ROD") in which the Agency selected a complex remedy to clean up the contaminants of concern found in the Canal. The ROD identifies three main contaminants of concern: 1) polychlorinated biphenyls ("PCBs"); 2) polycyclic aromatic hydrocarbons ("PAHs"); and 3) metals (particularly lead and copper). The ROD also outlines the required remedy, which generally includes dredging of the upper layer of contaminated sediments, in-situ stabilization of the native sediments in certain areas of the Canal's floor, and construction of a multilayer cap over the Canal floor.

11.     The ROD is important because it determines the Agency-selected remedy, which pursuant to CERCLA cannot be challenged by the responsible parties in court until after it is complete. 42 U.S.C. § 9613(h). The parties named by US EPA—essentially the same parties named in this lawsuit—are responsible for designing and implementing the remedy precisely as outlined by the ROD. Thus, the parties named here may not use this as a forum to challenge the remedy that is currently underway.

**Beginning in the 1800s, the Canal Was Used by Defendants to Dispose of Hazardous Wastes from Nearby Industries**

12.     More than 150 years ago, the City of Brooklyn, now the City of New York (collectively, the "City"), in response to the City's exploding population, constructed the Canal to accommodate massive industrial growth.

13.     In the first half of the nineteenth century, Brooklyn had transformed from a semi-rural village to a rapidly growing city. By 1867, when the Canal was completed, Brooklyn was beginning a period of rapid growth that, by the 1890s, resulted in it becoming the third largest city in the United States and a key center for industry, commerce, and distribution. The Canal became a principal hub for this growth and was lined by factories, manufacturing plants, warehouses, and incinerators. It was one of the busiest harbors in the United States, and it was a center for petroleum-based products, grain, and shipbuilding and repair. Figure 1 is a historical photograph of the Canal, a principal hub for transportation and industry in Brooklyn.


**Figure 1: Photo of Gowanus Canal (ca. 1928)**

14.     A number of shipyards also operated proximate to the historic Canal. Their operations included constructing, repairing, and converting vessels at five major shipyards: 1) Court Street Facility/Yard; 2) Tebo Yard; 3) 20th – 21st Street Yard; 4) 27th Street Yard; 5) Poillon/Clinton Dry Docks; and 5) Erie Basin Yard (collectively, the "Gowanus Shipyards"). Figure 2 shows this work on larger vessels.



**Figure 2: Photo of Larger Vessels at the Gowanus Shipyards (ca. 1948)**

15.     Brooklyn's extraordinary growth produced extraordinary residential, commercial, and industrial waste streams. The Canal was a cheap, expedient, and conveniently located open sewer for these combined waste streams.

16.     Prior to 1967 when limited pollution measures were first introduced, the municipal sewers carried into the Canal—without removal or treatment—a mixture of wastes, including human and horse wastes, industrial waste streams, and the soot and grit of Brooklyn's streets from gutters and stormwater sewers. Figure 3 depicts the sewershed showing the area of Brooklyn that eventually discharges into the Canal, both in the past and today.



**Figure 3: Gowanus Canal Sewershed**

## The Role of Manufactured Gas Plants in the Development of Brooklyn and the Canal

17.     In the nineteenth century, manufactured gas lighting and heating were by far the cleanest and safest alternative to the other available technologies—coal or wood fires and candlelight or oil lamps. Municipal gas service meant greatly reduced soot and smoke, modern streetlamps, and reliable, safe, and consistent fuel for heating and cooking. However, during Brooklyn's explosive growth in the nineteenth century, numerous separate gas companies competed for the same customers in the same neighborhoods by laying overlapping pipes and building multiple adjacent plants. Thus, by the 1890s, there were three gas plants on the Gowanus Canal, owned and operated by three different companies. Brooklyn Union was formed to acquire the gas manufacturing and distribution assets of these three separate companies and to rationalize gas service for Brooklyn by consolidating their operations.

18.     The MGP process converted coal and other hydrocarbon feed stocks into gas, which resulted in byproducts containing PAHs. These byproducts were not a waste, however; they were

viewed as a commercially valuable product, such as tars. Accordingly, Brooklyn Union's plants captured these products and re-used them as feed stocks and fuel for the same manufacturing process that produced them. Brooklyn Union also sold these products to local third parties who used tar as raw materials for their own distilled tar products.

19.     Because of the value of these products, Brooklyn Union used the available technologies of the time to extract and capture these byproducts from its waste streams, using settling tanks, tar separators, and storage tanks. Although such methods were the state of the art then and remained the state of the art even until the last part of the 20th century, the technology was far from perfect. Brooklyn Union does not dispute that, through the discharge of wastewater and likely through leaks and spills, its historical operations contributed to the PAH contamination in the Canal.

20.     Brooklyn Union's MGPs began shutting down in the early twentieth century:  One was shut down by Brooklyn Union as early as 1928; the second was shut down in 1936; and the third and last plant ceased operations in 1955, nearly 70 years ago.

21.     But other industrial operations continued in the following decades, until the 1970s and 1980s, at which time barge traffic on the Canal and manufacturing along the Canal greatly diminished. In the decades to come, this would allow for redevelopment of the Gowanus neighborhood for residential, retail, and commercial mixed uses, a transition that is still ongoing.

**Brooklyn Union Has Taken a Proactive Response to Remedying Other Responsible Parties' Contamination of the Canal**

22.     Brooklyn Union brings this lawsuit to seek the Court's help to ensure that the cleanup of the Canal proceeds on schedule, with an equitable allocation of costs among all of the PRPs.

23.     Figure 4 is a photograph showing barges and equipment being used to remediate the Canal in the fall of 2021.



**Figure 4: Photo of Canal Remediation Underway (2021)**

24.     At the Site, US EPA performed the Remedial Investigation and Feasibility Study ("RI/FS") in just two years. At most Superfund sites, by contrast, this investigation and study is undertaken by one or more PRPs—not US EPA. After the RI/FS at the Site, US EPA issued the ROD, in which it identified and explained the cleanup that will be used at the Canal. US EPA's speed in pushing through the CERCLA process is not typical for a Superfund site and reflects the Agency's sense of urgency to clean up the Canal.

25.      The contamination of the Canal has created a many-foot-thick layer of sludge in the upper sediment layers of the Canal bed that lie on top of the native soils. US EPA's ROD requires dredging and off-site disposal of this sludge (measuring ~700,000 cubic yards).

26.     The sheer volume of the surface and soft sediments is the primary driver of the remediation costs. In the ROD, US EPA determined that the soft sediments contain hazardous contaminants that must be removed from the Canal, including PCBs, because of their threat to human health. These hazardous substances result from the parties sued in this Complaint. US EPA also concluded that contaminated sewer sediments generally constitute the upper layer of soft sediments.

27.     Beneath the surface and soft sediments are native soils that US EPA has determined do not require excavation. Instead, the contaminated native soils are being left in place and covered with an engineered cover or cap that will be laid after the surface and soft sediments are removed. In some portions of the Canal in-situ stabilization ("ISS") with concrete will be used to bind the contaminants and stabilize the native soils beneath the cap. The cap is designed to be "armored," so that future deposits of contaminated sediments can be excavated without damaging the cap or disturbing the native sediment underneath.

28.     Figure 5 illustrates the selected remedy for the native soils, including ISS and the armored cap required to withstand future dredging.



**Figure 5: Diagram of ISS and Armored Cap Required by US EPA to Remediate the Native Soils**

29.     In order to dredge the contaminated sediments, the cleanup entails stabilizing or replacing the bulkheads that support the banks of the Canal. Many of the Canal's bulkheads have not been replaced since the original wood structures were built in the nineteenth century, and they are badly degraded or non-existent. The new bulkheads are not designed as a remedy for contaminant migration; they are not impermeable barriers. Rather, they are part of the remedy only because the extensive dredging of the upper sediments will further destabilize the old bulkheads and the structural integrity of the Canal.

30.     Any current owner of a property bordering the Canal would, even absent environmental concerns, need to replace the failing current bulkheads to be able to develop and use the land safely. The ROD requires these bulkhead improvements. The new bulkheads will materially enhance the value of the properties abutting the Canal and facilitate their development.

31.     Brooklyn Union is leading the way to clean up the Canal and transform the Gowanus neighborhood into a vibrant and growing community for arts, culture, and commerce for future generations. But Brooklyn Union cannot carry the lion's share of the costs. An equitable allocation of financial responsibility among the Defendants is necessary to fund this cleanup and will finally, after 150 years, align the benefits, costs, and responsibilities of the private and public stewards of Brooklyn's current and future prosperity consistent with prudent environmental policy and the best interests of those who live and work in the Gowanus neighborhood. An equitable allocation will best ensure that the cleanup of the Gowanus Canal will be maintained well into the future.

## JURISDICTION AND VENUE

32.     This Court has original subject matter jurisdiction over Brooklyn Union's CERCLA claims pursuant to 28 U.S.C. § 1331 and 42 U.S.C. § 9613(b).

33.     This Court has supplemental jurisdiction over Brooklyn Union's state law claims pursuant to 28 U.S.C. § 1367(a) because the state law claims arise out of the same case or controversy as the CERCLA claims.

34.     This Court has authority to issue a declaratory judgment action against the Defendants pursuant to 28 U.S.C. § 2201 and 42 U.S.C. § 9613(g)(2).

35.     Venue is proper in the Eastern District of New York pursuant to 42 U.S.C. § 9613(b) and 28 U.S.C. § 1391(b) because releases of hazardous substances have occurred in this District.

36.     A copy of this Complaint has been provided to the Attorney General of the United States and to the Administrator of the US EPA in accordance with Section 113(l) of CERCLA, 42 U.S.C. § 9613(l).

## **PARTIES**

37.     Plaintiff The Brooklyn Union Gas Company d/b/a Brooklyn Union New York ("Brooklyn Union") is a local public utility servicing Brooklyn, New York, a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of New York, and a "person" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

38.     Defendant Consolidated Edison Company of New York, Inc. ("Con Edison") is a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of New York.

39.     Defendant the City of New York is a municipal corporation with its principal place of business in New York City. The City and its Department of Environmental Protection, Department of Sanitation ("City DoS"), Department of Citywide Administrative Services, Department of Transportation ("City DoT"), Fire Department, Police Department, Department of Parks and Recreation, and Department of Small Business Services are or have been departments, agencies, or instrumentalities of the City.

40.     Defendant the United States of America and its Department of Defense, Department of the Navy, Department of the Army, Coast Guard, Federal Maritime Commission, as well as its historic agencies such as the Maritime Administration, the War Shipping Administration, the

Defense Plant Corporation, and the Military Sea Transportation Service, are or have been departments, agencies, or instrumentalities of the United States (collectively, the "Federal Shipyards Defendants").

41.     Defendant the United States Postal Service ("USPS") is a department, agency, or instrumentality of the United States.

42.     Defendant the United States General Services Administration ("GSA") is a department, agency, or instrumentality of the United States.

43.     Defendant Astoria Generating Company, L.P. ("Astoria") is a limited partnership organized and existing under the laws of the State of Delaware with its principal place of business in the State of New York.

44.     Defendant Ballantyne Legacy Holdings, LLC ("Ballantyne") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in the State of Delaware.

45.     Defendant Bayside Fuel Oil Corporation ("Bayside") is a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of New York.

46.     Defendant Beazer East, Inc. ("Beazer") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of Pennsylvania.

47.     Defendant The Brink's Company ("Brink's") is a corporation organized and existing under the laws of the State of Virginia with its principal place of business in the State of Virginia.

48.     Defendant Brooklyn Improvement Company ("BICO") is a corporation incorporated through a charter granted by the New York State Legislature on April 30, 1866, with its principal place of business in the State of New York.

49.     Defendant Dun and Bradstreet Corp. ("D&B") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of Florida.

50.     Defendant Hess Corporation ("Hess") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of New York.

51.     Defendant The Kraft Heinz Company ("Kraft") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of Pennsylvania.

52.     Defendants MCIZ Corp., 36-2nd J Corp., 15 Second Avenue LLC, and 107 Sixth Street LLC (collectively, the "MCIZ entities") are all corporations or limited liability companies organized and existing under the laws of the State of New York with their principal place of business in the State of New York.

53.     Defendant Metropolitan Transportation Authority ("MTA") is a public benefit corporation chartered by the New York State Legislature under the Metropolitan Transportation Authority Act, N.Y. Pub. Auth. Law § 1260 *et seq*.

54.     Defendant MRC Holdings, Inc. ("MRC") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of Maryland.

55.     Defendant New York City Economic Development Corporation ("NYCEDC") is a nonprofit economic development organization, organized under the laws of the State of New York with its principal place of business in the State of New York.

56.     Defendant New York City Industrial Development Agency ("NYCIDA") is an industrial development agency, organized under the laws of the State of New York with its principal place of business in the State of New York.

57.     Defendant New York City Transit Authority ("NYC Transit") is a public benefit corporation chartered by the New York State Legislature under N.Y. Pub. Auth. Law § 1200 *et seq.*, a subsidiary of the MTA.

58.     Defendant NL Industries, Inc. ("NL") is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in the State of Texas.

59.     Defendant Northville Industries Corporation ("NIC") is a corporation organized and existing under the laws of the State of New York, with its principal place of business in the State of New York.

60.     Defendant Phillips 66 Company ("Phillips") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of Texas.

61.     Defendant Power Authority of the State of New York ("NY Power Authority") is a public benefit corporation chartered by the New York State Legislature under the Power Authority Act, N.Y. Pub. Auth. Law § 1000 *et seq.*

62.     Defendant Puget Sound Commerce Center, Inc. ("Puget Sound") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in the State of Washington.

63.     Defendant Rexam Beverage Can Company ("Rexam") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of Colorado.

64.     Defendant SPX Technologies, Inc. ("SPX") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of North Carolina.

65.     Defendant Stauffer Management Company, LLC ("Stauffer") is a limited liability company organized and existing under the laws of the State of Delaware with its principal place of business in the State of Delaware.

66.     Defendant TDA Industries, Inc. ("TDA") is a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of New York.

67.     Defendant Texaco, Inc. ("Texaco") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in the State of California.

68.     Defendant Union Oil Company of California ("Unocal") is a corporation organized and existing under the laws of the State of California with its principal place of business in the State of Texas.

69.     Defendant Verizon New York Inc. ("Verizon") is a corporation organized and existing under the laws of the State of New York with its principal place of business in the State of New York.

70.     All of the Defendants named in Paragraphs 38 through 69 are "persons" within the meaning of CERCLA § 101(21), 42 U.S.C. § 9601(21).

# DEFENDANTS' OPERATIONS

71.  **Consolidated Edison Company of New York, Inc.** Predecessors of Con Edison owned and operated at multiple locations on the Canal, including: 1) The Third Avenue Yard (Block 968, Lot 1) (1925 to the present); 2) the (at least) 1,290 underground vaults and manhole sewer connections; 3) the Gas Turbine Generator Station ("GT Station") (Block 653, Lot 7) and the Gowanus Substation ("Substation") (Block 653, Lot 3); and 4) 233 Nevins Street (the "Nevins St. Site").

72.  **Third Avenue Yard**.

(a)  **Operations.** Over the years, Con Edison's operations at Third Avenue Yard have included 1) equipment and material storage yards; 2) storerooms for field crews, truck drivers, and heavy equipment operators; 3) a Flush Truck Facility; 4) a Vehicle Maintenance Garage; 5) a Vehicle Storage Garage; and 6) a Fuel Dispensing Station. In 1947, Con Edison began using an earthen pit at the Third Avenue Yard to dump untreated chemical-containing wastes collected from manholes and vaults directly to the Canal without prior treatment. In 1974, Con Edison replaced the dumping pit with a "Flush Truck Facility," but the new feature continued to discharge chemical wastes to the City sewers. The central portion of the Third Avenue Yard was used for fuel dispensing. Two USTs were located on the northern portion of the Third Avenue Yard ("North UST Area") and two were located in the southeastern ("South UST Area") portion of the Third Avenue Yard. The North UST Area contained two 2,500-gallon USTs that stored gasoline and diesel. The South UST Area contained two 4,000-gallon USTs. One stored gasoline, and the second originally stored gasoline and was converted to diesel in 1996. The storeroom and shop, more recently referred to as the Main Service Building, is located on the western side of the property. This area has been used for storage and warehouse purposes,

including the storage of hazardous substances including oils and PCBs. Con Edison also has an area located to the east of the Main Service Building where it stores cable, electrical equipment, and transformers returned from the field.

(b) **Hazardous Substances.** Con Edison conducted hazardous waste-generating activities at the Third Avenue Yard, including the storage and generation of PCB waste, PAHs, VOCs, SVOCs, metals, and LNAPL.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system; and 2) seepage. Con Edison's Third Avenue Yard had a total of 21 connections to the sewer system, all of which discharged untreated to the Canal during overflow events. Twenty of the sewer connections were made prior to the installation of Con Edison's waste pit in 1947. The chemical wastes were discharged to floor and stormwater drains and conveyed to combined sewers, which released to the Canal. The dumping pit at the property contained connections to the sewer system in the southwest corner of the storage yard, which conveyed chemical flows to a combined sewer on Third Avenue that flowed to the Canal. Overall, the Third Avenue Yard has received at least thirty-two notices of violation for its discharges. Contamination from the facility also reached the Canal through seepage. Environmental investigations at the Third Avenue Yard have revealed the presence of hazardous substances including PCBs, PAHs, copper, and lead in soils. Groundwater investigations have revealed the presence of hazardous substances including PAHs, copper, lead, and NAPL. Upon information and belief, groundwater from the property, including contaminated groundwater, discharges to the Canal.

73. **Con Edison's Immense Underground Infrastructure.**

(a)  **Operations.** Con Edison has had an underground network of hundreds of transformers, vaults connected to the sewer system that discharge water and solids without treatment, miles of cabling, and numerous electrical devices that contain PCBs, all of which discharged those PCBs and other contaminants directly into the Canal's sewershed. Much of this infrastructure, including vaults and manhole sewer connections, remain throughout the Gowanus sewershed and connected to the sewer system to this day.

(b)  **Hazardous Substances.** The wastes in Con Edison's underground system contain lead, oil, copper, PAHs, and PCBs.

(c)  **Pathways.** Upon information and belief, Con Edison's vaults and sewer connections released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) seepage. Con Edison's predecessors made the first sewer connection from one of its underground vaults in 1914. Sewer records indicate that between 1914 and 1956 Brooklyn Edison and/or Con Edison arranged for at least 564 connections to the City sewer system within the Canal Sewershed. As of 1995, CH2M Hill estimated that approximately 200,000 to 275,000 gallons per day were removed from underground structures throughout Con Edison's system, a substantial portion of which ultimately discharged to the Canal. These operations impacted the Canal in at least four ways:

- **Releases directly from underground structures to the sewer system**. Con Edison's underground structures can be divided into two categories: 1) structures that had "hard-piped" connections to the sewer; and 2) structures that are "manually pumped" by workers. The underground structures with hard-piped

connections to the sewer are straight forward—the transformer vaults were fitted with sump pumps that automatically pumped the liquid content in the underground structures to sewers when it reached a certain level in order to protect the distribution network or by gravity flow method. Other underground structures without hard-piped connections were routinely pumped.

- **Releases to the sewers from the Flush Truck Facility after wastewater from underground structures is transported to the Third Avenue Yard.** Con Edison operates a fleet of trucks for manually pumping wastes from the underground structures. Beginning in 1947, wastes were collected in this manner from underground structures in Brooklyn and Staten Island and were taken to the Third Avenue Yard for release to the Canal.

- **Releases to the sewers from underground structures when a truck's capacity was exceeded**. Prior to the mid-1990s, if the underground structures contained large amounts of water and exceeded the truck's storage capacity, Con Edison's employees released the excess wastewater into the nearest catch basin in the City's sewer system.

- **Releases (spills) from trucks to the sewer system.** Overflows also occurred from the trucks, and, historically, these overflows were also discharged to the sewer system.

In addition, groundwater infiltration has been documented in the distribution system and seepage is another pathway for contaminant migration from Con Edison's subsurface infrastructure to the Canal in areas where groundwater is expected to discharge to the Canal.

74. **The Gas Turbine Generator Station and Gowanus Substation.**

(a)     **Operations.** The Gas Turbine Generator Station and the Gowanus Substation is located between 25th and 28th Streets. After it acquired the GT Station and Substation in 1964, Con Edison demolished some of the existing structures on it, including sheds, an elevated coal trestle, several brick buildings, and one 1,200-gallon diesel oil tank. Con Edison began construction of the GT Station and the Substation sometime between 1964 and 1971. The two facilities began operating in 1971. Con Edison sold the GT Station to Astoria Generating Company in August 1999. Con Edison still owns and operates the Substation.

(i)     *GT Station Operations.* The GT Station extended into Gowanus Bay. The GT Station provided backup electrical power to various areas of the City during times of peak power use. The GT Station included an operations building, floating gas turbine barges, and oil barges, which were moored to the piers that extend into the Creek between 26th and 27th Streets. The GT Station specialized in the receipt of fuel oil by tanker and barge for plant consumption, mooring gas-turbine generators, and fueling barges. Fuel oil was received on the upper side of the upper pier extension. Two 215- by 80-foot gas-turbine barges moored on each side at breasting platforms. Two 210- by 40-foot fuel storage barges—with a total capacity of between 71,400 and 95,200 barrels—moored at the facility, with one moored on the upper side and one on the lower side. One 10-inch fuel-oil pipeline with a 6-inch hose connection divided into two 8-inch pipelines, which extended to each fuel storage barge. Six-inch pipelines extended from the fuel storage barges to the gas-turbine barges. The piping, conduits, and other utilities associated with the gas turbine operations were located underground, but Con Edison began relocating these features above ground in 1998.

(ii)    ***Substation Operations.*** The Substation occupies approximately 13.1 acres. The Substation distributes electrical power to Queens, Brooklyn, Manhattan, and Staten Island. It includes air-core reactors, phase-angle reactors, transformers, regulators, diesel generators, and pump houses. PCB fluid piping and electrical transmission lines from transformers and reactors are located underneath the Substation.

(b)    **Hazardous Substances.** Upon information and belief, petroleum products stored, loaded, and unloaded at the GT Station and Substation contained a mixture of hazardous substances, including VOCs, PAHs, and metals. Residuals from tank clean-outs contain contaminated liquids with oils including benzene, cyclohexane, ethylbenzene, toluene, 1,2-4-Trimethylbenzene, and xylene. Upon information and belief, the tank clean-out water was released to the Gowanus Bay. Tank bottom sludge contained the VOCs, PAHs, and metals, specifically the hazardous constituents of the products stored in the tank. Stormwater contains oils, VOCs, PAHs, heavy metals, and PCBs.

(c)    **Pathways.** Upon information and belief, the Gas Turbine Generator Station and the Gowanus Substation released hazardous substances to Gowanus Bay through 1) direct discharge via stormwater and surface runoff and connections to private outfalls; 2) seepage; and 3) in- and over-water operations. The Gas Turbine Generator Station and the Gowanus Substation were not connected to the sewer; however, portions of the site were within the area of direct drainage to the Bay. Stormwater was released to the Creek and/or Gowanus Bay through numerous documented spills. Further, five additional outfalls were identified during a NYCDEP survey that showed connections from the site to Gowanus Bay. Between 1977 and 1996, over twenty documented releases of oil, lube oil, #2 and #6 fuel oil, paint, and antifreeze ultimately entered the Creek and/or Bay from the GT Station. Upon information and belief,

contamination from the Substation also reached Gowanus Bay through seepage because both soil and groundwater at the Substation are contaminated with hazardous substances including PCBs, PAHs, copper, and lead. Groundwater at the Substation fluctuates with the tide, and groundwater flows beneath the Substation to the northwest toward Gowanus Bay. Finally, barges were used to transfer product at the bulkhead and allowed for spills and releases directly to the Bay.

75.     **The Nevins Street Location.**

(a)     **Operations.**  Con Edison purchased the Nevins Street Location to construct and operate a substation on or about March 20, 2007. In December 2008, Con Edison removed 315 kilograms of hazardous waste from the Nevins Street Location in preparation for demolishing the three-story building on the property. A substation was never constructed, however. Prior to Con Edison's ownership, former operations at the property included those of a dye manufacturer and paper manufacturer.

(b)     **Hazardous Substances.**  Upon information and belief, the former dye and paper manufacturing operations generated ignitable, corrosive, and reactive materials, and waste containing lead (including lead-acid batteries), chromium, chlordane, methyl isobutyl ketone, acetone, and chloroform, which contained numerous hazardous substances, including PAHs, copper, and lead.

(c)     **Pathway.**  Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via stormwater runoff, connections to the sewer system, and seepage. Prior to its demolition in 2008, there were several floor drains throughout the building, which discharged to the City's sewer system. In addition, as of 2009, the facility was covered with gravel, and surface water that does not soak into the ground has had the continuous potential to run-off the property and discharge into the combined sewers. There also

were at least seven city sewer connections from the site, all of which discharged to the City's combined sewer system. In addition, the property is located in the Red Hook Wastewater Pollution Control Plant service area, and the overflow point for the combined sewers in this area flows to the Canal at RH-034 and RH-033. Environmental investigations at the Nevins Street Location have revealed the presence of hazardous substances including PAHs, copper, and lead in soils. Groundwater investigations have revealed the presence of hazardous substances including PAHs and lead. Upon information and belief, groundwater from the property, including contaminated groundwater, discharges to the Canal.

76. **City of New York.** The City and its predecessor, the City of Brooklyn, as well as through the City's Department of Environmental Protection, Department of Citywide Administrative Services, City DoS, City DoT, Highway Department, Fire Department, Police Department, Department of Parks and Recreation, and Department of Small Business Services have been involved in the development and use of the Canal from its inception to the present day. As a result of this involvement, the City's history is inseparable from the story of the Canal's rise to an industrial waterway and its resulting degradation, and ultimately, its declaration as a Superfund site. The City's liability for the Canal's contamination arises from at least four separate operations:

- The City "has been the owner and operator of the Canal since its construction"[1] and owns the "bottomlands" of the Canal.[2]

- The City has used the Canal as a means to dispose of billions of gallons of sewage, industrial, and other wastes, which have settled to the bottom of the Canal.

---

[1] *See, e.g.,* City UAO, ¶ 8.
[2] RTA1 UAO, ¶ 8 ("The Canal bottomlands are owned by the City.").

- The City has used wastes to fill marshlands along the Canal and operated dumps and incinerators adjacent to the waterway for more than 80 years.

- Various City departments, agencies, and instrumentalities have conducted operations at numerous sites along the Canal, which have allowed releases (and the resulting contaminants) from City activities to reach the Canal through a number of pathways, including, but not limited to, surface runoff, seepage, sewer discharges, CSO discharges, stormwater, and airborne particulate deposition. These pathways have conveyed contaminants to the Canal, including heavy metals, PAHs, PCBs, VOCs, and SVOCs.

77. Sites that the City owned and/or operated proximate to the Canal included, but are not limited to:

- The Canal: The City of Brooklyn assisted with the development of the Canal from about 1853 until about 1870—today, the City owns the contaminated bottom of the Canal;

- Sewers and CSOs: The City constructed the sewers, combined sewer outfalls, and stormwater pipes which release to the Canal. The City was, and continues to be, responsible for the operation of the sewers, combined sewer outfalls, and stormwater pipes;

- The Flushing Tunnel and Pumping Station at the Head of the Canal (Block 411, Lot 14) from about 1911 to the present;

- The BRT Powerhouse and Coal Yard at Third Avenue and 153 Second Avenue, between First Street Basin and Third Street (Blocks 967 and 972) from about 1940 through about 1986;

- The Municipal Asphalt Plant at Seventh Street Basin (Block 990, Lot 269 (portion)) from about 1906 through about 1926;

- The Municipal Asphalt Plant at 416-462 Hamilton Avenue (Block 625, Lot 2) from about 1924 through the present;

- The Waterfront Dump and Incinerator at 488-500 Hamilton Avenue (Block 625, Lot 2) from about 1928 through the present;

- The City DoS District 2 Garage and Storage Property 15 Second Avenue (Block 979, Lot 31) from about 1957 through about 1995;

- The City DoS Garbage Truck Parking Area at 2 Second Avenue from about 1993 through the present;

- The City Pipe Yard at 627 Smith Street (Block 493, Lot 1) from about 1868 through about 1890;

- The Storage Yard at head of the Canal at 226-238 Nevins Street (Block 411, Lots 14 and 24) from about 1890 through about 1972;

- City DoS, Brooklyn South District 6 Garage at 127-129 Second Avenue (Block 1020, Lot 1) from about 1991 to the present;

- The City Dumping Platform at the Sixth Street Basin (Block 990, Lots 138, 151, 153, and 369), from about 1892 through about 1924;

- The Police Department Auto Repair and Garage, 280-286 Hamilton Ave. (Block 625, Lot 2), owned from about 1950 through the present and operated from about 1950 to 1993;

- The Smith St. Powerhouse, 509-513 Smith St. (Block 480, Lots 8 and 34) from about 1940 through the present, with a portion of the property, now referred to as Lot 8, sold in 1961;

- The Brooklyn Rapid Transit Facility, 7 9th St. (Block 477, Lot 1) from about 1930 through the present;

- The South Brooklyn Marine Terminal ("SBMT") (Block 662, Lot 1), which the City acquired between 1905 and 1908, then expanded its holdings in 1959, and continues to own today;

- The 23rd St. Pier (Block 644, Lots 1 and 50), from about 1958 through the present;

- The 25th St. Pier (Block 644, Lot 109; Block 653, Lot 103), from about 1966 through the present;

- 425 Smith St. and 435 Hoyt St. (Block 471, Lots 1 and 100), from about 1975 through the present; and

- City Contractor's Yard, 575-577 Smith St. (Block 483, Lot 1), from about 1940 through 1965.

78. **History of the Canal.** The southwestern area of Brooklyn initially consisted of a low-lying swampy area that was home to some of Brooklyn's earliest industries, known as tide mills. Several dams and mill ponds were constructed in the swamp lands, which were generally too shallow for navigation. In 1849, the New York Legislature passed an act authorizing the City of Brooklyn to layout and construct the Canal. The Brooklyn Common Council commissioned plans to construct a canal that would "open the area to barge traffic, flush away sewage, receive storm water and fill the adjacent lowlands for development."

79.     When the City of Brooklyn initiated construction of the Canal in 1853, it had two primary goals: 1) to provide drainage for a 1,700 acre-marshy area to make it fit for use and development; and 2) to turn the Canal into a navigable waterway to support commercial activity. The City's construction of the Canal to provide drainage for the 1,700-acre marshy area turned the Canal into a giant sewer and an extension of the sewer operations.

80.     According to US EPA, "[a]s a result of the 1849 legislation, [the City], successor in interest to the City of Brooklyn, has been the owner and operator of the Canal since its construction." City UAO, ¶ 8. The City still owns the contaminated bed of the Canal, as stated by US EPA in Paragraph 8 of the RTA1 UAO.

81.     **Sewers, CSOs and Stormwater Releases.** The timing for the development of the Canal coincided with Brooklyn's program to develop a city-wide sewer system. Shortly after construction of the Canal was completed, the Brooklyn Board of Health noted that with no inlet at the head of the Canal, "its waters with all their poisonous ingredients and feculent admixtures rise and fall with the tide, moving downward only enough to make room for the sewage that flows in behind. It has thus become a huge open sewer."[3] Efforts to address the problem first involved construction of "overflow sewers" on the Canal. The overflow sewers did little to improve conditions. Many studies (including studies conducted in 1906, 1908, 1911, 1914, 1916, 1938, and even 1983) have found that the sewers had inadequate capacity and continued to overflow industrial and sanitary wastes to the Canal during dry weather.

82.     US EPA has determined that discharges from the City's combined sewer outfalls contain CERCLA hazardous substances, which are discharged directly to the Canal:

---

[3] Brooklyn Board of Health, *The Report of the Board of Health of the City of Brooklyn*, 1875-1876, at p. 50.

Sampling by EPA, Brooklyn Union and [the City] documented that discharges from [combined sewer outfalls], particularly solids, contain CERCLA hazardous substances, including VOCs, PAHs, PCBs, pesticides and metals. In CSO solids from the four major outfalls (RH-034, RH-035, OH-007, and RH-031), total PAHs levels range from 4 – 185 milligram/kilogram ("mg/kg"), while copper and lead levels range from 94 – 2,286 mg/kg and 74 – 2,086 mg/kg, respectively. These are produced by a variety of sources, including but not limited to household and industrial discharges to the sanitary sewers and contaminated stormwater captured by storm drains. In addition, after discharge to the Canal, CSO solids adsorb and concentrate other hazardous substances released to the Canal, further impacting sediment contaminant levels.

City UAO, ¶ 34.

83. **The Flushing Tunnel and Pumping Station**. The City constructed a "Flushing Tunnel" in 1911 between Buttermilk Channel and the Canal to flush out accumulated pollutants and increase the velocity of flows in the Canal. Despite the Flushing Tunnel, the heavier deposits of sewage entering the Canal near the sewer outlets could not be moved.

84. Continuous dry weather discharges continued at the head of the Canal, so in 1947 the City constructed the Gowanus Pump Station at the head of the Canal to pump the discharges to the Bond Street interceptor. The attempt failed because solids deposited in the sewer as a result of shallow pipe slope and tidal inflow left the Bond-Lorraine Street sewer with inadequate capacity. As a result, flow from both the local drainage area and the Gowanus Pumping Station continued to overflow into the Canal through at least the 1980s.

85. The City's Flushing Tunnel brought fresh water to the Canal, but did nothing to address the cause of the underlying problem: the vast amount of discharge from the sewer system. In fact, the Flushing Tunnel "solution" simply relocated wastes within the Canal. To this day, the Tunnel operates by moving somewhere between 150 and 325 MGD, operating in both directions, drawing water either from Buttermilk Channel or the upstream end of the Canal. As a result, the Flushing Tunnel has pulled contamination into the Canal, pushed contamination towards the East River, and generally stirred up and redistributed contaminated sediments.

86.     Because of this continued problem, US EPA required the City alone to undertake the work outlined in the City UAO. This included building two CSO retention tanks to "control contaminated solids discharges from [combined sewer outfalls]." City UAO, ¶ 1. The tanks have not yet been built and are not expected to be fully functional until well after the clean-up is complete.

87.     The City sewers, collectively with the infrastructure related to the sewers, have been the largest single contributor of waste volume to the Canal, and have re-distributed the resulting contaminants, as well as those contaminants already in the Canal, throughout the Canal.

88.     **The BRT Powerhouse and Coal Yard (322 Third Avenue/153 Second Avenue)**.

(a)     **Operations.** At the start of the twentieth century, the Brooklyn Rapid Transit ("BRT") Railroad built the BRT Powerhouse on the shores of the Canal to increase the capacity power for BRT's power lines. Operations began in 1904. Block 967 was used for a power house that had eight 4,000-horse power engines, several turbines, and a two-stack, forced-draft boiler system, which was supplied by water pumped in from the Canal. Block 972 was used as a coal yard that could store up to 100,000 tons of coal. The coal was conveyed through a tunnel that ran underneath the pile of coal from the Canal to the Powerhouse. Drainage and intake systems were installed underground and operated through various underground pipes and structures. A trap was opened under the pile of coal and conveying buckets were filled and transported directly to the boiler rooms. The plant discharged its boiler wastewater directly to the First Street Basin.

(b)     The City acquired Block 967 and Block 972 in 1940 and became the owner and operator of the transit lines. By 1950, the NYC Board of Transportation operated

these transit lines and leased a portion of Block 967 to a lumber yard company to store and renovate steel drums.

(c)     By 1953, Defendant New York City Transit Authority ("NYC Transit"), a public benefit corporation, was created and began running the transit lines, used the site as an electrical substation and switching yard, and leased the property surrounding the substation to a scrap metal business for storage. The United States Army Corps of Engineers ("USACE") issued NYC Transit a permit in 1956 to fill in part of the First Street Basin. When USACE inspected the permitted work in 1963, it found that the entire basin was filled in, not just the portion authorized under the permit. NYC Transit informed USACE that the City had filled the basin according to the permit, but an unknown party had filled the rest of the basin. The City had also filled in the main coal tunnel previously used to transport coal from the Canal to the Powerhouse.

(d)     During its ownership, the City demolished various structures on the property, including the boiler house and the 125-foot tall smokestack. Following this demolition, the City re-graded portions of the site with fill materials and left remaining structures and other objects on-site, including storage tanks used to refuel boats on the Canal. The City did not decommission certain underground structures, however, including two lateral discharge tunnels that connected to the municipal sewer system and were used to store and move contaminants at the facility. The coal operations ceased on Block 972 by 1950. The City sold Block 972 consisting of three Lots 1, 43, and 58 in 1956. The City held the mortgage on Lots 1 and 43 until 1966 when the City assigned the mortgage to the City Employee's Retirement System in 1966. The retirement system assigned the mortgage to a private party in 1967. In 1968, NYC Transit came under Defendant MTA. Throughout the period of NYC Transit's and MTA's operation of the BRT Powerhouse, the trains continued to run, and the transit lines operated for passengers

without disruption. The City sold Block 967, Lot 1, upon which the substation sat in 1975, but retained the mortgage until 1986. The City sold the remainder of Block 967 consisting of Lot 24 in 1986.

(e)     **Hazardous Substances.** During the City's, NYC Transit's, and MTA's ownership and operation of the facility, and, consistent with industry practice of the time, PCBs were used as dielectric and coolant fluids in transformers in the electrical substation and power house. The parties also stored significant amounts of coal on-site, which contained various hazardous substances including PAHs, lead, copper, iron, aluminum, nickel, and trace metals. On January 17, 2020, plaintiffs Gemini Arts Initiative, Inc., and Powerhouse LLC, a charitable arts organization, and the current owner of the BRT Powerhouse, sued the City for over $20 million for clean-up costs at the BRT Powerhouse. Cleanup at the site will address PCBs, NAPL, PAHs, lead, and copper contamination. The parties settled in February 2021.

(f)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; 2) seepage; and 3) in- and over-water operations. First, when the City acquired the property in 1940, there were two connections to the sewer system, and the City made a third connection in 1959. All of these connections ultimately discharged to the Canal during storm overflow events. In addition, the discharge tunnels discharged directly to the Canal. A 2005 reconnaissance of the Canal also identified ten unpermitted and/or private outfalls along the site's bulkhead, which discharged directly to the Canal. Contamination from the site also reached the Canal through seepage. Several environmental reports have been prepared for the BRT Powerhouse and coal yard and indicate that the City's, NYC Transit's, and MTA's operations all contaminated the site. These reports

identified several environmentally sensitive and contaminated areas of the site, including the area adjacent to the intake tunnel used to transport cooling water from the Canal to the site. Soil at the site contains hazardous substances including NAPL, PAHs, PCBs, lead, and copper. Groundwater at the site contains hazardous substances including PAHs, PCBs, copper, and lead. Runoff from the site flows to the Canal, and on-site precipitation infiltrates to the water table in the unpaved portion of the site. In 2016, the bulkhead was reported to be in need of repair to limit PCB migration to the Canal. Recent site investigations and environmental reports have revealed significant PCB contamination in several areas of the site, including (a) in the soil, fill, and building materials located in below-grade areas of the power house and the boilers; (b) in the area around the coal tunnel; (c) in and around the lateral discharge tunnels to which the site was connected and which discharged PCB-contaminated water directly into the Canal; and (d) in the former intake structure and intake tunnel, which transported cooling water from the Canal to the site. Sampling results for the former First Street Turning Basin indicated the presence of hazardous substances including NAPL, PAHs, PCBs, copper, and lead within the fill. Groundwater sampling results also identified the presence of hazardous substances including PAHs, PCBs, copper, and lead. One environmental report for the BRT Powerhouse stated that contaminated sediments were believed to have been left in place when the basin was filled in. The basin is hydraulically connected to the Canal; therefore, the contaminants within the basin are an ongoing source of hazardous substances to the Canal. Finally, barges were used to transfer product at the bulkhead and therefore allowed for spills and releases directly to the Canal.

89. **Seventh Street Municipal Asphalt Plant.**

(a) **Operations.** In 1906, the City leased a portion of Lot 269 or Block 990 on the Seventh Street Basin, and the City's Highway Department constructed an asphalt plant on-

site. The plant had a multi-story building that housed three cylindrical melting tanks, driers, mixing drums, bucket elevators, and two mixing boxes. The elevators, driers, and mixers were steam powered. The tanks were supplied with fire boxes to heat the asphalt and oil with revolving agitators to keep ingredients properly mixed. The facility could produce 270 cubic feet ("cf") of asphalt surface materials and 100 cf of binding materials per hour with an average output of 1,500 square feet of finished pavement per day. The liquid asphalt material was delivered hot to a road crew using a dump wagon. Coal tars were used in road repair activities as a component of pavement filler mixtures. By 1912, the plant's production capacity expanded to 2,960 cubic feet of surface mixture per eight-hour day. Around 1915, the City erected of 52,800-gallon steel tank for the storage of liquid asphalt. In 1917, the City leased a 75 x 120 feet parcel of land adjacent to the plant (part of Block 990, Lot 369). The City had used an adjacent yard as early as 1916 and continued to use it through 1925 for the storage of materials such as asphalt paving blocks and asphalt sand.

(b)     **Hazardous Substances.** The City used a mixture of 60 pounds of liquid asphalt to every one pound of stone to manufacture asphalt. The asphalt contained residue oil at varying proportions. In 1907, the City used 100 parts asphalt to 29 parts oil. Upon information and belief, the City also used and stored coal tars.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and private outfalls; and 2) seepage. The Seventh Street Asphalt Plant was not connected to the municipal sewer during the plant's period of operation. Upon information and belief, industrial and sanitary wastes, sheet flow, and stormwater runoff were all discharged directly to the Canal. Contamination from the site also reached the Canal through seepage. Sampling results of the

nearby sediments identified elevated levels of PAHs and oil from and near the former asphalt plant. Upon information and belief, groundwater from the site, including contaminated groundwater, discharges to the Canal.

90.     **Hamilton Avenue Asphalt Plant**.

(a)     **Operations.** The City acquired a portion of Block 625 in 1924 and constructed the Hamilton Avenue Asphalt Plant on it by 1925. In 1995, the City added a fleet maintenance and repair shop at the site. Both facilities are currently active. In 1939, the City installed a paving unit that increased daily production from 450 to 600 tons of asphalt. The plant had a dust room, an open sand storage room, an open stone storage room, drier house, and mixing house, as well as two 60,000-gallon asphalt storage tanks and two 20,000-gallon storage tanks for fuel oil. The City also operated a garage at the site located along Hamilton Avenue and an equipment garage on the southeastern portion of the property. By 1942, the plant included a dump platform equipped with two steam locomotive cranes on a track running along the bulkhead, and the cranes were used to move cement, sand, stone, gravel, and crushed stone. One 8-inch asphalt pipeline and one 2.5-inch oil pipeline were used to transport the respective materials between barges and the tanks on-site. The plant remained the same until the mid-1970s when the City dismantled the old plant and built a new asphalt heating plant, which was operated by the City DoS until the 1990s. The City made major changes to the plant again in the early 1980s, installing a drum mixer with a maximum capacity of 280 tons per hour. Around 1990, the City installed a gas-fired industrial burner as part of the asphalt production equipment, which was replaced in 2014. In 1994, the City rebuilt the asphalt plant and also constructed a City DoT vehicle fleet maintenance and repair shop in 1995.

(b)     Since 1995, there have been two main operations at the site. First, the City DoT has operated the vehicle fleet maintenance and repair shop.  The fleet maintenance shop is located on the southeasterly portion of the site. The first oil-water separator was installed in 1998 and discharged to the sanitary sewer. The repair facilities are located in several indoor garage bays. Work is generally conducted in the facility, except during emergencies or when the vehicle or equipment is too large to fit into one of the bays. In those circumstances, the maintenance work is conducted outdoors in the yard area. In addition, the City DoT has operated the asphalt mixing plant for roadway repair and maintenance activities throughout Brooklyn. Around 1998, two new gas-fired building boilers were installed at the plant. Between 2010 and 2014, the City again rebuilt the asphalt plant. The plant had a Canal-side unloading area for aggregate delivery from barges; aggregate stockpiles; RAP stockpiles; portable crusher unit, mixing process, and emissions control units; asphalt cement / asphalt emulsion and cutback tanks; three heated silos containing hot mix asphalt; loading areas for transferring the hot mix to trucks; and 2,000-gallon AST used for biodiesel used for fueling. The garage bay housed a small fleet services operation, including four 275-gallon ASTs that store products associated with vehicle maintenance. The Hamilton Avenue Asphalt Plant currently has three 30,000-gallon ASTs for storing asphalt cement, one 15,000-gallon AST for storing emulsion (*i.e.* watered down asphalt cement), four 275-gallon ASTs for storing motor oil, transmission fluid, hydraulic oil, used oil, one 561-gallon UST for used oil which is tied to the oil-water separator for the fleet shop, and one 2,000-gallon AST for biodiesel used for fueling. When the City acquired the property, the buildings on it were connected to the sewer along Hamilton Avenue, which discharges to the Canal. When the plant was rebuilt in 1994, the City installed a new drainage system for the facility.

(c) **Hazardous Substances.** Upon information and belief, hazardous substances used and generated at the site include PAHs, VOCs, SVOCs, PCBs, and tar.

(d) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; 2) seepage; and 3) in- and over-water operations. Sanitary wastes, wastewater associated with the fleet garage (including the oil-water separator), and other wastewater discharged directly to the sewer and into the Canal. Surface discharge from the plant flows to the Gowanus Channel. Contamination from the site also reached the Canal through seepage. Soil and groundwater samples taken at the site during the dismantling and rebuilding of the plant in 1995 identified hazardous substances like PAHs in the site's soil and groundwater. In 2002, a NAPL plume containing a combination of hazardous substances, including diesel fuel and asphalt production materials (both of which contain PAHs), was identified at the site. Additional testing in 2010 indicated the presence of weathered #2 fuel oil and weathered diesel fuel. Upon information and belief, groundwater from the site, including contaminated groundwater, discharges to the Canal. There have also been several documented and reported spills at the site. And finally, barges were used to transfer materials including asphalt and fuel oil at the bulkhead, which allowed for spills and releases directly to the Canal.

91. **Waterfront Dump and Incinerator.**

(a) **Operations.** In 1928, the City approved the construction of the Waterfront Dump and Incinerator at 488-500 Hamilton Ave. (Block 625, Lot 2) adjacent to the Canal. The Waterfront Dump was a platform where 1) municipal wastes were delivered in preparation to be conveyed into the incinerator; and 2) burnt ash residue was stored while waiting for pickup for disposal off-site. By 1932, the dump was equipped with a platform on the Canal. Upon

information and belief, the platform received waste and shipments of burnt contaminated hazardous substance residues. A bucket conveyor transported incinerated chemical and metallic concentrated waste from the incinerator to the dumping platform. The first incinerator had a capacity to burn 500 tons a day. The City constructed a new incinerator in 1962 and dismantled the original. The new incinerator was equipped with a continuous unit, which fed wastes to four furnaces, each rated for 250 tons per day. Refuse was moved continuously through water-cooled chutes onto traveling grate stokers in the furnaces. Each furnace had a cooling chamber with air ports but no water sprays. The hot furnace gases entered a baffled settling chamber to remove fly ash and passed through an induced draft fan before being emitted from the two stacks at the plant. Refuse incinerated at the facility was collected primarily from an urban and industrial area. The City terminated operations at the incinerator in 1981. The incinerator was dismantled between 2004 and 2005. In 1962, when the City dismantled the original incinerator, it also removed the dumping platform and built a new two-slip marine transfer station ("MTS") to handle wastes from the new incinerator. After the incinerator ceased operations, the MTS was used as a transfer station where municipal wastes were brought and stored while waiting for transportation for disposal off-site. Between 1986 and 2001, the MTS received 7,954,288 tons of municipal waste from the City DoS and 611,370 tons of non-City DoS waste. The City expanded the MTS in 2008 to accept a maximum daily limit of 3,520 tons and a weekly limit of 16,650 tons a week for municipal solid waste. As part of daily operations, the City was permitted to store up to 634 tons of waste on the loading floor, 48 full containers of waste on each of the two barges moored at the facility, and 48 full containers stacked on the pier at the Waterfront Dump and Incinerator. Between 2010 and 2016, the City demolished the MTS and constructed a new MTS and added four ASTs to store biodiesel, motor oil, hydraulic oil, and waste/used oil.

(b) **Hazardous Substances.** The facility stored industrial and municipal waste, biodiesel, motor oil, hydraulic oil, and waste/used oil. These various types of waste contained numerous hazardous substances. During the decontamination of the incinerator in 2004, lead-based paint was found throughout the facility and elevated concentrations of lead, chromium, and cadmium in fly ash. An oily sludge taken from the ash conveyor pits contained total petroleum hydrocarbons in the diesel range and low levels of PCBs.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; 2) seepage; and 3) in- and over-water operations. The site initially had two connections to the City sewer. More specifically, a 1958 drainage plan for the new incinerator identified ten manholes, an ejector pit and catch basin, seven stormwater inlets, sewer lines, and connections to the existing 30-inch diameter combined sewer along Hamilton Avenue. Chemical, sanitary, and stormwater releases from the facility connected to sewers that discharged to the Canal at an overflow point at 19th Street. Contamination from the site also reached the Canal through seepage. Soil at the site contains hazardous substances including PAHs and lead. Soil and groundwater collected from a sample adjacent to the site contains hazardous substances including PAHs, lead, and copper. Upon information and belief, groundwater from near the site, including contaminated groundwater, discharges to the Canal. Finally, barges were used to transfer wastes at the bulkhead and therefore allowed for spills and releases directly to the Canal.

92. **City DoS District 2 Garage and Storage Property.**

(a) **Operations.** In 1957, the City began leasing the District 2 Garage and Storage Property, located at 15 Second Avenue (Block 979, Lot 31). The property owner

constructed a garage and gasoline pump service on the property, along with four 550-gallon USTs. The City DoS operated these facilities. At least sixteen storage tanks, twelve USTs, and four ASTs were used to store fuel oil, diesel, hoist oil, motor oil, kerosene, and gasoline at the site during the City's period of operation. The site was also equipped with a grease separator. Between 1957 and 1967, the City DoS failed to test its four 550-gallon gasoline tanks and associated piping. In 1971, the City DoS experienced a constant backup of water, grease, and oil from the sewers onto the garage floor due to the separator needing to be cleaned out. The City DoS vacated the property in 1995.

(b)    **Hazardous Substances.** The City DoS stored fuel oil, diesel, hoist oil, motor oil, kerosene, and gasoline, all of which contained hazardous substances such as VOCs, SVOCs, and metals, at the site. PCBs were also likely generated at the site due to waste oils and hydraulic fluids that were used in garaging operations.

(c)    **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) seepage. During the City's period of operation, the site had two connections to the sewer, both of which ultimately discharged to the Canal. Stormwater and surface runoff flowed directly to the Canal which allowed contaminated surface flows into the Canal. Contamination from the site also reached the Canal through seepage. In December 1988, the City's Department of Ports and Trade issued a notice of violation to the City DoS for failure to maintain the bulkhead. In 1996, the City agreed to perform site investigations and remedial work associated with the UST closures. Soil and groundwater contamination was discovered across a wide area and free oil product was identified in several on-site monitoring wells. Sampling indicated that both soil and groundwater contained

hazardous substances including PAHs and NAPL. By November 2005, the VOC contamination had been successfully remediated and PAH contamination was remediated to residual levels that pre-dated the City DoS's occupation of the site. Groundwater, however, continued to contain residual NAPL. Upon information and belief, groundwater from the site, including contaminated groundwater, discharges to the Canal.

93.     **City DoS Garbage Truck Parking Area**.

(a)     **Operations.** In 1993, the City acquired the Garbage Truck Parking Area, located at 2 2nd Avenue (Block 977, Lot 3), and used the site as a garbage truck parking lot through 1995. The City's Department of Citywide Administrative Services leased the property to Spartan Dismantling from 1994 until 2008, when the City evicted the company from the property. Starting in 2008, the City DoS began using the 65,053 square foot lot for the outside storage of salt, sand, and snow plows. Since 2010, the City DoS has permitted a not-for-profit environmental group to operate a composting facility on part of the site. Around 2016, the City scheduled to make improvements to the Garbage Truck Parking Area, including the construction of a salt shed with concrete slab and fabric cover and snow plow storage racks.

(b)     **Hazardous Substances.** Upon information and belief, site operates generated various hazardous substances including benzo(a)pyrene, benzo(b)fluoranthene, chrysene, arsenic, lead, acetone, total PCBs, chromium, mercury, nickel, and selenium.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) seepage. The site had at least one connection to the Second Avenue sewer, which discharged to the Canal during overflow events. Most of the site falls within a direct drainage area from which surface runoff flows directly into

the Canal. A November 2005 reconnaissance of the Canal also identified three outfalls to the Canal at the site. In March 2009, NYSDEC also identified a PVC pipe underneath the property discharging to the Canal. As a result, wastewater would have discharged from this site directly into the Canal via combined sewer overflow and private outfall(s). Contamination from the site also reached the Canal through seepage. Soil samples taken in August 2014 indicated concentrations of PAHs, PCBs, copper, and lead. Upon information and belief, groundwater from the site, including contaminated groundwater, discharges to the Canal.

94.    **City Pipe Yard.**

(a)    **Operations.** The City acquired a portion of Block 493, Lot 1 at 627 Smith Street in 1868. The City received, inspected, and kept iron drain pipes at the yard. The City sold the site in 1890.

(b)    **Hazardous Substances.** Hazardous substances used/generated at the site likely included VOCs and metals.

(c)    **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via private outfalls and stormwater and surface runoff; and 2) seepage. Although the site had no connections to the municipal sewers during the City's occupation of the site, upon information and belief, all storm water runoff from the site discharged to the Canal. Contamination from the site also reached the Canal through seepage. Soil and groundwater samples collected adjacent to the site contain hazardous substances including PAHs, copper, and lead. Upon information and belief, groundwater discharges to the Canal, meaning that groundwater contamination from the site also discharges to the Canal.

95. **Storage Yard at the Head of the Canal**.

(a) **Operations.** NYC acquired the property at the head of the Canal in early 1890 and stored materials including sewer pipes, castings, and fittings at this location. By 1904, the yard surrounded three sides of the Canal with a pipe shed and carriage house along Nevins Street and an office, shed, and pipe and wagon shed along Butler Street. In 1913, the City solicited a bid for the furnishing and construction of buildings at the site. In 1931, the City extended the garage building at the site. By 1950, the City had subdivided the parcel into Lot 14 and Lot 24. The Bureau of Sewers, a predecessor of the NYSDEC, occupied Lot 14, which is now the location of the Flushing Tunnel and Pump Station. The Department of Water, a predecessor of the NYSDEC, occupied Lot 24 (226-238 Nevins) for a storage yard. The City sold Lot 24 in 1972.

(b) **Hazardous Substances.** The operations on-site utilized hazardous substances such as oils, VOCs, SVOCs, and metals.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) seepage. The site connected to the municipal sewers via six connections, all of which ultimately discharged to the Canal during overflow events. The City completed four of these connections during its tenure at the site. Upon information and belief, contaminated surface runoff also discharged directly to the Canal. Contamination from the site also reached the Canal through seepage. Soil at the site contains hazardous substances including PAHs, PCBs, copper, and lead, and site groundwater contains hazardous substances including PAHs, copper, and lead. Upon information and belief, groundwater from the site, including contaminated groundwater, discharges to the Canal.

96. **City DoS, Brooklyn South District 6 Garage.**

(a) **Operations.** The City DoS has operated at the Brooklyn South District 6 Garage since 1991. During this time, the garage has had fourteen ASTs and USTs on-site, which were used for the storage of gasoline, diesel, lube oil, kerosene, and other substances.

(b) **Hazardous Substances.** The operations on-site utilized gasoline, diesel, lube oil, and kerosene, which are known to contain hazardous substances such as PAHs, VOCs, and SVOCs. In addition, garaging operations used waste oils and hydraulic fluids, both of which likely contained PCBs.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via stormwater and surface runoff and connections to the sewer system. Discharges from the Brooklyn South District 6 Garage flow to the sewer and release to the Canal during overflow events. The City DoS released an unknown amount of diesel to the soil in 1993 and an unknown amount of diesel, motor oil, and #2 fuel oil in 2000. NYSDEC stated that the latter release impacted the groundwater. Upon information and belief, groundwater from the site, including contaminated groundwater, discharges to the Canal.

97. **City Dumping Platform at the Sixth Street Basin.**

(a) **Operations.** The City operated at the Dumping Platform at the Sixth Street Basin (Block 990, Lots 138, 151, 153, and 369) from about 1892 through about 1930. Initial operations included the receipt of garbage, ashes, and manure. As of 1897, these operations were conducted directly under the supervision of a superintendent of streets of the Department of City Works. In August 1913, the Department of Street Cleaning, a predecessor of the City DoS, approved a contract for the Brooklyn Ash Removal Company for the final disposition of ashes, street sweepings, and rubbish for the Borough of Brooklyn, and the

company operated the dumping platform for the City. In December 1924, the New York State Department of Health ("NYS DoH") inspected the Canal and noted that "at the upper end of the canal much small driftwood was found…This wood appears to come from the municipal dumping pier where ashes and dry refuse are dumped into scows to be carried away for disposal. In dumping from the pier into scows some fine material and light rubbish fall into the water." The NYS DoH also observed that there was "an appreciable amount of solid matter consisting of ashes spilled from docks and barges being loaded at the municipal dumping pier."[4] Operations at the dumping platform ceased by 1932.

(b)     **Hazardous Substances.** The operations on-site involved handling a wide range of solid wastes, including ashes, garbage, street sweepings, dead animals, and industrial wastes. Ashes likely included residue from fires used for cooking and heating buildings. The ashes were typically composed of a mixture of powdery residue, cinders, and portions of unburned fuel and other noncombustible materials, such as metal and glass. By the late 1800s/early 1900s, boilers were used to supplement fireplaces as a source of heat, and boiler ash wastes would have been generated and disposed of as a result. Contaminants likely included PAHs, metals, lead, cadmium, zinc, and the highly soluble chloride and sulfate salts of those metals.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections private outfalls; and 2) seepage. Soil and groundwater at the site contains hazardous substances including PAHs, copper, and lead. Upon information and belief, groundwater from the site, including contaminated groundwater, discharges to the Canal.

---

[4] Letter fr. NYS Department of Health to State Commissioner of Health, at pp. 3-6 (Jan. 13, 1925).

98.    **Smith Street Powerhouse.**

(a)    The City acquired the Smith Street Powerhouse, 509-513 Smith St. (Block 480, Lots 8 and 34), in 1940 when the Brooklyn-Manhattan Transit Corporation / Brooklyn & Queens Transit Corporation properties were transferred to the City. In 1941, the City modified the brick building used for dead storage and began using it as garage for motor vehicles. As of 1942, the City of New York Board of Transportation was operating the site as a substation. By 1950, the City also used the site for storing rope, wood crates, and marine equipment, and as a parking lot. Prior to selling Lot 8 in 1961, the City created Lot 34 from Lot 8, which the City still owns and uses as a bridge operator's quarters.

(b)    **Hazardous Substances.** Upon information and belief, the City used coal to power the on-site dynamos and transmission fluid, brake fluid, and hydraulic fluid in the automotive repair shop. Upon information and belief, these materials contained hazardous substances including PAHs, SVOCs, VOCs, PCBs, and metals.

(c)    **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) seepage. The site had two connections to City sewers during the time the City owned the site, one of which directly discharged into the Canal. Soil and groundwater at the site contain PAHs, copper, and lead. Upon information and belief, groundwater at the site is expected to discharge to the Canal.

99.    **The Brooklyn Rapid Transit Facility.**

(a)    **Operations.** The City acquired 7 9th Street (Block 477, Lot 1) for rapid transit purposes by two condemnation proceedings in 1930 and 1931. The City built a transit viaduct over the site in or about 1932. The City currently owns Block 477, Lot 1 and leases it to

Defendant MTA, which operates a ticket office with the elevated railway track running across the block.

(b)     **Hazardous Substances.** Upon information and belief, the City operated an electric railway track and a ticketing office located adjacent to the Smith Street Powerhouse. Upon information and belief operation of and repairs to the tracks generated hazardous substances including metals, PCBs, and PAHs.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) seepage. The site had seven connections to city sewers in Ninth Street and Smith Street. The Ninth Street sewer discharges directly to the Canal. Soil and groundwater at the site contain hazardous substances including PAHs, copper, and lead. Upon information and belief, groundwater from the site is expected to discharge to the Canal. US EPA identified this site as a location of concern for groundwater recontaminating the sediments in the Canal.

100.    **South Brooklyn Marine Terminal.**

(a)     **Operations.** The City acquired the majority of SBMT in a series of transactions that occurred between 1905 and 1908. The City acquired additional portions of the site in 1959. The City currently owns the property, and it is managed by Defendant the NYCEDC. Several City entities have occupied portions of the site since at least 1926, including the NYC Street Cleaning Department (predecessor to the City DoS), NY Police Department, NYC Fire Department, NYC Highway Department, (predecessor to the City DoT) NYC Sewers Department (predecessor to the NYSDEC), NYC Department of Purchase (predecessor to the NYC Department of Citywide Administrative Services), NYC Transit, and City DoS. These City

entities have used various portions of the site for warehousing operations, commercial uses, machine shop operations, paint shop operations, bus and tractor repairs, fire boat station operations, and railroad operations. In addition, the City has leased the property to various businesses and entities engaged in maritime-related activities. Around 1917, the U.S. Navy had taken a tract of land owned by the City and located adjacent to the Bush Company Terminal Warehouse, which was located between 2nd and 3rd Avenues, south of 35th Street. The Navy expanded in this area, constructed temporary buildings on the site, and ultimately took over two NYC piers at the foot of 35th Street. During WWII, the City leased much of this area to the Navy. During the Navy's tenure, USACE issued two permits, one in 1941 and one in 1942, for dredging to a depth of 30 feet around Pier 33 and Pier 35. More recently, the City and lessees have used SBMT for the following: 1) storage and distribution of new automobiles, pipelines, cocoa beans, tea, and wine; 2) parking; 3) stationary printing and distribution; 4) warehousing; 5) construction of a ferry terminal; 6) as a UPS facility; 7) as a Metropolitan Transit Authority bus storage and rail yard; 8) as an NY Police Department vehicle impound lot for 4,000 vehicles; and 9) as an NYCEDC maintenance shop. An eight-track rail siding on the site is operated by the NYC Transit. Historically, the 110-acre facility included the following features: 1) four 160,000-gallon oil/diesel ASTs; 2) a diesel oil filling station with associated USTs; and 3) numerous gasoline USTs. Between 1935 and 1938, the Carroll Oil Terminal Storage Plant obtained permits to install four 160,000-gallon ASTs, a 13,700-gallon gasoline UST, and associated pumps for gasoline and fuel oil at the SBMT. Then in 1938, a permit was obtained for the installation of a 5,000-gallon #3 fuel oil UST. In 1964, two 550-gallon gasoline USTs were installed at the foot of 39th Street. Two 4,000-gallon diesel USTs were installed at the foot of 39th Street in 1973 and then in 1979 two more 4,000-galllon gasoline USTs were installed at the foot of 39th Street. A

1997 search of the Department of Building records indicated the presence of 24 petroleum storage tanks at the site ranging in size from 550 gallons to 28,000 gallons. These tanks had been installed between 1929 and 1946.

(b)  **Hazardous Substances.**  Upon information and belief, the City used hydraulic fluid, transmission fluid, brake fluid, paints, and petroleum products for bus, tractor, and ship repair operations and in heavy machinery on-site like cranes and lifts. The City also stored oil, diesel, and gasoline within numerous underground and above ground storage tanks on site. Upon information and belief, the City used transformer oil in transformers at the on-site substation. Upon information and belief, these materials contained hazardous substances including PAHs, SVOCs, VOCs, metals, and PCBs.

(c)  **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and 2) seepage. The Pier and associated structures do not connect to the municipal sewer system. Any discharge from these facilities or stormwater runoff goes directly into Gowanus Bay without treatment. In addition, there have been several documented spills and releases at the site. Numerous environmental investigations and remedial activities have taken place at this site. At least eight USTs and two ASTs were removed from the property in 1998, and impacted soils surrounding the former tanks were subsequently excavated and transported off-site for disposal. Site soil investigations have documented the presence of PAHs, copper, lead, and PCBs in soils at the site. Site groundwater investigations have identified PAHs, copper, and lead in groundwater samples on-site as well.

101. **23rd Street Pier (Block 644, Lots 1 and 50).**

(a) **Operations.** The City acquired the 23rd Street Pier (Block 644, Lots 1 and 50) through condemnation proceedings on March 10, 1958, and upon information and belief, leased it to other parties. In May 1958, the City leased the facility to Moore-McCormack Lines, Inc. for a period of 15 years. As part of the lease, Moore-McCormick built a new pier, which was completed in September 1959. The new pier included a 550,000-square-foot truck and cargo operational area (325,000 square feet was the cargo deck pier and 225,000 square feet was inland from the pier). The structure extended from 22nd Street to 24th Street along Gowanus Creek and inshore to 3rd Avenue. Beginning in March 1988, Continental Terminals, Inc. leased part of the pier for use as a warehouse to store coffee. In March 1999, the City leased Buildings 6 and 7 at the foot of the 23rd Street Pier to Commodity Storage, Inc., which used the site for the receipt, storage, and handling of cocoa. In the late 1990s, the shed was removed and the pier was used by American Warehousing for vehicle storage. Around July 2001, the NY Power Authority began operating a natural gas turbine facility that produced 79.9 megawatts of electricity. The facility consisted of two General Electric LM6000 gas turbines. Other equipment on-site included gas and air compressors, a cooling tower lube oil cooling system, water treatment and storage system, ammonia storage and injection system, raw water storage, and auxiliary electrical system. In 2006, the City's Department of Small Business Services surrendered a portion of the property at the intersection of 3rd Avenue and 23rd Street to the NY Police Department. The NY Police Department maintains an open air parking lot at the location for the storage of sea containers. According to NYSDEC, the NY Police Department continues to use the northern portion of the pier for storing sea containers. The NY Power Authority's power plant continues to occupy the southern part of the site.

(b) **Hazardous Substances.** Upon information and belief, the City used hydraulic fluid in heavy machinery at the pier, and lubricating oil and transformer oil at the gas turbine facility. Upon information and belief, these materials contained hazardous substances including PAHs, SVOCs, VOCs, metals, and PCBs.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and 2) seepage. The Pier and associated structures beyond the bulkhead do not connect to the municipal sewer system. Any discharge from these facilities or stormwater runoff goes directly into Gowanus Bay without treatment. In July 2009, petroleum-contaminated soil was discovered during the excavation to repair the bulkhead. Three test pits were excavated and detected hazardous substances including lead and copper. Laboratory analysis identified the spill as a combination of motor oil and hydraulic fluids. Approximately 40 tons of petroleum-impacted soil and five 55-gallon drums of used absorbent pads were removed off-site for treatment. The spill was closed in November 2010.

102. **25th Street Pier (Block 644, Lot 109; Block 653, Lot 103).**

(a) **Operations.** The City acquired the 25th Street Pier from Bethlehem Steel Corporation in 1966. The 25th Street Pier is 319,000 square feet, including a 244,000-square-foot open pier, garage, and office area. The garage is a 10,000-square-foot, single-story brick structure. The two-story office building is 10,000 square feet and made of brick. The City leased the 25th Street Pier to Moore-McCormack Lines, Inc., which used the facilities for the shipment of cargo at least from the 1950s to around about 1984. For at least a portion of the late 1980s, the City leased part of the property to Joseph Vinal Ship Repair until May 1989. In 1991, the City leased 87,500 square feet of land under water to McCormick Aggregate for berthing barges.

From March 1993 through at least February 1995, Dealer Storage Corporation leased the 25th Street Pier for the storage, sale, and auction of vehicles. From around August 1993 through December 1993, Con Edison and Dealer Storage Corporation signed an agreement that permitted Con Edison to use the 25th Street Pier while excavating and installing feeder pipes for laying cable. In turn, Dealer Storage Corporation was given access to two vacant lots at the Gowanus Substation. From 1996 through at least 2003, New York Sand & Stone Company (a.k.a. Cow Bay Sand Co.) used the pier for the transport and receipt of sand and gravel from waterborne vessels, storage, sorting, and trucking of sand and gravel. In November 2003, Lafarge North America ("Lafarge") applied to the City to use the pier and construct a cement distribution terminal, which would include a four-silo cement distribution and office center. In December, NYCDEP issued a permit for the installation of the silos. In 2005, the City leased a portion of the lot to Lafarge. Lafarge continues to use the property for storage and as a maritime dependent distribution facility for cementation materials, aggregate, gypsum-related products, and other materials used in the construction industry.

(b) **Hazardous Substances.** Upon information and belief, the City used hydraulic fluid and paints for ship repair activities at the site. Upon information and belief, these materials contained hazardous substances including PAHs, SVOCs, VOCs, metals, and PCBs.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and 2) seepage. The 25th Street Pier has no connection to the municipal sewer system. Thus, all discharge from the pier goes into the Bay.

103. **425 Smith St. and 435 Hoyt St. (Block 471, Lots 1 and 100).**

(a)     **Operations.** The City acquired 425 Smith Street and 435 Hoyt Street through condemnation proceedings in January 1975. Around the same time, the City leased the property to Ferrara Brothers Building Company, and Ferrara Brothers continued to use the property until at least 2017. Upon information and belief, Ferrara Brothers used trucks, loaders, mixers, and other equipment to move concrete and other raw materials, which were stored in piles on-site.

(b)     **Hazardous Substances.**  Upon information and belief, the City's lessee used heavy machinery (requiring hydraulic fluid) to move concrete and other raw building materials which were stored in piles on the site. Upon information and belief, these materials contained hazardous substances including PAHs, SVOCs, VOCs, metals, and PCBs.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and five connections to the sewer system and six private outfalls; 2) seepage; and 3) over-water activities. In September 2009, Riverkeeper filed a Notice of Intent to Sue Ferrara Brothers for its discharges of wash waters, concrete, gravel, and other unidentified materials from the facility into the Canal. The notice alleged that Ferrara Bothers uses large amounts of water to clean its fleet of trucks and the property, and that contaminated wash water flows from the site into the Canal. The notice also alleged that materials fall into the Canal during barge unloading operations.

104. **City Contractor's Yard, 575-577 Smith St. (Block 483, Lot 1).**

(a)     **Operations.** The City owned Block 483, Lot 1 ("City Contractor's Yard") from 1940 through 1965. Around 1942, the facility was operated by the City's Department of

Parks and Recreation. By 1950, the lot was used as contractor's yard and had several storage buildings. The City also used the area for mooring floating equipment.

(b) **Hazardous Substances.** Upon information and belief, the operations on-site utilized PAHs, metals, and PCBs.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and four connections to the sewer system and one private outfall; and 2) seepage.

105. **NYPD Auto Repair and Garage, 280-286 Hamilton Ave. (Block 625, Lot 2)**

(a) **Operations.** The City began using a portion of Block 625, Lot 2 in 1942 as a storage yard for highway materials and later a garage. From the late 1950s to 1986, the NY Police Department operated a garage on a portion of the lot. The NY Police Department also operated a vehicle repair service station from 1971 to 1985 on the property.

(b) **Hazardous Substances.** Upon information and belief, the operations on-site utilized lubricants, hydraulic fluids, paints, and electrical equipment containing PCBs during a portion of the NYPD Auto Repair and Garage operations. Waste/used oils were also typically generated at garages, and likely included crankcase oil, metal working oil, gear oil, transmission fluid, brake fluid, hydraulic fluid, and tank bottoms from used oil tanks. Waste oil historically contained PAHs, VOCs, heavy metals, and PCBs.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and four connections to the sewer system and private outfalls; and 2) seepage. Upon information and belief, PCBs were released at the site from leaking electrical equipment, improper disposal, and/or spills. Soil and groundwater at the site contains hazardous substances including PAHs,

copper, and lead. Groundwater at this location, including contaminated groundwater, is expected to discharge to the Canal.

106. **Federal Shipyards Defendants.** The United States of America, the Federal Maritime Commission, the Department of the Navy, the Department of Defense, the Coast Guard, and the Department of the Army (collectively, the "Federal Shipyards Defendants") through their own activities as well as activities of various historic agencies and the military, have been involved in shipyard operations at the Gowanus Shipyards. The additional historic agencies and branches of the military involved include 1) the Maritime Administration; 2) the War Shipping Administration; 3) the Defense Plant Corporation; and 4) the Military Sea Transportation Service. Upon information and belief, the volume of hazardous substances, waste residuals, and contaminants associated with ship construction and repair activities increased dramatically during high-volume shipbuilding and repair periods, such as during World Wars I and II. The discharge of these contaminants from federally owned materials, ships, or dry docks (*i.e.*, CERCLA "facilities"), including CERCLA-listed hazardous substances, give rise to the Federal Shipyards Defendants' liability at the Gowanus Shipyards. The operations at specific sites are described more fully below in Paragraphs 107 through 112, and these Paragraphs are therefore incorporated with the same force and effect as if fully set forth herein.

107. **The Federal Shipyards Defendants' Operations Generally.**

(a) **Operations.** Federal activities at the Gowanus Shipyards began in approximately 1917. Repair work was carried out on federally owned vessels, typically using floating dry docks to raise the ships above the surface for repairs.

(b) **Hazardous Substances.** The same hazardous substances were used and generated at all of the Federal Shipyards Defendants' shipyard operations. US EPA has identified

a variety of waste residuals generated during ship construction, repair, and maintenance activities, including paint solids, heavy metals, spent abrasives, solvents, petroleum-based fluids, oil-water emulsions, and synthetic emulsions. Upon information and belief, ship construction and repair activities also involved the use of materials such as paints and defouling agents. The waste streams from these shipbuilding sites—including industrial waste, stormwater, sheet flow, and raw sewage—contained metals, PAHs, PCBs, VOCs, and other hazardous substances.

(c) **Pathways.** Ship construction and repair activities occurred onshore and in the waters of the Gowanus Bay and Canal (both above and below the waterline). Although all the Gowanus Shipyards had multiple sewer connections to City sewers and private outfalls, the greatest impacts from these facilities were through their outdoor on-, over-, and in-water activities. Shipbuilding activities frequently involved the use of materials supplied by the government (*e.g.*, paints and defouling agents), which were often applied using techniques that allowed the discharge of hazardous materials to the nearby waterways. Upon information and belief, no containment, preventative, or control measures were used to minimize off-site discharges of contaminants via stormwater runoff from the Gowanus Shipyards. Upon information and belief, stormwater discharged directly to the Canal and Creek via overland flow. During the time the Federal Shipyards Defendants owned vessels and equipment used at the Gowanus Shipyards, industrial waste, stormwater, sheet flow, and raw sewage discharged untreated directly to Gowanus Bay and Canal. The Canal and Gowanus Bay are hydraulically connected and, upon information and belief, tidal flow from Gowanus Bay would have resulted in discharges from the Gowanus Shipyards entering and settling in the Canal.

108.    **The Court Street Yard.**

(a)    **Operations.** The Court Street Yard was located at the foot of Court Street and consisted of Tax Block 623 and Block 496. Operations at the Ira Bushey & Sons Company ("Bushey") yard at the foot of Court Street began in 1913. Bushey built and performed work on government-owned vessels from approximately 1918 through at least 1956. Bushey constructed coal barges for the Navy at the Court Street Yard as early as 1918. During WWII, the Navy Bureau of Ships provided government funds for the expansion of the facility. According to a summary memorandum and contract, the Navy initially provided approximately $369,000 to Bushey for the procurement and construction of a 1,000-ton dry dock and supporting equipment. Bushey used the dry dock to conduct ship repairs for the government. Upon information and belief, a total of $461,000 was provided by the Bureau of Ships for expansion of the Court Street Yard. By late 1941 and throughout the WWII period, Bushey was under contract to construct tugboats for both the Navy and the Maritime Commission. During WWII, the facility was under the supervision of the Navy Supervisor of Shipbuilding. The Court Street Yard included eight bays, five piers, three floating dry docks, various fabrication and machine shops, and facilities for paint, oil, and diesel storage. Government-owned materials passed through all "units" of the plant. By late 1941 or early 1942, 100 percent of the facility's normal capacity was used for work on government-owned ships. In addition, alterations, overhauls, and repairs were conducted on three floating dry docks that were located alongside the piers. As of 1943, approximately 1,200 employees worked at the Court Street Yard. The Maritime Commission conducted an industrial safety survey at the facility and found that housekeeping conditions were

poor and that the piers were "badly in need of repairs."[5] After WWII, government-owned vessels were repaired at the facility through at least 1958.

(b)     **Hazardous Substances.** In addition to the materials referenced above in Paragraph 107(b), hazardous substance handling practices at the Court Street Yard included the storage of chemicals. Large containers of paint were stored outside one of the buildings at the site and waste from the machine shop and offices were burned in the boiler daily.  Hot ashes were used to fill low spots at the site.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) in- and over-water operations. The facility had thirteen connections to the sewer system which discharged overflow to the Canal, along with eight additional private outfalls to the Canal. Significant in- and over-water operations occurred at the facility and are described more fully above in Paragraph 107(c).

109.    **27th Street Yard.**

(a)     **Operations.** Ship building and repair activities at the 27th Street Yard, located between the foot of 25th and 28th streets (Block 653), began in the early 1900s under the auspices of the James Shewan & Sons Dry Dock Company ("Shewan"). During WWI, the facility was reported to have the largest capacity of any dry dock ship building facility in the United States. Between 1917 and 1919, Shewan converted at least three vessels for the Navy. Around 1933, the Bethlehem Steel Company Shipbuilding Division ("Bethlehem"), acquired the facility and began ship repair and conversion activities. During WWII, approximately 50 percent of the work conducted at the 27th Street Yard was for the War Shipping Administration

---

[5] Industrial Safety Survey, July 17-August 3, 1943, pp. 5 and 12.

("WSA") for repairs to tankers and ships. Approximately five percent of the work was done for the Army, converting hospital ships and transports, and another five percent was conducted for the Navy, converting vessels to troop transports and repairing gunboats. The facility had seven floating dry docks, five piers, and various support facilities, such as machine, electric, blacksmith, and paint shops. The small 19th Street Yard operated as a component of the 27th Street Yard, adding two additional piers but no production shops. As of September 1944, the facility employed approximately 4,000 people. During WWII, Bethlehem had a master contract in place with WSA. Title to all material and equipment used to construct and repair or incorporated into vessels under this contract was vested in WSA. WSA also assumed the risk of loss or damage to these vessels, equipment, and cargo while in the possession of Bethlehem. Bethlehem continued ship repair operations for the United States at the facility through at least 1960.

        (b)     **Hazardous Substances.** In addition to the materials referenced in Paragraph 107(b), a 1944 Maritime Commission industrial survey of the 27th Street Yard revealed that housekeeping conditions in the shops and on the ships docked at the sites needed considerable improvement. The Maritime Commission noted that workers were exposed to (1) approximately two tons of red lead powder and about fifty pounds of zinc powder that were mixed into red lead paint each month; (2) lead and zinc oxide that was generated from burning and welding activities; (3) varnish, lacquer removers, and solvents (including carbon tetrachloride), unidentified chlorinated solvents, and benzol that was used in spray painting and various other activities; and (4) approximately one ton of lead per year, which was used in the babbitt shop to make hammer heads and balance weights.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) in- and over-water operations. The facility had one connection to the sewer system which discharged overflow to the Canal, along with three additional private outfalls to the Canal. Stormwater from the site also flowed directly to the Canal. Significant in- and over-water operations occurred at the facility and are described more fully in Paragraph 107(c).

110.     **Tebo Yard.**

(a)     **Operations.** In 1916, Todd Shipyards Corporation ("Todd") acquired the property for and constructed the Tebo Yard at the foot of 23rd Street (Block 644) in Brooklyn. During its early years of operation, Todd and/or its subsidiary, the Tebo Yacht Basin Company, constructed minesweepers and repaired a variety of ships for the Navy at the facility. In later years, Tebo Yard operated as an auxiliary yard, supporting Todd's nearby operations at the Erie Basin. Between 1918 and 1919, vessels constructed or converted for the Navy at the Tebo Yard included the following: 1) construction of eight minesweepers; 2) conversion of the *Ripple (ID 2439)* to a trawler; and 3) conversion of the *Niagra (PY-9)* and the *Sapphire (SP 710)* to patrol yachts. Starting in 1938, Sullivan Dry Dock & Repair Corporation ("Sullivan") leased the Tebo Yard from Todd. Sullivan also acquired equipment from a defunct shipyard company operating on Gowanus Bay. Sullivan moved the equipment to the Tebo Yard and began operations shortly thereafter. During WWII, Sullivan constructed at least sixteen PC (sub chasers) boats for the Navy. Sullivan also repaired and/or converted 114 ships for the Navy and another 83 ships for the Maritime Commission. Operations at the Tebo Yard included conversion and repair work on vessels for the Navy, WSA, and the Army. The facilities on-site consisted of three ways, four dry

docks, five piers, and support features, such as machine, sheet metal, plate, propeller, pipe shops, and a 550-gallon UST along with a gasoline pump. As of April 1943, approximately 2,350 employees worked at Tebo Yard. Sullivan continued ship repair operations at the site for the United States through at least 1948.

(b)     **Hazardous Substances.** In addition to the materials referenced in Paragraph 107(b), upon information and belief, waste oil was used for dust control at the Tebo Yard. In the course of an Industrial Safety Survey of the Tebo Yard, the Maritime Commission recommended that Sullivan should "treat" the unpaved surfaces of the facility to keep down the dust. Concerned about worker safety, a follow-up survey reported the following hazards: 1) lead dust from mixing red lead paint (workers mixed between 10 and 35 pounds of red lead powder with white lead daily to make red lead paint); 2) lead and zinc oxide smoke and fumes from welding and burning activities (used on vessels, in the sheet metal shop, plate shop, and machine shop); and 3) bronze casting on propellers were ground down to size in the propeller shop, generating dust problems. An inspector noted that the company had complied with the recommendation to treat the site surface to keep down the dust during dry weather.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) in- and over-water operations. The Maritime Commission noted that storm drains at the facility discharged to the waterfront between the ship ways. The facility had five connections to the sewer system which discharged overflow to the Creek, along with four additional private outfalls to the Canal. Stormwater from the site also flowed directly to the waterway. Significant in- and over-water operations occurred at the facility and are described more fully in Paragraph 107(c).

111.  **Erie Basin Yard.**

(a)  **Operations.** The Erie Basin is situated at the edge of Gowanus Creek. Upon information and belief, shipyard-related operations at the Erie Basin Yard began prior to the late 1870s, and, by the 1870s, the facility was known to be the largest docks in the country. The Erie Basin Yard was home to a number of companies over the years, including Todd and Robins. Todd began constructing tank barges and minesweepers for the Navy during WWI. The facility was expanded during the 1920s and 1930s with the addition of dry docks and various support facilities. In July 1940, President Roosevelt signed the Naval Expansion Act, which provided funds to expand the U.S. fleet. The Secretary of the Navy determined that in order to carry out the directive, the ship repair facilities of Brooklyn had to be expanded to carry a portion of the construction and repair activities. The Navy delegated the work to its Bureau of Ships, which in turn determined expansion of the Todd/Robins facilities was essential. Thus, on September 20, 1941, the Navy Bureau of Ships entered into a contract with Robins for the construction of an 18,000-ton dry dock and other facilities at the Erie Basin Yard. The original contract provided for a total expenditure of approximately $4.9 million. Title to the facilities, which included the 18,000-ton dry dock, piers, bulkhead, and land, as well as to all materials, supplies, and equipment was vested in the government. Robins was to pay rent and all taxes levied on the facilities. In order to expand the facility, the Navy reconstructed piers and bulkheads, dredged in and around the basin, constructed rail tracks, and installed new equipment such as cranes, transformers, motors, and pumps. During WWII, Robins repaired and converted ships, tankers, and passenger vessels. During WWII, approximately 70 percent of the work at the facility was done for the Navy, 30 percent for WSA, and a small amount of work for the Army. The Erie Basin Yard consisted of five outfitting piers, two large graving docks, one 18,000-ton

floating dry dock, and four smaller floating dry docks. Support facilities included machine, blacksmith, plate, and paint shops. Robins operated a small yard nearby known as the Crane Yard and also leased the north side of Pier #3 and the adjacent Columbia Street Pier. As of 1944, approximately 12,000 employees worked at the Erie Basin Yard. The demands on the facility were such that Robins had to secure vessels two abreast to a pier wherever possible. After WWII ended, Todd entered into a master ship repair contract with the Navy, and some expansion of the facilities occurred in 1951. Ship repair activities continued until at least September 1958 on the Navy's 18,000-ton floating dock at the Erie Basin Yard. In addition, upon information and belief, routine maintenance, including removing the existing paint and repainting the dry dock itself, occurred in 1946 and again in 1955. Upon information and belief, Todd acquired the government-owned land and equipment from the Navy in 1965.

(b) **Hazardous Substances.** The materials described in Paragraph 107(b) were also used at the Erie Basin Yard, and Paragraph 107(b) is therefore incorporated with the same force and effect as if fully set forth herein.

(c) **Pathways.** Upon information and belief, the Erie Basin Yard released hazardous substances to the Bay, which is hydraulically connected to the Canal, through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) in- and over-water operations. The Erie Basin Yard had eleven connections to the sewer system which discharged overflow to the Bay, along with thirty-seven additional private outfalls to the Bay. Stormwater from the site also flowed directly to the waterway. Significant in- and over-water operations occurred at the facility and are described more fully in Paragraph 107(c). Upon information and belief, tidal flow from Gowanus Bay would have resulted in discharges from the Erie Basin Yard entering and settling in the Canal.

112.    **US Navy Fleet Supply Base and Clothing Depot Facilities.**

(a)    **Operations.**  The Navy operated a Fleet Supply Base and Clothing Depot, located between 29th and 35th Streets and 3rd Avenue into the waterway, from approximately 1917 through at least the 1960s. During that time, the Navy used the site to supply its fleet, dry clean and impregnate clothing, service Navy equipment in a garage, operate a railway system to transport materials around the site, provide power to its facilities, and service vessels.

(b)    **Hazardous Substances.**  Wastes associated with the Navy's use of the facilities included copper, lead, PAHs, and PCBs.

(c)    **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; 2) seepage; and 3) in- and over-water operations. Stormwater runoff from these facilities discharges directly into Gowanus Bay without treatment. The Canal and Gowanus Bay are hydraulically connected and, upon information and belief, tidal flow from Gowanus Bay would have resulted in discharges from the Gowanus Shipyards entering and settling in the Canal. Numerous environmental investigations and remedial activities have taken place at this site. At least eight USTs and two ASTs were removed from the property in 1998, and impacted soils surrounding the former tanks were subsequently excavated and transported off-site for disposal.  Site soil investigations have documented the presence of PAHs, copper, lead, and PCBs in soils at the site. Site groundwater investigations have identified PAHs, copper, and lead in groundwater samples on-site as well.

113.    **United States Postal Service.** In addition, the United States Post Office Department and its successor**,** USPS, operated a (1) Detached Mail Unit ("DMU") from 1950 to 1999; and (2) a Vehicle Maintenance Facility ("VMF") from 1950 to June 1992. The USPS owned the

property located at 124 and 136-138 Second Avenue (Tax Block 1007, Lots 1, 118, 219, and 220), adjacent to the Canal, from 1971 to 2002.

114.    **The Detached Mail Unit.**

(a)    **Operations.** The DMU was a two-story concrete block structure with a footprint of approximately 50,000 square feet built on a concrete slab foundation. The slab foundation was elevated in order to provide loading dock areas from the first floor on the north and south sides of the building. Both floors of the DMU were comprised of large open areas for mail handling and distribution. A utility area was constructed on the north central side of the building. Four 10,000-gallon USTs used for heating oil were located beneath the loading platform near the utility area. Additional structures at the DMU included a two-story brick building with overhead garage doors that provided access for vehicles. A covered storage area without sides projected from the north wall of the building. There was also a warehouse building located adjacent to the Canal. Sanborn maps indicate that USPS utilized this warehouse historically for used machinery and chemical storage. A loading dock in the warehouse opened onto the Canal. Catch basins were located in the partially paved parking area between the buildings. Upon information and belief, at the DMU, the USPS performed routine vehicle maintenance, including replacement of fluids (*e.g.*, motor oil, radiator coolant, transmission fluid, and brake fluid), replacement of non-repairable equipment (*e.g.*, brake shoes/pads, shocks, batteries, electrical components, and water pumps), and repair of fixable equipment (*e.g.*, brake calipers/rotors/drums, alternators, fuel pumps, and carburetors). These maintenance activities involved the regular changing of fluids, parts cleaning, painting, and truck washing.

(b)    **Hazardous Substances.** Upon information and belief, wastes associated with the USPS's vehicle and machinery maintenance operations included used oil, grease, spent

fluids, spent batteries, metal machining wastes, spent organic solvents, and tires. US EPA has identified the hazardous substances commonly released from vehicle maintenance and washing activities (including mechanical repairs, painting, fueling, lubricating, and parts cleaning), outdoor vehicle and equipment storage and parking, including chlorinated solvents, oil, heavy metals, acid/alkaline wastes, ethylene glycol, arsenic, detergents, phosphorus, salts, suspended solids, hydraulic fluids, organics, fuel, and PAHs. The common wastes generated as a result of these activities include parts cleaners, greasy rags, waste/used oil, used oil filters, air filters, batteries, hydraulic fluids, transmission fluid, radiator fluids, degreasers, product spills, transmission fluid, radiator fluids, brake dust, absorbents and floor dry, aerosol cans, antifreeze, fluorescent bulbs, hazardous lamps, gasoline, lead-acid batteries, paints, refrigerants, shop towels, used electronics, used tires, and wastewater. Upon information and belief, the various waste streams from this site contained hazardous substances such as metals, PAHs, and VOCs.

(c)    **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) seepage. The DMU had four lateral connections to the City combined sewer system. The pump station that diverts overflows from this area of the sewer to the Owl's Head WPCP was not installed until 1990; as a result, up until 1990, all contaminated wastes that flowed directly to the sewer from the DMU discharged to the sewer and then to the Canal at the foot of Second Avenue. A stormwater sewer outfall that discharges to the Canal is also located near the northwesterly corner of the DMU. Upon information and belief, surface water runoff from a portion of the DMU flowed to this outfall. In addition, three unpermitted and/or private outfalls have been observed on or proximate to the DMU, all of which discharge to the Canal. Consultants working for USPS have also indicated

that the catch basins on-site drained into the Canal. Contamination from the site also reached the Canal through seepage. Environmental investigations at the DMU have identified soil and groundwater contamination at the DMU associated with the USPS's operations. Releases and/or spills have occurred from tanks. Hazardous substances including PAHs, copper, and lead have been found in soil, and analyses of groundwater samples revealed that groundwater contained hazardous substances including PAHs at the DMU. Groundwater at this location, including contaminated groundwater, discharges to the Canal.

115. **The Vehicle Maintenance Facility**.

(a)     **Operations.** The VMF was a one-story building of about 85,000 square feet, and it contained the vehicle service facilities for USPS in the area. The VMF was a large, open drive-through structure that included service bays for vehicle maintenance. Upon information and belief, operations at the VMF included routine vehicle maintenance activities, including replacement of fluids (*e.g.*, motor oil, radiator coolant, transmission fluid, and brake fluid), replacement of non-repairable equipment (*e.g.*, brake shoes/pads, shocks, batteries, electrical components, and water pumps), and repair of fixable equipment (*e.g.*, brake calipers/rotors/drums, alternators, fuel pumps, and carburetors). These maintenance activities involved the regular changing of fluids, parts cleaning, painting, and truck washing. The VMF was a concrete block structure, built on a concrete slab foundation with a partial basement and housed a vehicle wash apparatus, spray painting booth, USTs, ASTs, and vehicle fuel pumps and storage tanks. A boiler room was located on the south side of the VMF, which had a floor drain for boiler blow-down.

(b)     **Hazardous Substances.** Upon information and belief, wastes associated with the USPS's vehicle and machinery maintenance operations included used oil, grease, spent

fluids, spent batteries, metal machining wastes, spent organic solvents, and tires. US EPA has identified the hazardous substances commonly released from vehicle maintenance and washing activities, outdoor vehicle and equipment storage, and parking, including chlorinated solvents, oil, heavy metals, acid/alkaline wastes, ethylene glycol, arsenic, detergents, phosphorus, salts, suspended solids, hydraulic fluids, organics, fuel, and PAHs. The common wastes generated as a result of these activities include parts cleaners, greasy rags, waste/used oil, used oil filters, air filters, batteries, hydraulic fluids, transmission fluid, radiator fluids, degreasers, product spills, transmission fluid, radiator fluids, brake dust, absorbents and floor dry, aerosol cans, antifreeze, fluorescent bulbs, hazardous lamps, gasoline, lead-acid batteries, paints, refrigerants, shop towels, used electronics, used tires, and wastewater. Upon information and belief, the various waste streams from this site contained PAHs, PCBs, VOCs, and metals.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system; and 2) seepage. During the time USPS operated at the site, the VMF had two lateral connections to the City combined sewer system, both of which discharged to the Canal during overflow events. The VMF contained numerous floor drains in the vehicle service area and a sub-grade vault containing an oil-water separator, which USPS consultants believed was connected to the City's combined sewer system. USPS also discharged wash water containing hazardous substances from the vehicle washing area directly onto the adjacent street. Contamination from the site also reached the Canal through seepage. Environmental investigations at the VMF have identified soil and groundwater contamination associated with the USPS's operations. Releases and/or spills have occurred from tanks. Hazardous substances including PAHs, copper, and lead have been found in soil and analyses of groundwater samples

revealed that groundwater contained hazardous substances including PAHs at the VMF. Upon information and belief, groundwater at this location, including contaminated groundwater, discharges to the Canal.

116. **United States General Service Administration**. GSA owned property located at 124 and 136-138 Second Avenue (Tax Block 1007, Lots 1, 118, 219, and 220), adjacent to the Canal, from 1950 to 1971. Upon information and belief, GSA transferred the property to the USPS in 1971, after the USPS was reorganized into an independent agency under the Executive Branch. As described above in Paragraph 114, the USPS operated a Detached Mail Unit (DMU) and a Vehicle Maintenance Facility (VMF) at this property.

117. **Astoria Generating Company, L.P.**  Astoria Generating L.P. purchased the Gas Turbine Generator Station from Con Edison on September 1, 1999. Astoria inherited its ultimate predecessor's jurisdictional status and is subject to personal jurisdiction in New York because it assumed and bears liability for its predecessors' liability to Brooklyn Union.

(a) **Operations.** The GT Station extends into Gowanus Bay. The GT Station consists of four gas turbine moored barges, each containing eight gas turbine units with diesel starter units fueled by 185-gallon diesel fuel tanks. Each barge received fuel oil through fuel oil fill lines from up to four moored fuel storage barges. Each gas turbine moored barge is equipped with an oil-water separator system, a 550-gallon used oil tank, and a transformer. The four gas turbine barges are connected to the adjacent Con Edison substation by underground feeder cables.

(b) **Hazardous Substances.**  Upon information and belief, petroleum products stored, loaded, and unloaded at the facility contained a mixture of hazardous substances, including VOCs, PAHs, and metals. Residuals from tank clean-outs contain

70

contaminated liquids with oils including benzene, cyclohexane, ethylbenzene, toluene, 1,2-4-Trimethylbenzene, and xylene. Upon information and belief, the tank clean-out water was released to the Gowanus Bay. Tank bottom sludge contained the VOCs, PAHs, and metals, specifically the hazardous constituents of the products stored in the tank. Stormwater contains oils, VOCs, PAHs, heavy metals, and PCBs.

(c)     **Pathways.** Upon information and belief, Astoria and its predecessors released hazardous substances to Gowanus Bay through 1) direct discharge via stormwater and surface runoff and connections to private outfalls; 2) seepage; and 3) in- and over-water operations. The Generator Station is not connected to the sewer; however, portions of the site are within the area of direct drainage to the Bay. Stormwater is released to the Creek and/or Gowanus Bay. Further, five additional outfalls were identified during an NYCDEP survey that showed connections from the site to Gowanus Bay. Upon information and belief, contamination released from the generator station also reached Gowanus Bay through seepage. Finally, barges were used to transfer product at the bulkhead and allowed for spills and releases directly to the Bay.

118.    **Ballantyne Legacy Holdings, LLC.** Upon information and belief, Ballantyne is the successor to SPX. As described below in Paragraph 154, the ultimate predecessors of SPX—OZ Electrical Manufacturing Company and Gedney Electrical Company, Inc.—owned and operated a manufacturing facility located on the westerly side of the Canal at Bond and Douglas Streets from 1937 until 1995, and the manufacturing facility released hazardous substances to the Canal through direct discharge via stormwater and connections to the sewer system and seepage. Ballantyne and SPX inherited their ultimate predecessors' jurisdictional status and are subject to personal jurisdiction in New York because they assumed and bear liability for their predecessors'

liability to Brooklyn Union. Paragraph 154 is incorporated herein to the same force and effect as if fully set forth herein.

119.     **Bayside Fuel Oil Corporation.** Bayside and its predecessor and subsidiary owned and/or operated two bulk petroleum storage and distribution terminals at the following locations: 1) 510 Sackett Street (Tax Block 431 Lots 12 and 17, and Tax Block 424 Lots 1 and 20) from 1965 through 2008 (the "Bond Street Terminal"); and 2) 503-527 Smith Street (Block 480, Lots 1 and 8) from 1994 to the present (the "Smith Street Terminal").

120.     **Bond Street Terminal.**

(a)     **Operations.** Bayside began operating the Bond Street Terminal as a bulk petroleum storage and distribution facility in 1965 when it acquired Block 431, Lot 17. Terminal operations initially included five underground storage tanks ("USTs") ranging from 100,000 to 500,000 gallons containing #2 fuel oil, #4 fuel oil, diesel, and kerosene. Fuel oil was received by barge and small tank vessels. Three 6-inch pipelines extended from the wharf to the five storage tanks. The facility also had a truck filling area and offices. Bayside expanded the Bond Street Terminal operations in the mid-1980s when Victor Allegretti and Alfred Allegretti acquired Block 431, Lot 12 and Block 424 Lots 1 and 20. Block 431 was used as a motor freight station and had two fuel oil aboveground storage tanks ("ASTs") and one UST. Block 424 had truck repair shops, office space, and a truck storage area. Block 424 also had two pump islands and fourteen 550-gallon USTs. In the course of its operations, Bayside owned and maintained approximately 25 to 30 trucks at the facilities located on Block 431, Lot 12 and on Block 424. Bayside ceased operations on Block 424 and Block 431, Lot 12 in 2001. Bayside's subsidiary, Bayside Depot, leased Block 431, Lot 12 from 2001 through 2008 to conduct meter repair activities. Bayside continued to store and distribute petroleum products on Block 431, Lot 17

through 2006. Between 1994 and 2006, Bayside distributed on average two million gallons of petroleum product per year, with distribution up to ten million gallons in a single year from the terminal.

(b)     **Hazardous Substances.** Fuel oil, kerosene, and other petroleum products, which contained hazardous substances, including volatile organic compounds ("VOCs"), semi-volatile organic compounds ("SVOCs"), and metals (e.g., chromium, arsenic, copper, nickel, and zinc), were stored on-site. Waste oil and used parts cleaning solvents, all of which contained hazardous substances including oil, grease, PAHs, VOCs, PCBs, and heavy metals were also generated during the regular maintenance activities.

(c)     **Pathways.** Upon information and belief, the Bond Street Terminal facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff, private pipes, and connections to the sewer system; 2) seepage; and 3) in- and over-water operations. The Bond Street Terminal was located on the Canal, allowing runoff waters to flow directly to the Canal, including runoff contaminated from on-site soils. Further, the Bond Street Terminal had a private combined sewer and five other connections to the municipal sewer system, all of which drained to the Canal during overflow events, carrying hazardous substances from the site to the Canal. Contamination from the site also reached the Canal through groundwater seepage. Before 2002, a UST was removed, and 120 cubic yards of impacted soil was excavated from the site. Starting in 2002, soil samples at this site contained hazardous substances including PAHs, copper, lead, and PCBs. Groundwater samples at this site contained hazardous substances including PAHs, copper, and lead. Non-aqueous phase liquid (NAPL) was also found in subsurface media at the site. The site entered into the Brownfields Cleanup Program in 2015, and remediation at this site is ongoing. Over 12,000 cubic yards of

contaminated soil have been removed from the site as of December 2022. Upon information and belief, contaminated groundwater from the site discharged and continues to discharge to the Canal. Finally, documented fuel oil spills released hazardous substances to the Canal during vessel product transfers.

121. **Smith Street Terminal.**

(a) **Operations.** Bayside began operating the Smith Street Terminal, a bulk petroleum storage and distribution facility, in 1994 and acquired the property in 1996. When acquired, the terminal was level, paved with asphalt, and equipped with three USTs ranging in size from 200,000 gallons to 500,000 gallons, two 448,182-gallon ASTs, and one 3,000-gallon AST. Bayside stores diesel and #2, #4, and #6 fuel oil at the Smith Street Terminal. Bayside receives petroleum products by barge via two 8-inch and four 6-inch pipelines that extend from the wharf to three steel storage tanks. Between 1994 and 2009, Bayside Depot moved approximately 30 to 40 million gallons of petroleum products per year. Bayside continues to operate at the facility.

(b) **Hazardous Substances.** Fuel oil, diesel, and other petroleum products (all of which contain hazardous substances including VOCs, SVOCs, and metals) are stored on-site.

(c) **Pathways.** Upon information and belief, the facility releases hazardous substances to the Canal through direct discharge via stormwater and surface runoff and connections to private outfalls and the sewer system, as well as seepage from its upland property through the bulkhead to the Canal. The Smith Street Terminal is located on the Canal, allowing runoff waters to flow directly to the Canal, including runoff contaminated by hazardous substances from on-site soils. The Smith Street Terminal also has seven connections to the sewer, some or all of which have drained to the Canal during overflow events. When Bayside

began operations at the Smith Street Terminal in 1994, the owner was in a Consent Order with the NYSDEC to remediate hazardous substances at the terminal. In 1996, a petroleum spill was discovered while digging a trench at the terminal and later a hydrocarbon plume was identified that covered much of the terminal. The hydrocarbon plume contained hazardous substances such as PAHs and NAPL. In 1996, Bayside acquired the terminal and entered a Consent Order with NYSDEC to continue groundwater remediation to remove hazardous substances from the groundwater. In 1997, a remediation system was installed to recover product from the plume. In 2010, soil and groundwater samples at this site contained hazardous substances including PAHs, copper, and lead. Upon information and belief, groundwater at the site flows toward the Canal and therefore contaminated groundwater containing hazardous substances from the site releases to the Canal through the bulkhead which has been documented to be in poor condition. In addition, there have been at least five documented spills to soil on the site.

122. **Beazer East, Inc.** Predecessors of Beazer, including the Koppers Seaboard Coke Company, Inc., Koppers Gas and Coke Company, and the Koppers Company, Inc., owned and/or operated at 300-326 Nevins Street/484-504 Union Street (Tax Block 439, Lot 1) from 1919 until approximately 1956. Beazer inherited the jurisdictional status of its ultimate predecessor—The Koppers Seaboard Coke Company, Inc.—and is subject to personal jurisdiction in New York because it assumed and bears liability for its predecessors' liability to Brooklyn Union.

(a) **Operations.** Beazer's predecessors received coke by lighter or barge, offloading it to the site using two one-ton, steam-operated locomotive cranes. The cranes dumped the coke onto a conveyor which transported the coke to the on-site coke pockets and bins. These coke pockets and bins were located on the northerly portion of the site. The conveyor at the site was capable of receiving 60 tons of coke per hour, and the facility had the capacity to

store a total of 9,000 tons of coke. Beazer's predecessors stored large quantities of coke in open piles within the central and southern portions of the site prior to transporting it to the coke pockets. The site was also equipped with a building used as a garage.

(b) **Hazardous Substances.** Upon information and belief, Beazer's predecessors used waste oil to control dust, and the waste oil was pervasive in the area of the coke piles. Waste oils can include used crankcase oil, metal working oil, gear oil, transmission fluid, brake fluid, hydraulic fluid, and tank bottoms from used oil tanks. Upon information and belief, these waste oils contained hazardous substances including PAHs, SVOCs, VOCs, and heavy metals.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; 2) seepage from its upland property through the bulkhead; and 3) in- and over-water operations. Upon information and belief, floor drains, trenches, and sinks at the site, among other features, were connected to sewers at the site that connected to City-owned sewers, eventually discharging directly to the Canal at a point approximately seven feet below the ground surface. In addition, stormwater at the site, after interacting with outdoor coke storage areas and equipment, discharged 1) directly to the Canal via overland flow; 2) via the sewer system, which also discharged to the Canal; and 3) infiltrated into the ground. Contamination from the site also reached the Canal through seepage. In 2019, a Phase II environmental site investigation report documented hazardous substances at this site, including PAHs, PCBs, copper, and lead in the soil. This report also documented hazardous substances, including PAHs, copper, and lead in site groundwater. Groundwater at the site is also tidally influenced, which allows groundwater at the site to interface with the water in the Canal.

As a result, contaminants in the soil and groundwater at the site migrate out into the Canal. Finally, barges were used to transfer product at the bulkhead and therefore allowed for spills and releases directly to the Canal.

123. **The Brink's Company.** The predecessor of The Brink's Company is the Pittston Company. The Pittston Company was the parent company to a number of subsidiaries, all of whom are now dissolved. One of the Pittston Company's former subsidiaries owned and/or operated the Greason Coal Yard at 150-166 Third Street (Block 462, Lots 9 and 42; and Block 466, Lots 19 and Lot 23) and the support facilities located at 137 Third Street (Part of Block 462) from 1908 through about 1944. Another former subsidiary of the Pittston Company, the Prospect Coal Company, operated at the Prospect Coal Yard at 268 Third Street (Block 980) from 1930 until sometime prior to 1942. Finally, a separate former subsidiary of the Pittston Company owned and/or operated a bulk terminal and distribution center for petroleum products (including fuel oil and kerosene) along the Canal at 38 Second Avenue (Tax Block 990, Lot 160) from 1950 through 1974. Brink's inherited the jurisdictional status of its ultimate predecessor, the Pittston Company, and is subject to personal jurisdiction in New York because it assumed and bears liability for its predecessor's liability to Brooklyn Union.

124. **Greason Coal Yard.**

(a) **Operations.** A subsidiary of Brink's predecessor began operating at the Greason Coal Yard around 1908. The facility was equipped with two "stiff-leg and guy derricks" that were equipped with one-cubic yard buckets and a 50-foot boom to move hazardous substance- containing materials from ships to land and back. By 1938, the Greason Coal Yard had a boiler house, two storage tanks, a hoist, a 40-foot high structure identified as a coal pocket with an open first floor, other support structures, and a coal pile located in the center portion of

the coal yard. The support facilities were used as a private garage at the time. By 1942, the equipment at the site had been upgraded and included a gas-powered crane. The on-site coal pockets had the capacity to store 2,000 net tons of coal and the ground of the coal yard could store another 8,000 net tons of coal. Upon information and belief, operations at the Greason Coal Yard ceased in 1944.

(b) **Hazardous Substances.** Upon information and belief, coal loading and unloading operations released coal dust and particulates, while coal handling and coal storage released hazardous substances including PAHs, metals, PCBs, and suspended solids. The low pH runoff from these outdoor coal piles released hazardous substances including metals from the coal, contaminating the surrounding soil with aluminum, arsenic, beryllium, cadmium, copper, iron, nickel, lead, selenium, and zinc.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; 2) seepage from its upland property through the bulkhead; and 3) in- and over-water operations. The Greason Coal Yard's surface runoff flowed directly into the Canal and discharged to the municipal sewer on Third Street, which also discharged to the Canal during overflow events. The Greason Coal Yard had one connection to the sewer in Third Street while the support facilities had three connections to the municipal sewer system, all of which discharged directly to the Canal during overflow events. Contamination from the site also reached the Canal through seepage. In 2021, a Subsurface Investigation Report documented hazardous substances including PAHs, PCBs, copper, and lead in soil at this site. This report also documented hazardous substances including PAHs and lead in site groundwater. Upon information and belief, groundwater from the site, including

contaminated groundwater, discharges to the Canal. Finally, barges were used to transfer hazardous substance-containing product at the bulkhead and allowed for spills and releases directly to the Canal.

125. **Prospect Coal Yard.**

(a)     **Operations.** Another subsidiary of Brink's predecessor began leasing the Prospect Coal Yard in 1930. The Prospect Coal Yard had a "stiff-leg and guy" derrick, which was equipped with a 60-foot boom and a one-ton bucket to off-load coal for local distribution. The coal was stored in a coal pocket 35-by-280-feet in size, which was located on the bulkhead. Barges used at the Prospect Coal Yard were moored at a dock on the Fifth Street Basin proximate to the facility. Upon information and belief, the Prospect Coal Yard ended its operations by 1942.

(b)     **Hazardous Substances.** Upon information and belief, at the Prospect Coal Yard, coal loading and unloading operations released coal dust and particulates, while coal handling and coal storage released metals and suspended solids. The low pH runoff from the coal pocket released hazardous substances including metals from the coal, contaminating the surrounding soil with aluminum, arsenic, beryllium, cadmium, copper, iron, nickel, lead, selenium, and zinc.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater runoff and connections to the sewer system; 2) seepage through the bulkhead into the Fifth Street Turning Basin; and 3) in- and over-water operations at the bulkhead on the Fifth Street Basin. The Prospect Coal Yard had two connections to the municipal sewer system, and stormwater drainage from the Prospect Coal Yard, which, upon information and belief, contained hazardous substances, flowed directly into

the Fifth Street Basin or into the sewer along Third Street and then discharged to the Canal. Upon information and belief, contamination from the site also reached the Canal through seepage. Soil samples taken from the former Fifth Street Turning Basin near Prospect Coal Yard contained hazardous substances including PAHs, lead, and copper in the soil. Groundwater samples contained hazardous substances including PAHs, lead, and copper. Upon information and belief, groundwater from the site, including groundwater contaminated with hazardous substances, discharges to the Canal. In addition, barges were used to transfer product at the bulkhead, and barges were moored at the nearby American Can bulkhead, therefore allowing for spills and releases directly to the Canal via the historical Fifth Street Turning Basin.

126.    **38 Second Avenue.**

(a)    **Operations.** A third subsidiary of Brink's predecessor used the dock facilities on the Sixth Street Basin at 38 Second Avenue for the receipt of petroleum products by small tank vessels and barges. Two 6-inch pipelines extended from the wharf to six steel storage tanks, which had a total capacity of 13,000 barrels. In 1969, the facility had three 30,000-gallon fuel oil storage tanks and an unidentified number of earth-covered kerosene and fuel oil tanks. The terminal was also equipped with pumps and associated dispensing features for filling trucks. Operations at the facility ceased in 1974 when the property was sold. Upon information and belief, operations at the bulk storage and distribution terminal included the storage and handling of petroleum products; the receiving and unloading of products from vessels, and trucks; the loading of products to trucks for distribution to customers; facility maintenance activities; and vehicle washing and maintenance activities.

(b)    **Hazardous Substances.** Upon information and belief, petroleum products stored, loaded, and unloaded at the terminal contained a mixture of hazardous substances,

including PAHs, VOCs, and metals. Kerosene, for example, contained paraffins (alkanes), cycloparaffins (cycloalkanes), aromatics, and olefins from approximately C9 to C20. Aromatic compounds of concern included alkylbenzenes, toluene, naphthalenes, and PAHs. Effluents from tank bottom water, stormwater, and other sources contained separate phase and dissolved petroleum hydrocarbons, such as benzene, toluene, ethylbenzene, and xylene. Daily operations at the terminal generated waste oil from used crankcase oil, metal working oil, gear oil, transmission fluid, brake fluid, hydraulic fluid, and tank bottoms from used oil tanks. Upon information and belief, these waste oils contained hazardous substances including PAHs, VOCs, heavy metals, and PCBs. Upon information and belief, machinery used to maintain equipment and transport vessels required hydraulic fluids, lubricants, fuel, and electrical equipment. Paints, detergents, cleaners, solvents, and varnishes were also used to maintain the structures and equipment. Degreasers, solvents, and petroleum products all contained VOCs. Upon information and belief, lead-based paints were also used on tanks and in the garage.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; 2) seepage from its upland property through the bulkhead; and 3) in- and over-water operations. The terminal was situated on the Sixth Street Basin, and most of the terminal fell within a direct drainage area from which surface runoff flows directly into the Canal. The terminal had two connections to the municipal sewer, which flowed directly to the overflow outfall and into the Canal. Contamination from the site also reached the Canal through seepage. Soil and groundwater at the terminal contain elevated concentrations of hazardous substances including PAHs, lead, and copper. Upon information and belief, groundwater at the terminal flowed to the Canal, and the groundwater contamination at

the terminal discharges to the Canal. Finally, barges were used to transfer product at the bulkhead, which, upon information and belief, allowed for spills and releases directly to the Canal.

127. **Brooklyn Improvement Company.** BICO was chartered in 1866 by an Act of the New York State Legislature. Between 1866 and 1974, BICO was the Canal's leading business promoter. BICO acquired over a square mile of real estate in the area of the Canal, and BICO's founder, Edwin C. Litchfield, personally financed the construction of the 4th and 5th Street Basins. Litchfield transferred ownership of those basins and surrounding property he owned to BICO in 1869. Between 1947 and 1958, BICO sold the majority of its real estate holdings, including portions of the Fourth, Fifth, Sixth, and Seventh Street Basins. BICO continued to lease its remaining properties until it sold its last parcels in 1974. BICO's properties encompassed Tax Blocks 968 and 978, and the majority of Tax Blocks 979, 980, and 990. BICO participated in the construction of portions of the Canal, developed and leased many of its properties along the Canal for industrial operations, and held title to the Fourth, Fifth, Sixth, and Seventh Street Basins.

(a) **Operations.** BICO's tenants operated a wide-range of industrial sites, including automobile wreckers, coal-handling companies, demolition companies, and many manufacturing sites. BICO leased properties to the following: 13 coal yards and/or sites storing coal; 12 building materials, lumber, and/or construction yards; ten manufacturing facilities; six welding, metal work, and/or blacksmith facilities; seven warehouses; five asphalt plants; five automotive, salvage, junk, or scrap yards; three dumps or waste transfer facilities; three trucking facilities; two bulk oil terminals; and two boat repair facilities. The company also occupied a management office near the Fourth Street Basin.

(b)     **Hazardous Substances.** The processes used by BICO's tenants generated numerous types of wastes, all containing hazardous substances, including metals, VOCs, SVOCs, PAHs, and PCBs. Upon information and belief:

(i)     Coal yards or sites storing coal that were operated by BICO's tenants generated metals such as arsenic, beryllium, cadmium, chromium, copper, lead, mercury, nickel, selenium, and PAHs, namely, fluoranthene, pyrene, chrysene, and phenanthrene to the environment.

(ii)     Sites used by BICO's tenants for building materials, lumber, or construction yards generated oil, grease, and petroleum products containing VOCs, PAHs, and metals, and those facilities that treated wood generated pentachlorophenol, creosote, borates, ammonium compounds, inorganic formulations of chromium, copper, arsenic, and carrier oils.

(iii)     Welding, metal working, and blacksmithing operations by BICO's tenants generated chromium, nickel, arsenic, manganese, silica, beryllium, cadmium, nitrogen oxides, phosgene, acrolein, fluorine compounds, carbon monoxide, cobalt, copper, lead, ozone, selenium, and zinc. Machine repair and maintenance operations produced waste oil, cutting fluids, coolants, solvents.

(iv)     Warehouse operations by BICO's tenants entailed machine and equipment repair operations, which in turn produced waste oil, cutting fluids, coolants, and solvents.

(v)     Asphalt plants or paving plants operated by BICO's tenants produced benzene, chromium, PAHs, cadmium, and arsenic.

(vi)     Automotive, salvage, junk, or scrap yards operated by BICO's tenants generated oil and grease, arsenic, organics, heavy metals, and PCBs, as well as metals such as aluminum, cadmium, copper, chromium, and lead.

(vii)     Dumps or waste transfer facilities operated by BICO's tenants were used to collect ash, refuse, and the like. These materials contained PAHs, and ash contained heavy metals, such as arsenic, barium, cadmium, chromium, lead, mercury, selenium, and other metals.

(viii)     Trucking facilities operated by BICO's tenants generated spent solvents, used oil, gasoline, and used antifreeze containing heavy metals and VOCs.

(ix)     Bulk oil terminal facilities operated by BICO's tenants generated oil, grease, and petroleum products containing VOCs, PAHs, and metals.

(x)     Boat repair facilities operated by BICO's tenants generated lead, zinc, and PAHs from coal tar-derived pitch.

(xi)     Metal manufacturing facilities operated by BICO's tenants generated metals, oils, glycol ethers, n-butyl, xylene, methyl ethyl ketone, trichloroethylene, toluene-1, dichloromethane, methyl isobutyl ketone, acetone, and tetrachloroethylene.

(xii)     Wood furniture manufacturing facilities operated by BICO's tenants generated spent solvents, stains, drying oils, synthetic resins, thinners, and pigments, lacquers, varnish, shellac, polyurethane, paints, and oils.

(xiii)     Cork flooring manufacturing facilities operated by BICO's tenants generated phenolic or resin binders. Solvents were also used in cleaning, painting, and maintenance activities, and sealants and finishes known to have contained PCBs were used on flooring, certain paints, mastic, and adhesives.

(c)     **Pathways.** Upon information and belief, BICO's numerous tenants released hazardous substances to the Canal through 1) direct discharge via stormwater runoff, connections to private outfalls, and connections to the sewer outfalls; 2) seepage from its upland properties through the bulkhead; and 3) in- and over-water operations. In conjunction with its ownership of the basins, BICO granted drainage rights for adjacent property owners to discharge into the Canal. A portion of the BICO site is part of an area that drains directly to the Canal. Upon information and belief, BICO was involved in constructing facilities and related infrastructure, such as sewers and drains, on the BICO properties. At least 35 unpermitted and/or private outfalls have been identified on the former BICO properties, all of which discharge to the Canal. In addition, the facilities had numerous connections to the City sewer system, which also discharged to the Canal during overflow events. Untreated wastes from the BICO sites have been identified as contributing to pollution in the Canal through private sewers and surface drainage. The hazardous substance-laden wastewaters generated by BICO's tenants were discharged to the Canal or resulted in contaminants being contained in stormwater runoff, or both. Upon information and belief, spills and accidental releases from equipment, loading and unloading operations, and wash water, as well as any wastes generated at these facilities, contained numerous hazardous substances, including PAHs, VOCs, SVOCs, and metals. When these materials came into contact with site soils and stormwater runoff, the contaminants migrated through the unsaturated zone to the underlying shallow groundwater. Portions of the historic BICO properties are now in state remedial programs. Soil at BICO properties contains hazardous substances including PAHs, lead, copper, and PCBs, and groundwater contains hazardous substances including PAHs, lead, and copper. Upon information and belief, groundwater flow from the BICO sites is towards the Canal, meaning that groundwater contamination discharges to

the Canal. During the time BICO and its tenants operated at the Canal, industrial waste and raw sewage were discharged untreated to sewers and directly to the Canal and/or the Fourth, Fifth, Sixth, and Seventh Street Basins. Upon information and belief, stormwater runoff from the property also contained hazardous substances such as VOCs, PAHs, heavy metals, pesticides, and/or PCBs and released to the ground surface, storm sewers, and/or directly into the Canal. Contamination from the site also reached the Canal through seepage.

128. **Dun & Bradstreet.** Between 1913 and 1966, predecessors of D&B owned and operated a 4-story printing plant, which was located at 206-224 Nevins Street; 239-257 Butler Street; and 484-498 Baltic Street (Block 405, Lot 27). D&B inherited the jurisdictional status of its predecessors and is subject to personal jurisdiction in New York because it assumed and bears liability for its predecessors' liability to Brooklyn Union.

(a) **Operations.** At this site, D&B's predecessors undertook activities such as metal printing plate preparation, printing, printing cleanup, stencil preparation for screen printing, materials handling, photo processing, and fueling.

(b) **Hazardous Substances.** Upon information and belief, the operations at this facility commonly used solvents, heavy metals, fuel, and oil, all of which contained hazardous substances such as VOCs, PAHs, PCBs, lead, chromium, and copper. Upon information and belief, the waste streams from these operations contained numerous hazardous substances (such as VOCs, SVOCs, PAHs, and metals) from the solvents, metals, petroleum-based fluids, oil-water emulsions, and synthetic emulsions used in D&B's operations.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via stormwater runoff and connections to the sewer system. There were multiple floor drains throughout the plant and two trench drains

(located in the truck loading area), which discharged to the City's sewer system. Overall, there were seven city sewer connections from the site, all of which discharged to the City's combined sewer system. The former D&B site is situated within the current sewershed for the Red Hook WPCP, but the Red Hook WPCP did not begin operations until 1987—long after D&B's predecessors' ceased operations. During D&B's tenure, industrial hazardous waste and raw sewage discharged from the site to City sewers and emptied, untreated, into the Canal.

129. **Hess Corporation.** Predecessors of Hess operated at a site approximately 19 acres in size, at the foot of Clinton and Court Streets (Block 496, Lot 1; Block 623, Lots 1, 20, 62, and 93; Block 624, Lots 1 and 100; and Block 621, Lots 134, 136, and 139) (the "Court Street Facility") from 1913 to 2013. From approximately 1905 to 1920, predecessors of Hess also operated a boat repair operation at what is now known as Block 635, Lot 13.

130. **The Court Street Facility and Bulk Terminal.**

(a) **Operations.** Hess's predecessors conducted vessel construction and repair activities at the Court Street Facility from 1913 through 1981. Ship construction and repair operations took place onshore and at its piers and floating dry docks for more than 50 years. Between 1913 and 1981, over 340 vessels were repaired, converted, or built at Hess's shipyard facilities. Repair work was carried out on vessels, usually using floating docks that could be lowered under the surface of the water to raise ships up for repairs. Hess and its predecessors also operated a bulk petroleum storage and distribution facility at the Court Street Facility from approximately 1940 until 2013.

(b) **Hazardous Substances.** Upon information and belief, Hess's ship construction and repair activities involved the use of materials such as paints, defouling agents, and sand blasting grit and residuals. The wastes generated from these activities included metals

(such as copper, zinc, and lead), PAHs, VOCs, and PCBs. Upon information and belief, waste streams from the bulk terminal operations included waste oils (containing heavy metals, PCBs, aliphatic and aromatic hydrocarbons), tank bottom sludge and water, tank cleaning residuals, and other similar hazardous substances.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal and Bay through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; 2) seepage; and 3) in- and over-water operations. The Court Street Facility is located in an area that drains directly to the Canal. Stormwater runoff and sheet flow from outdoor activities flowed directly into the Creek. The Court Street Facility was also equipped with approximately 13 connections to the sewer system, all of which discharged to the Creek and/or Bay during overflow events. The Court Street Facility also had eight private outfalls. Contamination from the site also reached the Canal through seepage. Hess had numerous spills and releases at the bulk oil terminal from both tanks and underground pipelines. In January 1976, two USTs exploded and spilled 2.5 million gallons of #2 and #6 fuel oil (NAPL) into the Canal. This was the largest spill ever recorded on the Gowanus. Only a partial cleanup was conducted, leaving the Canal adversely impacted. Sampling conducted in the mid-1980s as part of Hess's bulkhead rehabilitation project indicated that the sediments were so badly contaminated that Hess was denied permission by USACE to dispose of the dredge materials by ocean dumping. Finally, releases from day-to-day shipbuilding and repair operations discharged hazardous substances into the Canal and Bay. The storage of petroleum products and additive materials created the potential for leaks or accidental releases from tanks, piping, hoses, and pumps during loading and unloading operations. In August 2001, NYSDEC filed a complaint against Hess, noting that the company had discharged

a total of 12,000 gallons of fuel oil (NAPL) in two documented spill incidents to the water and the Canal. Ultimately, NYSDEC issued an Order on Consent that required Hess to pay a $1.1 million penalty and meet other requirements. One of Hess's consultants noted that between 1993 and 2002, over 2,239 gallons of liquid phase hydrocarbons had been removed from groundwater at the site; by 2009, 296,573 gallons of total fluids and approximately 2,580 gallons of NAPL had been removed. Between February 2008 and September 2009, Hess collected NAPL from recovery monitoring wells at the rate of a little over 2,500 gallons per month. Site investigation has demonstrated that groundwater, including contaminated groundwater, flows from the site to the Bay and the Canal. Soil and groundwater samples collected from the site as part of the Gowanus Canal Remedial Investigation contained hazardous substances including PAHs, lead, and copper.

131. **Kraft Foods Inc.** The ultimate predecessors of Kraft, including the New York Tartar Company, Tartar Chemical Company, and Royal Baking Powder Company, owned and/or operated a manufacturing facility located on the Canal between Ninth Street and the Seventh Street Basin (Tax Block 990, Lot 50) from 1883 until 1946. Kraft inherited the jurisdictional status of these predecessor entities and is subject to personal jurisdiction in New York because it assumed and bears liability for its predecessors' liability to Brooklyn Union.

(a) **Operations.** Between 1883 and 1946, Kraft's predecessors manufactured cream of tartar, tartaric acid, and Rochelle salt. Site features included manufacturing buildings with crystallizing equipment, evaporators, an acid room, and processing tanks, as well as fuel oil tanks and a carpenter shop. Outdoor features included a coal bin, coal trestle, coal hopper, hoists, and coal sheds. Kraft's predecessors received fuel oil, sulfuric and other acids, and other materials by vessels at the site. Pipelines at the facility included a 3-inch wrought iron pipeline

for sulfuric acid that extended from the dock to the storage tanks. One 6-inch pipeline extended to four 25,000-gallon oil storage tanks. Various intermediary products were generated in the decomposition process and these were conveyed from the autoclaves to a furnace where they were destroyed. The other products were apparently discarded as a solution. The tanks, crystallizing vats, and filter presses were connected with wooden chutes that led to three absorption systems. The absorption systems consisted of a 30-foot high by 4-foot diameter tower that was filled with wooden slabs or coke, on which a continuous stream of water was poured.

(b) **Hazardous Substances.** Upon information and belief, the most common products and wastes stored at the site were argols, cream of tartar, tartaric acid, coal, coke, ash, bone black, sulphuric acid, other acids, fuel oil, waste/used oil (lubricating oil and hydraulic fluid), solvents, degreasers, cleaning or disinfectant chemicals, paints, and varnishes. Upon information and belief, the waste streams generated by the manufacturing processes and the maintenance of equipment contained hazardous substances such as oil, heavy metals, fuel, chlorinated solvents, acid/alkaline wastes, arsenic, hydraulic fluids, and organics. Industrial waste, raw sewage, and stormwater from the facility contained VOCs, PAHs, heavy metals, sulfuric acid, and PCBs. Stormwater also contained pesticides.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to private outfalls; 2) seepage; and 3) in- and over-water operations. Upon information and belief, during the time Kraft's predecessors operated at the site, industrial waste and raw sewage was discharged directly to the Canal and/or through the Seventh Street Basin to the Canal. The site, situated on the Seventh Street Basin, is in a direct drainage area, meaning that it was not connected to the City sewer system and therefore the facility released directly to

the Canal. During various investigations of the Canal, approximately twenty-six unpermitted and/or private outfalls have also been identified proximate to the site, all of which discharge directly to the Canal. A commission created in 1899 to examine the pollution in the Canal found that wastewaters generated at the site were discharged to the Canal. In its study, the commission concluded that the New York Tartar Company was among one of the top five polluters of the Canal waters and surrounding atmosphere. Contamination from the site also reached the Canal through seepage. Soil samples collected from the site as part of the Gowanus Canal Remedial Investigation contained hazardous substances including PAHs, PCBs, lead, and copper while groundwater samples contained PAHs, lead, and copper. Groundwater, including contaminated groundwater, discharges from this site to the Canal. Finally, barges were used to transfer product at the bulkhead and therefore allowed for spills and releases directly to the Canal.

132. **<u>MCIZ Corp., 36-2nd J Corp, 15 Second Avenue LLC and 107 Sixth Street LLC</u>.** MCIZ Corp., 36-2nd J Corp., 15 Second Avenue LLC, and 107 Sixth Street LLC (collectively, "MCIZ entities") have owned and/or operated at two sites on the Canal. The four companies are run by the Marmurstein entities. MCIZ Corp. operated a Bus Garage and Maintenance Facility (Tax Block 979, Lot 31), from 1992 until 2012 at the first site, located on the Fourth Street Basin. 15 Second Avenue LLC purchased this site in 1997, and continues to own it today. The second site, the Sixth Street Yard (Tax Block 990, Lots 160, 117, 151, and 153), is located on the Sixth Street Basin and has been owned and operated by the MCIZ entities since 1984.

133. **Bus Garage and Maintenance Facility.**

(a) **Operations.** MCIZ Corp. operated the Bus Garage and Maintenance Facility from 1992 until approximately September 2012 and used it as a garage and maintenance facility for buses. Operations included mechanical repairs, painting, fueling, lubrication,

equipment cleaning, parts cleaning, vehicle washing, and outdoor vehicle and equipment storage and parking. The site includes a building equipped with mechanic pits, automobile repair equipment, and both USTs and ASTs. 15 Second Avenue LLC has owned the property since 1997, and continues to own it today.

(b)  **Hazardous Substances.** Upon information and belief, vehicle maintenance, washing activities, and outdoor vehicle and equipment storage and parking activities utilized hazardous substances such as chlorinated solvents, oil, PCBs, heavy metals, acid/alkaline wastes, ethylene glycol, arsenic, detergents, phosphorus, salts, suspended solids, hydraulic fluids, organics, fuel, transmission fluid (containing VOCs and SVOCs), and PAHs.

(c)  **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system; and 2) seepage. Environmental investigations at the property have identified petroleum-contaminated soils and releases of petroleum product flowing from the facility to the street and sewer system, which discharges to the Canal. The facility has at least two sewer laterals that connect to the Second Avenue sewer and discharge to the Canal during overflow events. Contamination from the property also reaches the Canal through seepage. Numerous documented spills, releases, and incidents involving petroleum products have occurred at the facility. For example, at some point between July 2005 and December 2006, MCIZ Corp. parked a disabled tour bus over a monitoring well for roughly eighteen months. Investigations revealed that the bus leaked transmission fluid into the monitoring well during the time it was parked there. Free product (NAPL) has been identified in on-site monitoring wells, and inspections have identified unreported and unremediated petroleum discharges. The groundwater from this site, including contaminated groundwater, discharges to the Canal.

134. **Sixth Street Yard.**

(a)  **Operations.** J Corp. acquired a portion of the Sixth Street Yard in 1984 and 107 LLC acquired the remainder of the site in 2002. J Corp. has operated at the Sixth Street Yard since 1984; MCIZ Corp. began operations there in or around 1992. The property is used as a bus garage, bus washing facility, and unpaved parking area for about 50 to 75 buses. J Corp. and 107 LLC are the current owners of the property. The property includes a garage, an open structure for bus washing, a parking area, diesel AST, and approximately 500 feet of Canal frontage.

(b)  **Hazardous Substances.** Upon information and belief, vehicle maintenance, washing activities, and outdoor vehicle and equipment storage and parking activities utilized hazardous substances such as chlorinated solvents, oil, PCBs, heavy metals, acid/alkaline wastes, ethylene glycol, arsenic, detergents, phosphorus, salts, suspended solids, hydraulic fluids, organics, fuel, and PAHs.

(c)  **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) seepage. The majority of the Sixth Street Yard falls within a direct drainage area from which surface run-off flows directly into the Canal. Twelve private/unpermitted outfalls have been identified on or near the property, all of which discharge directly to the Canal. In 2011, NYSDEC and NYCDEP observed:

> pools of discharged petroleum and automotive fluids at the 6th St. Bus Yard and in the Canal abutting the 6th St. Bus Yard. Department staff observed that the 6th St. Bus Yard is pitched toward 6th St., which has six catch basins collecting stormwater and other runoff from the 6th St. Bus Yard. Department staff conducted a dye test and determined that one of the catch basins drained the [s]ite discharges directly to the Canal. The first flush of the dye test contained black oily sludge.

Numerous documented spills and releases of petroleum products have occurred at the Sixth Street Yard since the MCIZ entities began operating at the facility. The MCIZ entities' improper management of materials allowed metals and PAHs to enter the Canal, catch basins, drains, the City's sewer system and groundwater. For this reason, in February 2011, MCIZ Corp., J Corp., and 107 LLC entered into an Order on Consent with NYSDEC wherein the companies agreed to pay $482,750 in penalties for violations related to petroleum bulk storage, solid waste, Stream Protection Act Violations, Tidal Wetlands Act, and petroleum discharges at the facility. Contamination from the site also reached the Canal through seepage. Groundwater and soil on-site have been found to be impacted with PAHs and metals (including copper and lead), and the groundwater from this site, including contaminated groundwater, discharges to the Canal.

135.    **Metropolitan Transportation Authority.** As described above in Paragraph 88, MTA owned and/or operated the BRT Powerhouse, located at 322 (or 332) 3rd Avenue and 153 2nd Avenue (Tax Block 967), from about 1968 to 1972, as well as the Brooklyn Rapid Transit Facility located at 7 9th St. (Block 477, Lot 1), from about 1968 through present day. This Paragraph is incorporated herein to the same force and effect as if fully set forth herein.

136.    **MRC Holdings, Inc.** MRC handles and discharges the environmental liabilities for the American Can Company ("ACC"). Between 1884 and 1951, ACC owned and operated a tin can manufacturing facility located at 232-250 Third Street and 361-385 Third Avenue (Block 980, Lots 1, 8) on the Fifth Street Basin of the Canal. MRC inherited the jurisdictional status of ACC and is subject to personal jurisdiction in New York because it assumed and bears liability for ACC's liability to Brooklyn Union. MRC is a subsidiary of Citigroup, Inc.

(a)     **Operations.** There was a tin can factory on-site, a four-story brick-engine house, machine shop, rolling mill, heating furnaces, dry kilns, tin lined drying ovens, and pattern

shop areas for painting, printing, grinding, and varnishing. MRC's predecessors manufactured black plates, tin plates, and cans and painted tin cans. These activities required metal cutting, heating, forming, shaping, assembling, and similar activities. The surfaces of the products were prepared for decorative printing and painting, during which enamels, inks, and/or protective surface coatings applied.

(b)     **Hazardous Substances.** Upon information and belief, materials used in these processes included numerous hazardous substances, such as metals (*e.g.,* tin and lead), paints containing metals (*e.g.,* lead, chromium, cadmium, and arsenic), metalworking fluids (*e.g.,* petroleum-based fluids, oil-water emulsions, and synthetic emulsions), and metal cleaning chemicals (*e.g.,* contained n-butyl alcohol, phosphoric acid, chlorine, chlorine dioxide, formaldehyde, nitric acid, toluene, carbon tetrachloride, and xylenes). Upon information and belief, the industrial waste, raw sewage, and stormwater from the site contained metals (including copper), PCBs, PAHs, VOCs, and SVOCs.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; 2) seepage; and 3) in- and over-water operations. Upon information and belief, during the entire time period that MRC's predecessors operated at the site, industrial waste, raw sewage, and stormwater runoff wastewaters from these operations discharged into sewers, which flowed untreated into the Canal. The tin can manufacturing facility was situated on the Fifth Street Basin, which was subsequently filled in. During the time the facility was in operation, there were at least three connections to City sewers. During wet weather events or during periods of high volume, these flows discharged directly to the Canal without any pretreatment. In addition, MRC's predecessors had a private storm sewer

that discharged directly into the Fifth Street Turning Basin. When the Fifth Street Turning Basin was filled in 1949 or 1950, the storm sewer from the site was extended to the Fourth Street Basin continuing the release of hazardous substances. Further, barges were used to transfer product at the bulkhead and therefore allowed for spills and releases directly to the Canal. Soil samples taken from the former Fifth Street Turning Basin near the site contained hazardous substances including PAHs, lead, and copper in the soil. Groundwater samples contained hazardous substances including PAHs, lead, and copper.

137. **New York City Economic Development Corporation.** As described above in Paragraph 100, NYCEDC has managed the City's SBMT located along Second Avenue between 29th and 39th Streets (Block 662, Lots 1, 130, 136, 137, and 155) from 1991 to the present. The operations conducted on the SBMT include a maintenance shop, the storage and distribution of automobiles and pipelines, warehousing, stationary printing and distribution, an MTA bus storage and rail yard, and a NY Police Department impound lot. As further described above, the NYCEDC has also operated the 23rd Street Pier (*see* ¶ 101 above) and the 25th Street Pier (*see* ¶ 102 above) (at Block 644, Lots 1, 50, and 109 and Block 653, Lot 103) from 1991 to the present. Paragraphs 100-102 are incorporated herein to the same force and effect as if fully set forth herein.

138. **New York City Industrial Development Agency.** NYCIDA is an industrial development agency organized under Section 917 of the Municipal Law. In 1974, the NYCIDA was established as part of a state-wide program to create industrial development agencies. NYCIDA was empowered to acquire, construct, reconstruct, lease, improve, maintain, equip, and furnish land, buildings, and real property (*e.g.*, machinery and equipment suitable for commercial or industrial purposes). NYCIDA entered into negotiations with various entities to

"induce" the entity to expand or refurbish existing operations. As a part of its routine operations, NYCIDA acquired either fee simple title or leasehold title to the property in question and then leased or subleased it to the entity. NYCIDA was placed under the supervision of the EDC after that entity was formed in 1991. Through its program, NYCIDA owned the following sites on or near the Gowanus Canal:

- **A ship repair facility at Block 612, Lot 130, from 1985-1994.** Upon information and belief, hazardous substances generated from ship construction, repair, and maintenance activities included paints and paint solids, defouling agents, heavy metals, spent abrasives, solvents, petroleum-based fluids, oil-water emulsions, and synthetic emulsions, which contained metals, PAHs, PCBs, VOCs, and SVOCs. Upon information and belief, the facility released hazardous substances to the Bay through in- and over-water operations. PAHs, PCBs, copper, and lead have been detected in site soil, and copper and lead have been detected in site groundwater.

- **A commercial printing facility at Block 465, Lots 12 and 112, from 1984-1999 and 2002-2008.** Upon information and belief, hazardous substances generated from printing operations included solvents, heavy metals, fuel, and oil, all of which contained hazardous substances such as VOCs, PAHs, PCBs, lead, chromium, and copper. Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via stormwater runoff and connections to the sewer outfalls.

- **A truck reconditioning/rehabilitation facility at Block 1025, Lot 26 and Block 1031, Lots 1 and 100, from 1981-2000.** Upon information and belief, hazardous

substances generated from vehicle repair, service, and reconditioning activities included solvents, heavy metals, lubricants, fuel, and oil, which in turn contained total PAHs, cPAHs, copper and lead. Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via stormwater and connections to the sewer system.

- **A general contracting, construction, and masonry subcontracting facility at Block 462, Lot 142, from 1985-1996.** Upon information and belief, hazardous substances generated from construction and masonry activities included metals and hydrocarbon fuels. These substances, in turn, can contain total PAHs, cPAHs, copper, and lead. Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via stormwater and connections to the sewer system. LNAPL, PAHs, and lead have been detected in site groundwater, and PAHs, PCBs, copper, and lead have been detected in site soil.

- **A light fixture and electrical items distribution facility at Block 623, Lots 100 and 118, from 2005-present.** Upon information and belief, hazardous substances generated from operations associated with materials and equipment handling activities at warehouses and distribution facilities included solvents, oils, metals, hydraulic fluids, and hydrocarbons. These substances, in turn, can contain total PAHs, cPAHs, PCBs, copper, and lead. Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater; 2) seepage from its upland property through the bulkhead. PAHs, lead, and copper have been detected in site soil and groundwater.

- **A direct mail and marketing service facility at Block 583, Lots 1 and 36, from 1998-2003.** Upon information and belief, hazardous substances generated from operations associated with materials and equipment handling activities at warehouses and distribution facilities included solvents, oils, metals, hydraulic fluids, and hydrocarbons. These substances, in turn, can contain total PAHs, cPAHs, PCBs, copper, and lead. Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via stormwater runoff and connections to the sewer outfalls.

- **A computer systems remanufacturing and distribution facility at Block 465, Lots 29 and 33, from 2001-2013.** Upon information and belief, hazardous substances generated from electrical and electronics manufacturing included metals, inorganic compound, organic solvents, and halogenated compounds. These substances, in turn, can contain metals (e.g., copper), PAHs, VOCs, and SVOCs. Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via stormwater runoff and connections to the sewer outfalls.

- **A mirror and glass manufacturing/warehouse facility at Block 633, Lot 24, from 1983-1993.** Upon information and belief, hazardous substances generated from glass manufacturing and warehousing operations included metals, organic compounds, solvents, lubricating oils, and hydrocarbon fuels. These substances, in turn, can contain total PAHs, cPAHS, and lead. Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via stormwater runoff and connections to the sewer outfalls.

- **A medical supplies manufacturer/distribution facility at Block 464, Lot 51 and Block 471, Lot 110 from 2001-2006.** Upon information and belief, hazardous substances generated from operations associated with materials and equipment handling activities at warehouses and distribution facilities included solvents, oils, metals, hydraulic fluids, and hydrocarbons. These substances, in turn, can contain total PAHs, cPAHs, PCBs, copper, and lead. Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via stormwater runoff and connections to the sewer outfalls.

- **A paper and plastics product manufacturer/distribution facility at Block 1002, Lot 1 and Block 1007, Lot 29, from 1984-1988.** Upon information and belief, hazardous substances generated from paper and plastics manufacturing included plasticizers, resins, processing oils, adhesives, hydrocarbons, oil and grease. These substances, in turn, can contain total PAHs, cPAHs, PCBs, copper, and lead. Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via stormwater runoff and connections to the sewer outfalls.

- **A wholesale grocery item warehouse facility operated at Block 625, Lots 65, 80, and 250, from 1982-1991 and 2005-present.** Upon information and belief, hazardous substances that have been identified at the site included total PAHs, cPAHs, PCBs, copper, and lead. Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater runoff and connections to the sewer outfalls; 2) seepage from upland properties through the bulkhead.

- **A building material warehouse and distribution facility operated at Block 641, Lots 77 and 100, from 1984-2001.** Upon information and belief, hazardous substances generated from operations associated with materials and equipment handling activities at warehouses and distribution facilities included solvents, oils, metals, hydraulic fluids, and hydrocarbons. These substances, in turn, can contain total PAHs, cPAHs, PCBs, copper, and lead. Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via stormwater runoff and connections to the sewer outfalls.

139. **New York City Transit Authority.** As described above in Paragraph 88, NYC Transit owned and operated the BRT Powerhouse, located at 322 3rd Avenue and 153 2nd Avenue (Tax Block 967), from about 1953, when NYC Transit was created, until 1968, when NYC Transit became part of the MTA. As described above in Paragraphs 98 and 99, NYC Transit also owned and/or operated the Smith Street Powerhouse, located at 509-513 Smith St. (Block 480, Lots 8 and 34) from 1953 through 1961 and the Brooklyn Rapid Transit Facility located at 7 9th St. (Block 477, Lot 1) from 1953 through present day. These Paragraphs are incorporated herein to the same force and effect as if fully set forth herein.

140. **NL Industries Corp.** NL's predecessors, including Doehler Die Casting Company, W.B. Jarvis Company, and Doehler Jarvis Corporation, owned and operated two facilities near the Canal: (1) a die casting production facility located at 197 W. 9th Street, 196 Huntington Street, and 505 Court Street (Block 476, Lot 6) (the "Court Street Facility"), owned from 1908 to 1942 and operated from approximately 1908 to 1924; and (2) a garage and storage facility located at 307-315 Bond Street and 452-487 Union Street (Block 438, Lot 7) (the "Bond Street Facility"), owned and operated from 1917 to 1924. NL inherited the jurisdictional status of its

predecessor entities and is subject to personal jurisdiction in New York because it assumed and bears liability for its predecessors' liability to Brooklyn Union.

141.     **Court Street Facility.**

(a)     **Operations.** At the Court Street Facility, NL's predecessors manufactured die-castings in white aluminum and brass alloys and made bronze back and aluminum back babbit-lined bearings. The operations building at the Court Street Facility was expanded several times until it was 10-stories high. Raw materials such as bars and ingots were stored in the basement near the "gas producing plant" that supplied gas for all of the metal alloying and heat-treating processes and laboratory activities. The ground floor had the receiving, shipping, and alloying departments. The alloy department had several cast-iron kettles of 7,500 pounds capacity and a reverberatory furnace lined with alundum brick. The second floor contained offices and the engineering department. The third floor housed the machine shop, die room, and heat-treating room. The fourth floor contained the cleaning and finishing department. The company made tin, zinc, and lead alloys and cast them into ingots on the fifth floor. The sixth floor consisted of the aluminum casting department and the seventh floor housed the chemical and physical testing rooms as well as the electrolytic department. The eighth through tenth floors held the brass casting department which produced the "Do-Di" brass casting. The company manufactured items such as speedometer parts, motor housings and covers, automatic photographic machine parts, a wide range of gears, bearings, and parts for drinking cup dispensers.

(b)     **Hazardous Substances.** At the Court Street Facility, NL's predecessors used substantial amounts of metals. The company used lead alloys, zinc alloyed with tin, copper, and aluminum, and brass to make its die castings. As of 1919, the plant produced 25 standard

alloys. Standard mixtures included: (1) 88% zinc, 8% tin, and 5% copper; (2) 86% tin, 6% copper, and 8% antimony; (3) 83% lead and 17% antimony; and (4) 92% aluminum and 8% copper. To make these and other mixtures, the company used electrolytic copper ($\approx$ 300,000 pounds), zinc ($\approx$ 400,000 pounds), tin ($\approx$ 300,000 pounds), lead ($\approx$ 100,000 pounds), aluminum ($\approx$ 250,000), and antimony ($\approx$ 50,000 pounds) each month. The wastewaters contained metals as well as various chemicals for cleaning equipment, such as solvents used in cleaning that, upon information and belief, contained substances such as n-butyl alcohol, dichloromethane, phosphoric acid, tert-butyl alcohol, chlorine, chlorine dioxide, formaldehyde, nitric acid, toluene, and xylenes. Metal-working fluids used in machine shops were used to control the temperature of tools and work pieces, aid in lubrication, wash away debris, and inhibit corrosion or surface oxidation. Upon information and belief, these fluids included petroleum-based fluids, oil-water emulsions, and synthetic emulsions, which likely contained PCBs and, after use, contained high levels of metals.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through direct discharges to the City sewer. Upon information and belief, the waste streams from these activities were discharged to the sewer system without pretreatment. The facility was situated one block west of the Canal and was equipped with at least 15 lateral connections to the City sewers.

142.     **Bond Street Facility.**

(a)     **Operations.** The Bond Street Facility was on the Canal just south of the Union Street Bridge. Upon information and belief, the Bond Street Facility was used as a maintenance garage and storage facility with steam heating boilers.

(b) **Hazardous Substances.** Upon information and belief, the facility generated waste oil (or used oil) such as used crankcase oil, metal working oil, gear oil, and hydraulic fluid. Waste oil contains PAHs, VOCs, and heavy metals. The major components of waste oil are aliphatic and aromatic hydrocarbons (such as phenol, naphthalene, benz(a)anthracene, benzo(a)pyrene, and fluoranthene).

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls. Sheet flow from this site discharged directly to the Canal, and the building was equipped with three lateral connections to the City sewer, all of which discharged directly to the Canal. Seven private outfalls were identified that discharged to the Canal. During the time NL's predecessors operated at the site, industrial waste, stormwater, and raw sewage were discharged untreated to the Canal. In 2016, soil and groundwater at the site contained hazardous substances including PAHs, copper, and lead.

143. **Northville Industries Corporation.** Predecessors of NIC, including its ultimate predecessor, Premium Coal & Ice Company, owned and/or operated three facilities along the Canal: (1) a coal yard at 495-505 Sackett Street (Block 424, Lot 20) from 1964 to 1986; (2) a vehicle storage/oil service at 347-355 Bond Street (Block 452, Lot 5) from 1966 through 1986; and (3) a coal pocket at the 25th Street Pier (approx. Block 653, Lot 3) from at least 1929 through at least 1960.

144. **Sackett Street Coal Yard.**

(a) **Operations.** NIC's predecessors began operating at the Sackett Street Coal Yard by 1965. The yard received coal by barge, where an electric crane with a 60-foot boom and a 2-ton clamshell bucket unloaded the coal from barges. Once at the facility, coal was

sorted by grade and stored in a reinforced concrete hopper until it was loaded onto trucks for delivery. Several small structures existed along the northwesterly boundary of the lot and a gasoline UST existed between these structures and the coal pockets.

(b)     **Hazardous Substances.** Coal loading and unloading operations resulted in the release of coal dust and particulates at the Sackett Street Coal Yard. Contaminants released during coal handling and storage primarily included PCBs, metals, and suspended solids. Upon information and belief, operations at the coal yard exposed the coal to weather-related precipitation. Stormwater reacts with the minerals in the coal to produce a leachate contaminated with ferrous sulfate and sulfuric acid. Leachates from outdoor coal piles are usually of very low pH. The low pH runoff releases metals from the coal, contaminating the surrounding soil with aluminum, arsenic, beryllium, cadmium, copper, iron, nickel, lead, selenium, and zinc. Unburnt coal contains a large fraction of volatile organic hydrocarbons, and organic compounds from coal pile run-off include PAHs.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff; 2) seepage; and 3) in- and over-water operations. Upon information and belief, run-off from the facility flowed freely to the Canal or to the storm drains located near Court Street and Bond Street because there were no containment features, such as berms, dikes, or levees, at the site. The Sackett Street Coal Yard was not connected to the municipal sewer system; however, upon information and belief, surface flow ran to combined sewers that discharged to the Canal during overflow events. Contamination from the site also reached the Canal through seepage. Soil and groundwater at the site contain hazardous substances including PAHs, lead, and copper. Upon information and belief, groundwater from the site, including contaminated groundwater,

discharges to the Canal. Finally, barges were used to transfer product at the bulkhead and therefore allowed for spills and releases directly to the Canal.

145. **Vehicle Storage and Oil Service at 347-355 Bond Street.**

(a) **Operations.** NIC's predecessor acquired the vehicle storage and oil service area in 1966. In 1969, the facility was used as a parking lot and motor freight station. From at least 1977 through approximately 1988, the facility was used as an oil service area and parking lot. The property was sold in 1986, but NIC's predecessors held the mortgage until 1991.

(b) **Hazardous Substances.** Upon information and belief, vehicle maintenance, including oil servicing, generates waste oils from used crankcase oil, gear oil, transmission fluid, and brake fluid. These waste oils contain PAHs, PCBs, VOCs, and heavy metals.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through direct discharges to City sewer connections. The vehicle storage and oil area had four connections to the Bond Street sewer, all of which ultimately discharged to the Canal during overflow events.

146. **Coal Pocket and Distribution Facility at the 25th Street Pier.**

(a) **Operations.** NIC's predecessors operated a coal pocket and distribution facility at the 25th Street Pier from at least 1929 through at least 1960. The coal pocket received coal by barge and a locomotive moved hopper cars from a carfloat at the pier up an elevated trestle to deposit coal in concrete pockets. In 1929, a switchback trestle was built on the 25th Street Pier. The trestle allowed a locomotive to receive coal hopper cars off a carfloat and then pull the open top hopper cars up to the top of the building. Upon information and belief, the hopper cars then dumped their contents directly into the coal pockets below the track. The coal

pockets had an open construction under the first floor and an elevated railroad siding. The trestle and pockets were bounded on the north by the Gowanus Bay. Additionally, coal appears to have been distributed from the structure next to the Bay. The coal was exposed to the weather during both receiving and distribution activities.

(b)　**Hazardous Substances.** Upon information and belief, stormwater reacted with the minerals in the coal to produce a leachate contaminated with ferrous sulfate and sulfuric acid. Leachates from outdoor coal piles are usually of very low pH, and the low pH runoff would have released metals from the coal, contaminating the surrounding soil with aluminum, arsenic, beryllium, cadmium, copper, iron, nickel, lead, selenium, and zinc. Unburnt coal also contains a large fraction of volatile organic hydrocarbons, and organic compounds from coal pile run-off include PAHs.

(c)　**Pathways.** Upon information and belief, the facility released hazardous substances to the Bay through 1) discharge via stormwater and surface runoff; and 2) in- and over-water operations. The coal pocket did not connect to the municipal sewer system and therefore the stormwater and surface run-off from the coal pocket would have flowed freely to the Bay because there were no other containment features on-site, such as berms, dikes, or levees. Finally, barges were used to transfer product at the bulkhead and therefore allowed for spills and releases directly to the Canal.

147.　**Phillips 66 Co.** The ultimate predecessor of Phillips—the American Agricultural Chemical Company—owned and/or operated the Gowanus Chemical Works on First Street (Block 967, Lot 1) from 1864 through 1879 and the Chemical Fertilizer Plant between Huntington and Seventh Streets (Blocks 475 and 473) from 1879 through 1911. Both facilities were located on the Canal. Phillips inherited The American Agricultural Chemical Company's

jurisdictional status and is subject to personal jurisdiction in New York because it assumed and bears liability for The American Agricultural Chemical Company's liability to Brooklyn Union.

148. **Gowanus Chemical Works.**

(a) **Operations.** Phillips' predecessors owned and operated the Gowanus Chemical Works between 1864 and 1879. By 1865, the company had built a 350-foot by 200-foot single story wood building to manufacture saltpeter and liquid caustic soda from nitrate of bicarbonate soda and pot ashes. The company was also producing 50,000 gallons of castor oil and 1,200 tons of castor oil cake annually. By 1868, the company had erected additional buildings and installed new equipment to manufacture bicarbonate of soda, sal soda, glauber salt, refined camphor, "and any other articles that come within their province as manufactures of chemicals."[6] By 1874, the company annually manufactured 2,260,000 pounds of saltpeter, 100 tons of fertilizers, 60 tons of camphor, large quantities of borax, and salts. In April 1875, Phillips' predecessor and three other companies completed the dredging of the First Street Basin. Phillips' predecessor owned the entire property along the southern side of the 590-foot long basin, but ceased operations around 1879. The saturated saltpeter wooden factory caught on fire and burned to the ground in 1883. The executors of H. J. Baker's will sold the property in January 1886.

(b) **Hazardous Substances.** To manufacture the products listed above, the company stored and used nitrate of bicarbonate soda and pot ashes, siliceous matters, phosphates, and phosphoric acid. The raw products used in the manufacturing process contained potassium, nitrates, phosphate, phosphoric acid, sulphates, sodium, chlorides, camphor, and an unknown amount of other chemicals because the facility produced "other articles that come

---

[6] Cleave, E. "H.J. Baker & Brother" in Prominent Mercantile Houses and Corporate Bodies in *History of New York City,* 1868.

within their province as manufactures of chemicals."[7] In the course of its production, the facility also used 300 tons of coal a month. Upon information and belief, leachates from outdoor coal piles at the Gowanus Chemical Works had very low pH which released metals from the coal, contaminating surrounding soil with aluminum, arsenic, beryllium, cadmium, copper, iron, nickel, lead, selenium, and zinc. Unburnt coal also contained a large fraction of volatile organic hydrocarbons and organic compounds from coal pile runoff include PAHs.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to private outfalls; 2) seepage; and 3) in- and over-water operations. Because the Gowanus Chemical Works was not connected to the municipal sewer system during these operations, upon information and belief, industrial discharges and stormwater runoff containing hazardous substances released from the site directly to the Canal. Upon information and belief, after 1874, industrial discharges and stormwater runoff also flowed to the Canal through the First Street Basin, which was privately developed. Contamination from the site also reached the Canal through seepage. Soil and groundwater at the site contained hazardous substances including PAHs, lead, and copper. Studies have documented that groundwater at the site is tidally influenced, allowing groundwater from the site, including contaminated groundwater, to interface with the water in the Canal. Finally, barges were used to transfer product at the bulkhead and therefore allowed for spills and releases directly to the Canal.

149. **Chemical Fertilizer Plant.**

(a) **Operations.** Phillips' predecessors began operating the Chemical Fertilizer Plant in 1879 and acquired the property in 1892. By at least 1888, the factory had a

---

[7] Cleave, E. "H.J. Baker & Brother" in Prominent Mercantile Houses and Corporate Bodies in *History of New York City,* 1868.

phosphate room, mixing room, grinding room for saltpeter, crystalizing room, refining room, and coal bin. By 1904, the site had grinding and mixing rooms, storage tanks, and sulfuric acid tanks that were located on the roof of one of the buildings. In 1908, a fire broke out in the boiler room and ignited chemicals used in the manufacturing process that in turn caused explosions that engulfed the two-story framed factory. The fire spread to two brick storage houses of the adjacent site before it was extinguished. Phillips' predecessor sold the site in December 1911.

(b)     **Hazardous Substances.** Historical fertilizer industry operations consisted of mixing chemicals and natural materials to produce the end-product. Upon information and belief, Phillips' predecessors manufactured fertilizers using, among other things, nitrogen, phosphorus, and potassium compounds. Upon information and belief, the fertilizers also contained trace elements of calcium, magnesium, sulfur, iron, chlorine, copper, manganese, zinc, molybdenum, and boron that improved the growth of plants. Upon information and belief, sulfuric acid was also used in the production of fertilizers. Upon information and belief, leachates from the on-site coal bin at the Chemical Fertilizer Plant had very low pH which released metals from the coal, contaminating surrounding soil with aluminum, arsenic, beryllium, cadmium, copper, iron, nickel, lead, selenium, and zinc. Unburnt coal also contained a large fraction of volatile organic hydrocarbons and organic compounds from coal pile runoff include PAHs.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; 2) seepage; and 3) in- and over-water operations. The Chemical Fertilizer Plant connected to the municipal sewer system between 1882 and 1885, and discharged directly to the Canal through the sewer. Contamination from the

site also reached the Canal through seepage. Soil and groundwater samples taken near the site contained hazardous substances including PAHs, lead, and copper. Upon information and belief, groundwater at this location, including contaminated groundwater, discharges to the Canal. Finally, the parcel was adjacent to the Canal, and, upon information and belief, raw materials used to manufacture fertilizers were shipped via barge to this facility.

150. **Power Authority of the State of New York.** As described above in Paragraph 101, the NY Power Authority began operating a natural gas turbine facility at the 23rd St. Pier (Block 644, Lots 1 and 50) in July 2001, and the power plant continues to occupy the southern part of the site. This Paragraph is incorporated herein to the same force and effect as if fully set forth herein.

151. **Puget Sound Commerce Center, Inc.** Puget Sound is a wholly owned subsidiary of Vigor Industrial, LLC. Puget Sound inherited the jurisdictional status of its predecessor, Todd Shipyards Corporation, and is subject to personal jurisdiction in New York because it assumed and bears liability for Todd's liability to Brooklyn Union. Puget Sound's predecessor owned and/or operated shipyards at three locations proximate to the Canal:

- **Tebo Yard**, situated at the foot of 23rd Street (Block 644). Tebo Yard was owned and operated by Todd from 1916 to 1938, then leased to Sullivan Dry Dock & Repair Corporation ("Sullivan"). Todd sold the Tebo Yard in or about 1948.

- **Poillon/Clinton Dry Docks**, situated on a portion of Block 623. Todd owned and operated this facility from 1918 to 1933. Todd sold the property to Ira S. Bushey & Sons in 1939.

- **Erie Basin Yard**, situated at the edge of Gowanus Creek (Block 612). The Erie Basin Yard was operated by Todd, and its two subsidiaries, Todd Erie Basin Dry

Docks, Inc. and Robins Dry Dock and Repair Company ("Robins"), from 1889 to 1985.

152. In the nearly 100-year span of time that Puget Sound's predecessors operated in the area, they constructed and/or repaired thousands of vessels. Employment at the three facilities peaked during WWII, with approximately 12,000 employees working at the Erie Basin Yard and about 2,350 employees at the Tebo Yard.

(a) **Operations.** At all the shipyards, ship construction and repair activities occurred onshore and in the waters of the Gowanus Channel and Canal (both above and below the waterline), at its piers, and at the floating dry docks. Repair work was carried out on vessels, usually using floating dry docks which were lowered under the surface of the water to raise ships above the surface for repairs. The volume of waste residuals/contaminants associated with ship construction and repair activities increased dramatically during high-volume shipbuilding and repair periods, such as during World War I and II. The government operations that occurred at these shipyards is detailed above in Paragraphs 107 through 112. These Paragraphs are incorporated herein to the same force and effect as if fully set forth herein. After WWII ended, Todd entered into a master ship repair contract with the Navy, and some facilities were expanded in 1951. The Navy's 18,000-ton floating dock remained in use at the Erie Basin Yard until at least September 1958. Todd continued to use the floating dock and dry docks for ship repair activities and routine maintenance (such as removing existing paint and repainting).

(b) **Hazardous Substances.** Upon information and belief, hazardous substances generated from ship construction, repair, and maintenance activities included paints and paint solids, defouling agents, heavy metals, spent abrasives, solvents, petroleum-based

fluids, oil-water emulsions, and synthetic emulsions. Upon information and belief, the waste streams from these shipyard operations contained metals, PAHs, PCBs, VOCs, and SVOCs.

(c)     **Pathways.** Upon information and belief, the shipyards released hazardous substances to the Bay and Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) in- and over-water operations. The Tebo Yard and the Erie Basin Yard had multiple connections to City sewers and private outfalls, and the Poillon/Clinton Dry Docks had two private outfalls, all of which discharged directly to the waterway. Upon information and belief, stormwater discharged directly to the Canal or Creek via overland flow because Puget Sound's predecessors did not use any containment, preventative, or control measures to minimize off-site discharges of contaminants via stormwater runoff. But the greatest impact from the three facilities was through their on-, over-, and in-water activities. None of the facilities had the ability to construct or repair vessels under cover; therefore, upon information and belief, all of the shipbuilding and repair activities were conducted outdoors, with much of the work carried out over, in, under, and around water. Paints and defouling agents were often applied using techniques that allowed the discharge of hazardous substances to the nearby waterways. Upon information and belief, during this time, hazardous substances, industrial waste, stormwater, sheet flow, and raw sewage discharged untreated directly to the Creek and Canal.

153.     **Rexam Beverage Can Company.** Predecessors of Rexam owned and/or operated a can manufacturing plant located at 346 Carroll Street (Tax Block 451, Lot 25) from 1916 to 1936. Rexam inherited the jurisdictional status of its predecessors—including the Metal Package Company, Metal Package Corporation, and National Can Company—and is subject to personal

jurisdiction in New York because it assumed and bears liability for its predecessors' liability to Brooklyn Union.

(a)  **Operations.** Rexam's predecessors manufactured cans, syrup cans, paint/varnish cans, oyster cans, decorated talcum cans, and decorated drug, candy, and utility boxes. Upon information and belief, manufacturing of these products required cutting, heating, forming, shaping, and assembling the metals. The surfaces of the products were prepared for lithography, and paints, enamels, or inks and protective surface coatings were applied.

(b)  **Hazardous Substances.** Upon information and belief, waste streams contained metal shavings from cutting can bodies and end blanks from tinned sheet metal, and excess solder from forming the can was a source of lead, tin, and antimony. Metalworking fluids were used to control the temperature of tools and machinery, aid in lubrication, wash away debris, and inhibit corrosion or surface oxidation. Upon information and belief, waste streams included petroleum-based fluids, oil-water emulsions, and synthetic emulsions, all of which contained hazardous substances such as metals, VOCs, and PAHs.

(c)  **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through stormwater runoff to the sewer system. Most of the sewers in the area were installed between 1870 and 1877. Stormwater runoff from the site flowed to the combined sewers and into the Canal during dry weather overflows, when the capacity of the sewers was exceeded, as well as during overflow events. The site, situated one block west of the Canal, is located in an area now known as the sewershed for the Red Hook WPCP, which did not begin operations until 1987—long after Rexam's predecessors ceased operations at the site.

154.  **SPX Technologies, Inc.** As described above in Paragraph 118, the ultimate predecessors of SPX Technologies, Inc.—OZ Electrical Manufacturing Company and Gedney

Electrical Company, Inc.—owned and operated a manufacturing facility located on the westerly side of the Canal in portions of three blocks (Blocks 416, 417, and 411) at Bond and Douglas Streets from 1937 until 1995. This manufacturing facility released hazardous substances to the Canal through direct discharge via stormwater and connections to the sewer system and seepage. SPX inherited its ultimate predecessors' jurisdictional status and is subject to personal jurisdiction in New York because it assumed and bears liability for its predecessors' liability to Brooklyn Union. Paragraph 118 is incorporated herein to the same force and effect as if fully set forth herein.

(a)     **Operations.** At this location, predecessors of SPX manufactured conduit fittings, cable terminators, junction boxes, solderless connecters, power connectors, and grounding devices. The property included machine shops, foundry, plating and plastic molding equipment, and an assembly area. The company cast and fabricated fittings in the on-site foundry and machine shops. Plating manufacturing and assembly activities occurred on a portion of Tax Block 416. Bakelite molding operations, two machine shops, a foundry, and additional manufacturing facilities were carried out on a portion of Tax Block 417. Additional manufacturing and assembly operations were conducted on a portion of Tax Block 411.

(b)     **Hazardous Substances.** Toward the end of its tenure at the site, the company electroplated 3,200 pounds of malleable iron fittings per day. Every year, the OZ/Gedney Company used approximately (1) 6,000 pounds of zinc per year in its plating operations; (2) 500 pounds of vinyl chloride in coating operations; (3) 1,100 gallons of trichloroethylene for degreasing; and (4) 11,000 pounds of copper in foundry/melting operations. Analysis of the untreated plating wastes identified various hazardous substances, including cadmium, copper, cyanide, nickel, and zinc in the discharge stream. The company proposed to

build a pretreatment plant at the site, but had not done so by 1986, when it ceased operations on the Canal. Waste streams contained metals (such as copper, lead, and zinc), PCBs, VOCs, and SVOCs.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and connections to the sewer system; and 2) seepage. The site had at least 19 connections to the sewer system and was located in what is now known as the Red Hook WPCP service area, which only became operational in 1987. Upon information and belief, waste streams generated from these activities discharged to the sewer system, which ultimately discharged to the Canal during overflow events. By February 1972, the City's Industrial Wastes Control Section ("IWCS") of the Department of Water Resources discovered that SPX's predecessors discharged untreated plating wastes to a "housetrap" and then to the City sewers. Contamination from the site also reached the Canal through seepage. Soil samples collected on site in 2017 contained hazardous substances including PAHs, PCBs, copper, and lead in soil, and groundwater samples collected on site in 2017 contained hazardous substances including PAHs, copper, and lead. Studies have shown that groundwater interfaces tidally with the waters of the Canal; as a result, hazardous substances in the soil and groundwater at the site release into the Canal.

155.     **Stauffer Management Company.** The ultimate predecessors of Stauffer—New York Tartar Company, Tartar Chemical Company, and the Royal Baking Powder Corporation—owned and/or operated the manufacturing facility located on the Canal between Ninth Street and the Seventh Street Basin (Tax Block 990, Lot 50). Between 1883 and 1946, these predecessors manufactured cream of tartar, tartaric acid, and Rochelle salt as described in Paragraph 131. Paragraph 131 describes the operations at the facility owned and operated by both Kraft's and

Stauffer's predecessors and is incorporated with the same force and effect as if fully set forth herein. Stauffer itself acquired the facility in 1947 and owned and operated it until 1959. Stauffer inherited the jurisdictional status of the New York Tartar Company, Tartar Chemical Company, and the Royal Baking Powder Corporation, and is subject to personal jurisdiction in New York because of its own activities in New York and because it assumed and bears liability for these entities' liability to Brooklyn Union.

156. **TDA Industries, Inc.** TDA's predecessor, Northeastern Plastics, Inc. ("Northeastern"), owned and operated a plastics manufacturing facility located at 420 Carroll Street (Tax Block 453, Lot 1) from 1963 to 1999. Northeastern owned and operated a plastics manufacturing facility located at 420 Carroll Street (Tax Block 453, Lot 1) from 1963 to 1999.

(a) **Operations.** Northeastern and its predecessors' manufactured plastic boxes, cases, slide rules, trays, and housewares and extruded polyvinyl chloride ("PVC") insulated conductor products (jumper cables and non UL Listed cord sets) on-site. There were two structures on-site, the largest of which was used for manufacturing purposes and was equipped with a 10,000-gallon steel water tank on the roof. Upon information and belief, the smaller structure was the machinery repair shop and included a gasoline UST.

(b) **Hazardous Substances.** In general, contaminated wastewater is generated from three main plastic molding and forming processes: (1) water to cool or heat the plastics products; (2) water to clean the surface of both the plastics products and the equipment used in production; and (3) water to finish the plastics products. Upon information and belief, this contaminated wastewater contained petroleum, VOCs, SVOCs, and metals.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and

connections to the sewer system and private outfalls; and 2) seepage. Stormwater runoff from the site discharged directly to the Canal and to sewers that had outfalls and overflow points to the Canal. Four lateral connections to the sewer system were made prior to Northeastern's tenure at the site. A site investigation identified a floor drain that discharged to the City sewers and two floor drains that discharged directly to subsurface soils at the Site. Contamination from the site also reached the Canal through seepage. Sampling at the three discharge points revealed the presence of PAHs and metals. A 2005 Subsurface Investigation Report documented PAHs, copper, and lead in site soils and groundwater. Upon information and belief, groundwater, including contaminated groundwater, from the site flows to the Canal. During the time that Northeastern and its predecessors operated at the site, industrial waste and raw sewage containing hazardous substances discharged untreated to the subsurface soils and to the Canal.

157.   **Texaco, Inc.**   Texaco (1) acquired the 744/762 Clinton Street Terminal, which operated from 1911 to between 1961- 1965; and (2) owned a Gas Station at 290 3rd Street from 1927 to 1984.

158.   **744/762 Clinton Street Terminal.**

(a)   **Operations**. Texaco acquired 744/762 Clinton Street and began operating the site as a terminal from in or around 1911 to between 1961 and 1965. Upon information and belief, Texaco operated the site for the bulk storage of gasoline, lubricating oils, and kerosene and for the transfer of products to and from vessels. Upon information and belief, by 1911, Texaco had already built a warehouse and a filling house and had installed a set of six tanks aboveground to permit easy filling of wagons, which were apparently used to distribute product. The tanks had a capacity of 17,500 gallons each. Citing an extensive increase of business in Brooklyn in 1931, Texaco applied for and received permission to remove the existing six tanks

and install four tanks: two 3,450 barrel tanks for gasoline, one 1,500 barrel tank for ethyl gas, and one 700 barrel tank for kerosene. Texaco added a 550-gallon underground gasoline storage tank at the site sometime prior to 1941, which Texaco used as a private filling station for Texaco trucks operating in the area. A 1942 U.S. Army Corps of Engineers survey indicates that the site had three 6-inch pipelines, which, upon information and belief, was later re-configured to include two 6-inch and one 4-inch pipelines. Upon information and relief, by 1953, Texaco had added two small tanks at the site bringing the total storage capacity at the site to 9,640 barrels.

(b)      **Hazardous Substances**. Upon information and belief, these operations generated waste streams containing hazardous substances including VOCs, SVOCs, and PAHs.

(c)      **Pathways**. Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater; 2) seepage from its upland property through the bulkhead; and 3) in- and over-water operations.  The facility was located on the Henry Street Basin, and, upon information and belief, stormwater runoff would have flowed to the Henry Street Basin which is proximate to the Canal. Contamination from the site also reached the Canal through seepage. Investigations conducted in 2000 identified elevated levels of SVOCs in site soils and elevated levels of VOCs and BTEX in a groundwater sample taken near the former Texaco filling house. Upon information and belief, this contaminated groundwater discharged to the Canal. Finally, barges were used to transfer product to and from the site and therefore allowed for spills and releases directly to the Canal.

159.    **Texaco Gas Station.**

(a)      **Operations**. Texaco owned and operated a gas station at 290 3rd Street from 1927 to 1984.

(b)  **Hazardous Substances**. Upon information and belief, these operations generated waste streams containing hazardous substances such as SVOCs and metals.

(c)  **Pathways**. Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via connections to the sewer system. The gas station had four public sewer connections which ultimately discharged to the Canal during overflow events.

160.  **Union Oil Company of California.** The ultimate predecessors of Unocal owned and/or operated three fuel oil bulk terminal facilities along the Canal: (1) at 202-208 Third Street (Block 978, Lot 19) from prior to 1903 to sometime prior to 1915; (2) at 150-154 Third Street (Block 466, Lot 19) from 1905 through 1918; and (3) at 400 Carroll Street / 91-107 First Street (Block 452, currently Lots 15 and 19, and a portion of Lot 1) from 1916 through 1943. Predecessors of Unocal also owned (1) a garage at 109-115 Third Street (Block 461, Lot 42) from 1907 through 1924; and (2) property on the First Street Basin (Block 453 Lots 26 and 54) between 1903 and 1905.

161.  **202-208 Third Street.**

(a)  **Operations.** At 202-208 Third Street, Unocal's predecessor, Pure Oil, operated a 200,000-gallon oil tank, two elevated oil tanks (size unknown), a pitch kettle, a pump house, a filling shed, and various support structures.

(b)  **Hazardous Substances.** The facility stored petroleum products which contained hazardous substances such as VOCs, SVOCs, and metals.

(c)  **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to private outfalls; 2) seepage from its upland property through the bulkhead; and 3)

in- and over-water operations. Stormwater runoff from the site discharged to the adjacent Canal. Upon information and belief, the surface flows from the site also discharged to the Canal. Further, the site did not connect to the municipal sewer system, but two unpermitted outfall release points to the Canal have been located on the site. Contamination from the site also reached the Canal through seepage. Investigations conducted in 2004 identified PAHs at the location of the former 200,000-gallon AST, and PCBs were also detected in site soils. Lead was detected in the soil as well. In addition, a plume containing PAHs was identified on a portion of the site formerly occupied by Pure Oil. The plume extended toward the Fourth Street Basin. A NAPL plume was discovered in groundwater monitoring well MW-4 at the former Pure Oil facility. Soil and groundwater samples collected form the site as part of the Gowanus Canal Remedial Investigation contained hazardous substances including PAHs, lead, and copper. Upon information and belief, this contaminated groundwater discharged to the Canal. Finally, barges were used to transfer product at the bulkhead and therefore allowed for spills and releases directly to the Canal.

162. **150-154 Third Street.**

(a) **Operations.** Unocal's predecessor, Pure Oil, began operations at 150-154 Third Street around 1905. The site had five aboveground oil tanks, an oil pump house, storage and filling buildings, and various other support structures. Ohio Cities Gas Company ("OCG") acquired Pure Oil and assumed its liabilities and properties in 1917. OCG sold the property in August 1918.

(b) **Hazardous Substances.** The facility stored petroleum products which contained hazardous substances such as VOCs, SVOCs, and metals.

(c)    **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to private outfalls; 2) seepage; and 3) in- and over-water operations. Upon information and belief, although the site did not connect to the municipal sewer system, stormwater runoff from the site flowed directly to the Canal or to storm drains or private outfalls that drained to the Canal. Upon information and belief, groundwater from this location discharges to the Canal. Soil and groundwater at the site contain elevated concentrations of hazardous substances, including PAHs and metals (including copper and lead); thus, contamination from the site also reached the Canal through seepage. Fires also occurred on-site. In 1917, for example, a motor truck backfired while unloading barrels of oil at the warehouse and the plant caught on fire. The fire destroyed the plant, consisting of three two-story buildings that contained 200 barrels of kerosene. The oil spread to the Canal where three fire boats fought flames on the Canal. Finally, barges were used to transfer product at the bulkhead and therefore allowed for spills and releases directly to the Canal.

163.    **400 Carroll Street / 91-107 First Street.**

(a)    **Operations.** Unocal's predecessor, Pure Oil, acquired part of the 400 Carroll Street / 91-107 First Street site in 1916. By 1927, the site had three large ASTs containing kerosene (100,000 gallons), gasoline (100,000 gallons), and fuel oil (50,000 gallons). These tanks received product from six 4-inch lines running from the Canal. In addition to these ASTs, Pure Oil had three 4,000-gallon underground lube tanks that received product via a pipeline running from the Canal. The site also had a garage, a warehouse with two drum filling rooms, a foamite room, a dissolving tank, and a pump that collected rainwater and discharged it into an open drain in the yard. In 1927, Pure Oil added two 100,000-gallon ASTs. One of the

ASTs was for Detonox, a red colored gasoline developed by Pure Oil in 1927. The other tank was for Purol, a blue gasoline. Upon information and belief, two new 6-inch pipelines were built from the Canal to Tank #2, the Purol tank, and new piping was laid underground when practical. As of 1938, the site had four 100,000-gallon ASTs, one 50,000-gallon tank, two gasoline USTs, a pump house, a filling house, and various other support structures. By 1942, three pipelines (two 6-inch and one 4-inch) were used at the site to transfer product to and from vessels moored at the dock. Pure Oil sold the property in June 1943.

(b)    **Hazardous Substances.** The facility stored petroleum products such as gasoline, motor oils, and kerosene, all of which contained hazardous substances such as VOCs, SVOCs, and metals.

(c)    **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; 2) seepage; and 3) in- and over-water operations. Stormwater runoff from the site discharged directly to the Canal. The site also had two connections to the sewer that discharged to the Canal during overflow events and an additional five private outfalls, all of which discharged to the Canal as well. Contamination from the site also reached the Canal through seepage. Soil and groundwater samples and soil characterization starting in the mid-1990s and continuing into the 2010s have indicated PCBs and gross petroleum contamination containing hazardous substances such as PAHs, lead, and copper in on-site media. Upon information and belief, groundwater from this location discharges to the Canal, carrying with it contamination from the site. Finally, barges were used to transfer gasoline, motor oils, and kerosene at the bulkhead, which allowed for spills and releases directly to the Canal.

164. **109-115 Third Street.**

(a) **Operations.** Unocal's predecessor, Pure Oil, acquired 109-115 Third Street in 1907 and was operating a garage at the site in 1915.

(b) **Hazardous Substances.** Upon information and belief, these operations generated waste streams containing hazardous substances such as SVOCs and metals.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through direct discharge via connections to the sewer system. The garage had two connections to the municipal sewer in Third Street prior to Pure Oil's acquisition of the site and Pure Oil made a third connection in 1908—all of these sewer connections ultimately discharged to the Canal during overflow events.

165. **312 Third Ave.**

(a) **Operations**. Unocal's predecessor, Pure Oil, acquired 312 Third Ave. site in 1903 and sold the site in 1905.

(b) **Hazardous Substances**. Upon information and belief, these operations generated waste streams containing hazardous substances such as SVOCs and metals.

(c) **Pathways**. Upon information and belief, the facility released hazardous substances to the Canal through groundwater seepage.

166. **Verizon New York, Inc.** Verizon and its predecessors have owned and/or operated at four sites proximate to the Canal: (1) Third Street Work Center ("TSWC") at 175 and 201 Third Street (Tax Block 972, Lot 58 and 43) from 1972 through the present; (2) the Nevins Street Work Center ("NSWC") at 318 Nevins Street (Tax Block 439, Lot 1) from 1976 through 2013; (3) Court Street Work Center ("CSWC") 651 Court Street (Tax Block 494, Lot 1) from 1970

through about 1979; and (4) the Bond Street Work Center ("BSWC") at 267-279 Bond Street (Tax Block 424, Lot 1) from 1977 through 1979.

167.    **Third Street Work Center ("TSWC").**

(a)    **Operations.** Verizon's predecessor, NYTEL, began leasing the TSWC for vehicle maintenance, storage, and fueling operations in 1972. Prior to the lease, the landlord prepared the existing facility for NYTEL's occupation, equipping the building with a motor vehicle garage, car wash, electrical switchboard room, mechanical equipment room, "replenishment center," assembly area, and office space. Between 1972 and 1994, two gasoline dispensing areas with their associated tanks were located at the site. The site had four USTs and one AST. Fueling activities continued until 2003, when the last petroleum tank was removed. In 1997, NYTEL began leasing the property at 201 Third Street to store supplies used to construct telephone physical plants and the parking of motor vehicles. Beginning in 2012, the telephone cable system construction and repair operations previously conducted at NSWC were transferred to TSWC. Since that time, used telephone poles were stored on 201 Third Street.

(b)    **Hazardous Substances.** Used and new automotive fluids, including motor oil, antifreeze, hydraulic oil, and petroleum naphtha were stored in the maintenance garage. Between March 2010 and November 2015, maintenance performed on the 115 vehicles housed at the TSWC generated over 2,000 gallons of used motor oil. Operations also produced antifreeze, spent petroleum naphtha, used oil filters, absorbent rags, batteries, and other used auto parts. Scrap telephone cable and copper conductors protected by a lead or polyethylene sheath are also stored at the TSWC. Operations have periodically produced hazardous wastes containing benzene, lead, PCBs, and spent halogenated solvents used in degreasing. Between March 2013 and February 2016, over 133 tons of street poles were disposed of from 201 Third Street.

(c) **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) seepage. The site has two connections to the sewer, both of which ultimately discharged to the Canal during overflow events. It also had six private outfalls to the Canal. During the environmental investigations undertaken to perform remedial activities, consultants discovered that wastes from the vehicle service bays discharged to an outside storm drain which flowed into the Canal. NYTEL temporarily plugged the drains in 1996. Thus, upon information and belief, wastes generated in the service bays discharged to the Canal from 1972 to 1996. Contamination from the site also reached the Canal through seepage. Over four feet of NAPL was observed in groundwater wells at the TSWC in 1996. Soil samples collected from the TSWC between 2014 and 2016 contained hazardous substances including PAHs, PCBs, copper, and lead and groundwater samples collected from the site during the same time period contained hazardous substances including PAHs, copper, and lead. Because groundwater flows towards the Canal, contaminated groundwater reaches the Canal from the site.

168. **Nevins Street Work Center ("NSWC").**

(a) **Operations.** Verizon's predecessor, NYTEL, acquired the NSWC in February 1976. NYTEL conveyed the property to another party in June 1978 and then leased the NSWC until 2013. NYTEL conducted vehicle maintenance, storage, and fueling operations at NSWC. Fueling activities continued until around 2003, when the USTs were removed. An AST used for waste oil containing hazardous substances was removed in 2012. Verizon continued to conduct vehicle maintenance activities at the NSWC until 2013. Verizon used the area

surrounding the NSWC as a storage area for reels of telecommunications wire, utility poles, propane, and nitrogen tanks, and as a parking area for 106 on-site spaces and 61 spaces off street.

(b)     **Hazardous Substances.** Between 1993 and 2000, NYTEL produced hazardous wastes such as lead, PBCs, and spent halogenated solvents used in degreasing. Automotive operations at the NSWC generated around 715 gallons of used motor oil and about 150 gallons of antifreeze annually between 2005 and 2010. The used oil generated at the site was typically stored in USTs and ASTs prior to being recycled. Verizon produced wastes including used oil and fuel filters, absorbent rags, batteries, alternators, air filters, and other used auto parts. Workers also brought scrap telephone cable and splicing cases to the NSWC for repairs. The scrap materials consisted of copper conductors protected by a lead or polyethylene sheath. These materials were reclaimed off-site. Between May 2005 and October 2010, Verizon shipped 67.5 tons of used utility poles from this site.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharge via stormwater and surface runoff and connections to the sewer system and private outfalls; and 2) seepage. The site has five sewer connections that discharged to the Canal and were made prior to 1960. Also, five private outfalls were observed at the bulkhead, and upon information and belief, these private outfalls were used by the NSWC to discharge hazardous substances directly into the Canal. Moreover, the vehicle service area at NSWC had three service bays that connected to a trench-type floor drain that discharged to the Canal. These drains discharge into an oil-water separator located in the northern most service bay. According to a 1980 plumbing plan for the NSWC, the facility's oil separator discharged to the bulkhead at the Canal. Upon information and belief, direct discharges from the separator to the Canal occurred until at least October 1992, after which time the oil-

water separator was connected to the sewer system. In 2011, two stormwater catch basins were also discovered at the site with an interconnecting pipe to the city sewer system. Contamination from the site also reached the Canal through seepage. Petroleum-related groundwater contamination has been found at the site as a result of on-site leaking USTs, spills, and releases. Remedial activities have been underway since 1992. In the early 1990s, NAPL was observed in on-site monitoring wells near USTs. Soil samples collected from the NSWC in 2019 contained hazardous substances including PAHs, PCBs, lead, and copper. Groundwater samples collected from the NSWC in 2019 contained hazardous substances including PAHs, lead, and copper. The contaminated groundwater has a direct hydrologic relationship to the surface water in the Canal because the tide both pushes and pulls the groundwater at the site. Upon information and belief, this pulling effect causes contaminants in the soil and groundwater at the NSWC to migrate out into the Canal and filter down into the sediments.

169.    **Court Street Work Center.**

(a)    **Operations.** Verizon's predecessor, NYTEL, acquired the property for the CSWC in 1970 and began construction in 1971. Operations at the CSWC included electric machinery repair, motor vehicle repair, public utility vehicle storage, and parking for 100 trucks and 25 cars. The CSWC had three USTs, two of which were used for gasoline storage. NYTEL sold the CSWC in 1972 and leased it from 1972 through 1979. Upon information and belief, NYTEL's operations at the CSWC included electric machinery and motor vehicle repairs.

(b)    **Hazardous Substances.** These activities generated hazardous substances, including chlorinated solvents, oil, heavy metals, acid/alkaline wastes, ethylene glycol, arsenic, detergents, phosphorus, salts, suspended solids, hydraulic fluids, PCBs, organics, and fuel.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) connections to the sewer system; and 2) seepage. The CSWC building had one floor sink and nine floor drains. The CSWC had two connections to the municipal sewer prior to NYTEL's acquisition of the property. In 1971, two more connections were made to the municipal sewer system and one of the old connections was plugged. Thus, shortly after NYTEL began operations at the CSWC, there were three sewer connections in place, all of which ultimately discharged wastewater to the Canal. Contamination from the site also reached the Canal through seepage. Soil samples taken at or near the CSWC contained hazardous substances including PAHs, PCBs, copper, and lead, while groundwater samples contained hazardous substances including PAHs, copper and lead. Upon information and belief, groundwater at the site discharges to the Canal, including contaminated groundwater.

170.     **Bond Street Work Center.**

(a)     **Operations.** Verizon's predecessor, NYTEL, used the BSWC from 1977 to 1979 while it prepared the NSWC for use. While NYTEL operated at the BSWC, the site had thirteen USTs. These tanks were moved after NYTEL left the site. Upon information and belief, NYTEL's operations were similar to those conducted at other sites in the area.

(b)     **Hazardous Substances.** These activities generated hazardous substances, including chlorinated solvents, oil, heavy metals, acid/alkaline wastes, ethylene glycol, arsenic, detergents, phosphorus, salts, suspended solids, hydraulic fluids, PCBs, organics, and fuel.

(c)     **Pathways.** Upon information and belief, the facility released hazardous substances to the Canal through 1) direct discharges via connections to the sewer system and private outfalls; and 2) seepage. During NYTEL's operations, the BSWC had five connections to the sewer system, all of which discharge to the Canal during overflow events. Upon information

and belief, BSWC also discharged hazardous substances to the Canal via a private outfall. Contamination from the site also reached the Canal through seepage. Soil samples collected between 2017 to 2022 from the BSWC contained hazardous substances including PAHs, PCBs, lead, and copper while groundwater samples contained hazardous substances including PAHs, lead, and copper. NAPL was also observed in on-site monitoring wells during the aforementioned site investigation activities. Upon information and belief, groundwater at the site discharges to the Canal, including contaminated groundwater.

## SITE INVESTIGATION

171.     As described above, all of these parties contributed to the pollution in the Canal through three pathways that allowed hazardous substances to release into the Canal: 1) direct discharge via stormwater runoff, private outfalls, and public outfalls; 2) seepage; and 3) on/over-water operations.

172.     USACE, NYSDEC, and US EPA have been involved in investigating the Site since 2001. From 2004-2006, Brooklyn Union also conducted additional investigatory activities at the Site under the direction of NYSDEC.

173.     These preliminary investigations showed that the groundwater, soil, and sediments in and near the Canal are contaminated with PAHs, PCBs, pesticides (such as methoxychlor and DDT), metals (lead, cadmium, mercury, and chromium), and VOCs (benzene, toluene, and ethylbenzene). Following this site characterization process, US EPA set remedial action objectives ("RAOs"), which are designed to protect human health and the environment.

174.     US EPA proposed the Site for inclusion on the National Priorities List ("NPL") on April 8, 2009. The Site was formally included on the NPL on March 2, 2010.

175.    On April 29, 2010, Brooklyn Union entered into an Administrative Order and Settlement Agreement, Index Number CERCLA-12-2010-2009, with US EPA, pursuant to which Brooklyn Union conducted response actions in support of US EPA's performance of a RI/FS of the Site ("RI/FS AOC"). US EPA finalized the RI in January 2011 and FS in December 2011.

176.    US EPA also issued a Feasibility Study Addendum on December 1, 2012, which focused on the City's role in polluting the Site. The FS Addendum concluded that "[m]ultiple lines of evidence indicate that CSOs to the Canal adversely affect canal sediment quality and are contributing to unacceptable risks that must be addressed under CERCLA."

177.    Brooklyn Union undertook the work that was required by the RI/FS AOC.

178.    On December 27, 2012, US EPA released a Proposed Plan for the Site. After receiving comments on the Proposed Plan, on September 27, 2013, US EPA issued a ROD selecting the remedy and source controls for the Site. The ROD selects the following combination of necessary response actions to be taken to address contaminated sediment at the Site:

- dredging the entire column of hazardous substance-contaminated soft sediments, which have accumulated above the native sediments in the mid- and upper reaches of the Site;

- capping and in-situ stabilization of the native sediments in certain areas in the upper and mid-reaches on the Site;

- excavation and restoration of certain turning basins; and

- management of PCB-laden sediments.

179.    The ROD also set the preliminary remediation goals ("PRGs") for the Site. The PRGs "are used by [US EPA] to define the extent of cleanup needed to achieve the [RAOs]." ROD, p. 45. As detailed in the ROD, there are three main contaminants of concern at the Canal: 1) PCBs; 2) PAHs; and 3) heavy metals (including lead and copper). All of the Defendants have contributed these contaminants of concern to the Canal.

180.    PCBs are located throughout the Canal in concentrations exceeding the PRGs. The mixture of PCBs can be attributed to the many facilities that utilized PCBs at the Site, such as former shipbuilding operations, electric power generation and component manufacturing, hydraulic fluids in foundry and metal cutting operations, and printing operations.

181.    PAHs are also found throughout the Canal at levels exceeding the PRGs. Historic and current operations along the Canal contributed—and continue to contribute—PAHs to the Canal, including power generation, petroleum storage refining and distribution operations, tar production and distillation, shipbuilding, and urban runoff.

182.    Like the other ROD COCs, lead and copper exceed their respective PRG throughout the Canal. Metals are ubiquitous in industrial operations and reached the Canal from incinerators, shipyards, metal manufacturing and finishing operations, among others. The consistently high concentration of metals in the surface and soft layers of sediment is caused by releases from the myriad industrial and municipal operations and discharges that have occurred—and continue to occur—to the Canal.

183.    After the ROD was issued, US EPA turned toward locating and directing PRPs to undertake the necessary work. As the first step, US EPA issued questionnaires to the parties it recognized had a historical presence at the Canal, pursuant to its authority under CERCLA § 104(e) ("104(e)s"). The parties that received these questionnaires were required by law to

respond to US EPA. US EPA then used this information to help the Agency develop a nexus between each individual party and the hazardous substances that have been released to the Canal.

184.	Next, US EPA sent general notice letters to the PRPs it believed were liable for response costs at the Site. The general notice letter was sent to each individual PRP and notified the PRP of its potential liability, stating: "EPA has evaluated information obtained in connection with the Site. . . . By this letter we are notifying you that we have reason to believe that your company . . . is a potentially responsible party . . . with respect to the Site."

185.	On December 17, 2009, US EPA sent Defendants Brink's Inc. and Beazer East, Inc. a general notice letter ("GNL") for the Site. On September 21, 2010, US EPA sent the following Defendants a GNL for the Site: (a) Consolidated Edison Co. of New York, Inc.; (b) the City of New York; (c) U.S. Navy; (d) Amerada Hess Corp.; (e) Kraft Foods Global, Inc.; (f) Stauffer Management Co., LLC; (g) MCIZ Corp., Fifteen Second Avenue LLC, 36-2nd-J Corp., and 107 Sixth Street LLC; (h) Bayside Fuel Oil Corp.; (i) ConocoPhillips Co.; (j) Citigroup, Inc./MRC Holdings, Inc.; (k) NL Industries, Inc.; (l) The Union Oil Company of California (c/o Chevron U.S.A. Inc.); (m) Verizon New York Inc.; (n) SPX Corp.; (o) U.S. Postal Service; (p) U.S. General Services Administration; (q) Dun & Bradstreet, Inc.; (r) Rexam Beverage Can Co.; (s) Northville Industries Corp.; and (t) U.S. Maritime Administration. On October 5, 2012, US EPA sent Defendant TDA Industries, Inc. a GNL for the Site. On September 30, 2013, US EPA sent Defendants Puget Sound Commerce Center, Inc. and Brooklyn Improvement Co. a GNL for the Site.

186.	Following receipt of a GNL letter, Brooklyn Union agreed to continue to cooperate with US EPA on the cleanup of the Site. On January 23, 2014, Brooklyn Union entered into an Amendment to the Administrative Order and Settlement Agreement ("Amendment") with US

EPA, pursuant to which Brooklyn Union agreed to conduct further sampling, analysis, and other pre-design tasks necessary to begin the remedial design phase of remediation at the Site.

187.    On March 20, 2014, Brooklyn Union, along with 26 other PRPs (Beam Inc.; Beazer East, Inc.; Brink's Inc.; CBS Corp.; Citigroup, Inc.; Consolidated Edison Co. of New York, Inc.; Dun and Bradstreet Corp.; ExxonMobil Oil Corp.; Hauck Manufacturing Co.; Hess Corp.; Honeywell International Inc.; Kraft Foods Global, Inc.; MCIZ Corp. and Fifteen Second Avenue LLC, 36-2nd-J Corp., and 107 Sixth Street LLC; MRC Holdings, Inc.; NL Industries, Inc.; Northville Industries Corp.; Patterson Fuel Oil Co., Inc.; Phillips 66 Co.; Puget Sound Commerce Center, Inc.; Rexam Beverage Can Co.; SPX Corp.; Stauffer Management Company, LLC; TDA Industries, Inc.; The Brooklyn Improvement Co.; The Union Oil Company of California; and Verizon New York Inc.), received a Unilateral Administrative Order requiring the named parties to undertake Remedial Design work ("RD UAO"). The RD UAO requires the parties to investigate, characterize, and plan a remediation for the Site. The recipients of the RD UAO are jointly and severally liable for this work.

188.    On May 28, 2014, the City received a separate Unilateral Administrative Order from US EPA ("NYC UAO"). The NYC UAO was based on the City's unique responsibility for the conditions in the Canal. It required the City to cooperate in the performance of the RD, as well as individually clean up Turning Basin #1 and construct CSO retention tanks to prevent CSOs from re-contaminating the Site. *See* RTA1 UAO, ¶ 24.

189.    Brooklyn Union is working with some of the other named PRPs to undertake the work required by the RD UAO. These parties (including Brink's Inc.; Citigroup, Inc.; the City of New York; Consolidated Edison Co. of New York, Inc.; Dun and Bradstreet Corp.; ExxonMobil Oil Corp.; Hauck Manufacturing Co.; Hess Corp.; Honeywell International Inc.; Kraft Foods

Global, Inc.; MCIZ Corp.; MRC Holdings, Inc.; Northville Industries Corp.; Phillips 66 Co.; Puget Sound Commerce Center, Inc.; Rexam Beverage Can Co.; SPX Corp.; Stauffer Management Company, LLC; TDA Industries, Inc.; The Brooklyn Improvement Co.; and Verizon New York Inc.) have resolved their liability for the RD UAO as to each other pursuant to a confidential agreement.

190.    Despite receiving the RD UAO, Beazer East, NL Industries, and Unocal have refused to participate, cooperate, or support the RD work with the other PRPs.

191.    On July 9, 2015, Bayside Fuel signed an Administrative Settlement Agreement and Order on Consent for a Removal Action that required it to install a new bulkhead and remove debris from its bulkhead area, and also to "coordinate in the performance" of the RD work being performed by the RD UAO parties. Despite this requirement, Bayside Fuel has not performed or otherwise contributed to the RD work.

192.    On April 11, 2019, Brooklyn Union received another Unilateral Administrative Order, Index No. CERCLA-02-2019-2010 (the "Bulkhead UAO"), along with Beazer East, Inc.; Brink's Inc.; Citigroup, Inc.; City of New York; Consolidated Edison Co. of New York, Inc.; Dun and Bradstreet Corp.; ExxonMobil Oil Corp.; Hauck Manufacturing Co.; Hess Corp.; Honeywell International Inc.; Kraft Foods Global, Inc.; MCIZ Corp. and Fifteen Second Avenue LLC, 36-2nd-J Corp., and 107 Sixth Street LLC; MRC Holdings, Inc.; NL Industries, Inc.; Northville Industries Corp.; Phillips 66 Co.; Puget Sound Commerce Center, Inc.; Rexam Beverage Can Co.; SPX Corp.; Stauffer Management Company, LLC; TDA Industries, Inc.; The Brooklyn Improvement Co.; The Union Oil Company of California; and Verizon New York Inc. The Bulkhead UAO requires the named parties to undertake additional bulkhead work as part of the removal action and in preparation for the Remedial Action.

193. Each of these parties have been named by US EPA as responsible parties three more times in amendments to the BH UAO. Those amendments were issued on March 3, 2020, September 18, 2020, and June 8, 2023.

194. Despite having received the BH UAO and related amendments from US EPA, Beazer East, the MCIZ entities, NL Industries, Phillips, and Unocal have flatly refused to contribute to any of the BH UAO work, and no Party has contributed its equitable share to this work.

195. On January 29, 2020, Brooklyn Union and the City; Consolidated Edison Co. of New York; Hess Corporation; Honeywell International, Inc.; and The Brooklyn Improvement Company (the "RTA1 UAO Recipients") received an Administrative Order for Remedial Action, Index No. CERCLA-02-2019-2010 (the "RTA1 UAO"). The RTA1 UAO requires these respondents to implement the dredge and cap design for both the First Street Turning Basin ("TB1") and Remediation Target Area 1 ("RTA1"). This is the first step in the Remedial Action.

196. The remaining Defendants have not been included on the RTA1 UAO "so long as they are acting in good faith with respect to the requirements and agreements reached under prior orders and negotiating a potential settlement in good faith." Brian Carr, Assistant Regional Counsel, US EPA, to Bradley S. Rochlen, ArentFox Schiff, et al. (Feb. 18, 2020, 13:59 EST). Mr. Carr further stated that "EPA of course reserves the right to take other enforcement steps, e.g., adding respondents to the RA UAO."

197. To continue the remedial activities in the Canal, EPA issued an amendment to the RTA1 UAO to begin the remedial action in RTA2 ("RTA2 UAO"). EPA issued RTA2 UAO to the same six parties on June 28, 2024.

198. Brooklyn Union further anticipates that US EPA will issue additional orders that will require the Defendants to continue the Remedial Action as outlined in the ROD.

## COUNT ONE
## (CERCLA § 107 COST RECOVERY CLAIM AGAINST EACH AND EVERY DEFENDANT)

199.     Brooklyn Union repeats and realleges each and every allegation contained in the foregoing Paragraphs 1 through 198 with the same force and effect as if fully set forth herein.

200.     Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), provides that the following persons are liable for response costs: "(1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party of entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance."

201.     The Canal is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

202.     There have been "releases" of "hazardous substances" at the Site within the meaning of Section 101(22) and (14) of CERCLA, 42 U.S.C. § 9601(22) and (14).

203.     Plaintiff Brooklyn Union is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

204.     Each Defendant is a "person" within the meaning of Section 101(21) of CERCLA, 42 U.S.C. § 9601(21).

205.    Each Defendant is a former owner and/or operator at a facility from which a release of hazardous substances to the Site has occurred, as outlined in Section 101(22), (14) of CERCLA, 42 U.S.C. § 9601(22) and (14).

206.    In addition, the City is liable as both an "arranger" and "transporter" for the releases of hazardous substances discharged to the sewer from other parties.

207.    A person is an "arranger" "if he or she had the authority to control and did in fact exercise actual or substantial control, directly or indirectly, over the arrangement for disposal, or the off-site disposal, of hazardous substances." Defendant City of New York is a person who by contract, agreement, or otherwise arranged for disposal or treatment of hazardous substances owned or possessed by such persons, or by any other party or entity, and that was disposed or treated at the Site, as outlined in Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3).

208.    Further, Defendant City of New York is a person who accepted hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs of a hazardous substance, as outlined in Section 107(a)(4) of CERCLA, 42 U.S.C. § 9607(a)(4).

209.    The release of hazardous substances at and from the Defendants' facilities has caused the incurrence of response costs.

210.    Brooklyn Union has incurred and will continue to incur necessary costs of response consistent with the National Contingency Plan ("NCP"), 42 C.F.R. Part 300, within the meaning of Section 101(31) of CERCLA, 42 U.S.C. § 9601(31).

211.    Brooklyn Union has incurred tens of millions of dollars in necessary costs of response pursuant to the UAOs as well as voluntary costs incurred beyond the scope of the RD UAO,

Bulkhead UAO, RTA1 UAO, and RTA2 UAO. Brooklyn Union will continue to incur additional response costs in the future.

### COUNT TWO
**(CERCLA § 113(f) CONTRIBUTION CLAIM AGAINST THE FOLLOWING DEFENDANTS: BRINK'S, BICO, THE CITY, CON EDISON, D&B, HESS, KRAFT, MCIZ ENTITIES, MRC, NIC, PHILLIPS, PUGET SOUND, REXAM, SPX, STAUFFER, TDA, AND VERIZON)**

212.    Brooklyn Union repeats and realleges each and every allegation contained in the foregoing Paragraphs 1 through 211 with the same force and effect as if fully set forth herein.

213.    Pursuant to Section 113(f)(3)(b) of CERCLA, 42 U.S.C. § 9613(f)(3)(b), "[a] person who has resolved its liability to the United States or a State for some or all of a response action or for some or all of the costs of such action in an administrative or judicially approved settlement may seek contribution from any person who is not party to a settlement."

214.    Brooklyn Union has incurred and will continue to incur liability and necessary costs of response due to releases at the Site for which Defendants are liable under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

215.    The RI/FS AOC and the Amendment to the RI/FS AOC are administrative settlements within the meaning of Section 113(f) of CERCLA, 42 U.S.C. § 9613(f).

216.    By agreement among the Defendants against whom this claim is asserted, this claim is timely.

217.    Brooklyn Union is a person that has resolved its liability with respect to the United States in an administrative settlement within the meaning of Section 113(f) of CERCLA, 42 U.S.C. § 9613(f).

218.    Brooklyn Union is entitled to seek contribution from Defendants pursuant to Section 113(f) of CERCLA, 42 U.S.C. § 9613(f), for the costs that Brooklyn Union has incurred in settling with US EPA through the RI/FS AOC and the Amendment to the RI/FS AOC.

219.    Brooklyn Union is providing a copy of this Complaint to the Attorney General of the United States and the Administrator of the US EPA, pursuant to Section 113(l) of CERCLA, 42 U.S.C. § 9613(l).

## COUNT THREE
**(CONTRIBUTION UNDER NEW YORK NAVIGATION LAW § 176(8) AGAINST EACH AND EVERY DEFENDANT, EXCEPT THE UNITED STATES OF AMERICA, THE UNITED STATES DEPARTMENT OF DEFENSE, THE UNITED STATES DEPARTMENT OF THE NAVY, THE UNITED STATES DEPARMENT OF THE ARMY, THE UNITED STATES COAST GUARD, THE FEDERAL MARITIME COMMISSION, THE UNITED STATES POSTAL SERVICE, AND THE UNITED STATES GENERAL SERVICES ADMINISTRATION)**

220.    Brooklyn Union repeats and realleges each and every allegation contained in the foregoing Paragraphs 1 through 219 with the same force and effect as if fully set forth herein.

221.    Navigation Law § 176(8) provides that "every person providing cleanup [or] removal of discharge of petroleum . . . shall be entitled to contribution from any other responsible party."

222.    Brooklyn Union has engaged in the cleanup of petroleum discharges, has incurred cleanup and removal costs within the meaning of New York Navigation Law Section 172(4), and will incur further cleanup and removal costs to address petroleum discharges along the Canal. N.Y. NAV. LAW § 172(4).

223.    Defendants discharged petroleum within the meaning of New York Navigation Law Section 172(8), (15) during their operations along the Canal. N.Y. NAV. LAW § 172(8), (15).

224.    Defendants are liable to Brooklyn Union under New York Navigation Law Section 176(8) for cleanup and removal costs relating to the discharge of petroleum. N.Y. NAV. LAW § 176(8).

**COUNT FOUR**

**(STRICT LIABILITY UNDER NEW YORK NAVIGATION LAW § 181 AGAINST EACH AND EVERY DEFENDANT, EXCEPT THE UNITED STATES OF AMERICA, THE UNITED STATES DEPARTMENT OF DEFENSE, THE UNITED STATES DEPARTMENT OF THE NAVY, THE UNITED STATES DEPARMENT OF THE ARMY, THE UNITED STATES COAST GUARD, THE FEDERAL MARITIME COMMISSION, THE UNITED STATES POSTAL SERVICE, AND THE UNITED STATES GENERAL SERVICES ADMINISTRATION)**

225.     Brooklyn Union repeats and realleges each and every allegation contained in the foregoing Paragraphs 1 through 224 with the same force and effect as if fully set forth herein.

226.     Pursuant to Section 181(1), "[a]ny person who has discharged petroleum shall be strictly liable, without regard to fault, for all cleanup and removal costs and all direct and indirect damages, no matter by whom sustained." N.Y. NAV. LAW § 181(1).

227.     In addition to cleanup and removal costs as previously alleged, Brooklyn Union has incurred other direct and indirect damages (including attorneys' fees and litigation costs) within the meaning of New York Navigation Law Section 181(2) due to the petroleum discharged by Defendants along the Canal. N.Y. NAV. LAW § 181(2).

228.     Brooklyn Union is not responsible for the discharge of petroleum along the Canal.

229.     Defendants are liable under New York Navigation Law Section 181(1) for the past, present, and future direct and indirect damages relating to the discharge of petroleum, in addition to its cleanup and removal costs, that Brooklyn Union has incurred, and will incur in the future. N.Y. NAV. LAW § 181(1).

**COUNT FIVE**

**(DECLARATORY JUDGMENT FOR RECOVERY OF FURTHER RESPONSE COSTS AGAINST EACH AND EVERY DEFENDANT)**

230.     Brooklyn Union repeats and realleges each and every allegation contained in the foregoing Paragraphs 1 through 229 with the same force and effect as if fully set forth herein.

231. During the period that Defendants owned, operated, managed, directed, and controlled sites near the Canal, hazardous substances were released into the Canal and environment and/or remain a threat to the Canal and environment.

232. In accordance with applicable federal and state statutes and regulations and the RD UAO, Bulkhead UAO, RTA1 UAO, and RTA2 UAO, as well as any future orders issued by the US EPA, Brooklyn Union has incurred and will continue to incur substantial costs in taking actions to investigate, remediate, and monitor the hazardous substances and to restore the Canal.

233. An actual controversy exists between Brooklyn Union and each Defendant pursuant to 28 U.S.C. § 2201 and N.Y.C.P.L.R. § 3001 concerning the respective obligations and potential legal liabilities for costs that have been incurred and will be incurred in the future by Brooklyn Union in connection with the investigation and remediation of contamination at the Site.

234. Each Defendant is liable to Brooklyn Union under CERCLA or New York law as specified in Counts One through Four.

235. Pursuant to CERCLA §§ 107(a) and 113(g)(2), 42 U.S.C. §§ 9607(a) and 9613(g)(2), the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, and, and N.Y.C.P.L.R. § 3001, Brooklyn Union seeks a declaration that Defendants are liable to Brooklyn Union for their fair share of any response costs that Brooklyn Union is required to pay in connection with the Site, not inconsistent with the NCP.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Brooklyn Union respectfully prays for judgment as follows:

1. Judgment against the Defendants for the response costs Brooklyn Union has incurred in responding to the Site;

2.     Declaratory judgment against Defendants for future response costs to be incurred by Brooklyn Union in connection with the Site;

3.     Prejudgment interest on all response costs incurred in connection with the Site, and any other interest according to law, 42 U.S.C. § 9607(a)(4);

4.     Costs, reasonable attorneys' fees, consulting fees, expert witness fees, and other fees and expenses incurred herein to the extent permitted;

5.     A permanent injunction requiring Defendants to participate and cooperate in the cleanup of the Canal, as outlined in the ROD; and

6.     Any further relief as the Court deems just and necessary.

Dated: October 3, 2024

Respectfully submitted,

**ARENTFOX SCHIFF LLP**

*/s/* J. Michael Showalter
Matthew F. Prewitt
J. Michael Showalter
Sonul Rao
1301 Avenue of the Americas, 42nd Floor
New York, NY 10019
Phone: (212) 484-3900
Email: matthew.prewitt@afslaw.com
         j.michael.showalter@afslaw.com
         sonul.rao@afslaw.com

Bradley S. Rochlen (*pro hac vice* forthcoming)
David C. Giles (*pro hac vice* forthcoming)
233 S. Wacker Dr., Suite 7100
Chicago, Illinois 60606
(312) 258-5500 (telephone)
(312) 258-5600 (facsimile)
Email: bradley.rochlen@afslaw.com
         david.giles@afslaw.com

*Attorneys for Plaintiff The Brooklyn Union Gas Company d/b/a National Grid NY*