UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------

THE BROOKLYN UNION GAS COMPANY,
*doing business as* NATIONAL GRID NY,

                Plaintiff,

          v.

CONSOLIDATED EDISON COMPANY OF NEW
YORK, INC., THE CITY OF NEW YORK, THE
UNITED STATES OF AMERICA, THE UNITED
STATES DEPARTMENT OF DEFENSE, THE
UNITED STATES DEPARTMENT OF THE
NAVY, THE UNITED STATES DEPARTMENT
OF THE ARMY, THE UNITED STATES COAST
GUARD, THE FEDERAL MARITIME
COMMISSION, THE UNITED STATES POSTAL
SERVICE, THE UNITED STATES GENERAL
SERVICES ADMINISTRATION, ASTORIA
GENERATING COMPANY, L.P.,
BALLANTYNE LEGACY HOLDINGS, LLC,
BAYSIDE FUEL OIL CORPORATION, BEAZER
EAST, INC., THE BRINK'S COMPANY,
BROOKLYN IMPROVEMENT COMPANY,
DUN AND BRADSTREET CORP., HESS CORP.,
THE KRAFT HEINZ COMPANY, MCIZ CORP.,
36-2ND J CORP., 15 SECOND AVENUE LLC,
107 SIXTH STREET LLC, METROPOLITAN
TRANSPORTATION AUTHORITY, MRC
HOLDINGS, INC., NEW YORK CITY
ECONOMIC DEVELOPMENT CORP., NEW
YORK CITY INDUSTRIAL DEVELOPMENT
AGENCY, NEW YORK CITY TRANSIT
AUTHORITY, NL INDUSTRIES, INC.,
NORTHVILLE INDUSTRIES CORP., PHILLIPS
66 COMPANY, POWER AUTHORITY OF THE
STATE OF NEW YORK, PUGET SOUND
COMMERCE CENTER, INC., REXAM
BEVERAGE CAN COMPANY, SPX
TECHNOLOGIES, INC., STAUFFER
MANAGEMENT COMPANY, TDA
INDUSTRIES, INC., TEXACO, INC.,
UNION OIL COMPANY OF CALIFORNIA, and

**MEMORANDUM & ORDER**
24-CV-6993 (MKB)

VERIZON NEW YORK INC.,

Defendants.

--------------------------------------------------------------

MARGO K. BRODIE, United States District Judge:

I.  Background ........................................................................................................... 6

   a.  Factual background ............................................................................................. 6

      i.  The Gowanus Canal Superfund Site .............................................................. 7

      ii.  The EPA's 2013 Record of Decision and subsequent administrative orders ................ 7

      iii.  The Agreement ............................................................................................. 8

   b.  This action ......................................................................................................... 12

      i.  Motions to seal the Agreement .................................................................... 15

      ii.  Pre-motion conference and oral argument ................................................. 17

II.  Discussion ........................................................................................................... 18

   a.  Standard of review ............................................................................................ 18

   b.  Brooklyn Union's motion is not a premature motion *in limine* ....................... 20

   c.  The unambiguous language of the Agreement does not prevent the parties from introducing the Agreement in this litigation but the parties are prevented from introducing their RD allocation percentages ............................................................................ 24

      i.  The confidentiality provisions of the Agreement, sections 27 and 13(a), do not individually bar use of the Agreement or the RD allocation percentages ........................... 27

         1.  Section 27 of the Agreement does not bar the parties from asserting the Agreement as a claim, defense, or limitation to liability because the exception applies .................... 28

         2.  Section 13(a) of the Agreement does not separately bar disclosure of the RD allocation percentages in this litigation ......................................................................... 31

      ii.  Defendants are not prohibited from asserting the Agreement as a claim or defense in this litigation, but are prohibited from asserting their RD allocations as a claim or defense 35

         1.  Section 10(a) prohibits the parties from asserting their RD allocation as a defense or limitation to liability in this action ...................................................................... 36

            A.  Section 10(a) ...................................................................................... 38

            B.  Section 10(j) does not limit section 10(a) .......................................... 41

      iii.  Defendants are not prohibited from applying their RD allocation to RA costs and, as incurred by a future agreement, other response costs under section 10(j) ........................... 43

      iv.  The May 2019 Vote applied the RD percentage to RA costs and to other response costs that Phillips becomes obligated to pay by any future agreement .......................... 54

   d.  The Court denies Brooklyn Union's motion and Phillips' cross-motion for summary judgment on Phillips' breach-of-contract counterclaim ........................................ 57

2

III.   Conclusion ......................................................................................................... 63

Plaintiff The Brooklyn Union Gas Company, doing business as National Grid NY ("Brooklyn Union"), commenced the above-caption action on October 3, 2024, against several Defendants[1] alleging claims for (1) cost recovery under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"); (2) contribution under CERCLA; (3) contribution under New York Navigation Law § 176(8); (4) strict liability under New York Navigation Law § 181; and also seeks (5) declaratory judgment for recovery of further response costs.  (Compl. ¶¶ 199–235, Docket Entry No. 1.)  Brooklyn Union alleges that Defendants are each partially responsible for contaminating the Gowanus Canal (the "Canal") in Brooklyn, New York, and "asks the Court to hold all parties liable for their equitable share" of cleaning up the Canal.  (*Id.* ¶ 7.)

Phillips filed counterclaims against Brooklyn Union on December 2, 2024, for (1) contribution under CERCLA; (2) contribution under New York Navigation Law; and (3) contribution under New York common law and New York Civil Practice Law and Rules.[2]  In its counterclaims, Phillips also alleges that Brooklyn Union breached the Gowanus Canal Superfund Site Remedial Design Funding, Participation and Confidentiality Agreement (the "Agreement") by filing this case.  (Phillips' Answer and Counterclaims, Phillips' Counterclaims, ¶¶ 31–62.)  In addition, Phillips claims that Brooklyn Union's claims are barred by the Agreement and seeks to

---

[1]  Defendants include, among others, Phillips 66 Company ("Phillips"), Puget Sound Commerce Center, Inc. ("Puget Sound"), the New York City Transit Authority, and the Metropolitan Transportation Authority.

[2]  (Phillips' Answer and Counterclaims, Phillips' Counterclaims, ¶¶ 63–130, annexed to Decl. of Bradley S. Rochlen in Supp. of Pl.'s Mot. for Summ. J. ("Rochlen Decl.") as Ex. 1, Docket Entry No. 237-4; Agreement, annexed to Rochlen Decl. as Ex. 2, Docket Entry No. 237-5.)

introduce the Agreement, including Phillips' allocated percentage for costs related to cleaning up the Canal, as a defense to Brooklyn Union's claims.[3]  (*Id.*)

On June 11, 2025, Brooklyn Union filed a motion for summary judgment, requesting that the Court (1) "hold, as a matter of law, that the [Agreement] governing a prior alternative dispute resolution and related results cannot be asserted as a basis for a claim or defense in this lawsuit"; (2) grant Brooklyn Union summary judgment on Phillips' counterclaim for breach of contract; and (3) grant Brooklyn Union summary judgment against "any other defendant in this lawsuit who asserts the [Agreement] and related results as a defense to liability or cap on liability in this litigation."[4]  (Pl.'s Mem. 1.)

Phillips opposes Brooklyn Union's motion and cross-moves for summary judgment, requesting that the Court (1) hold, as a matter of law, that "Phillips' prior allocation under the Agreement applies to remedial design, remedial action, and other costs Brooklyn Union is seeking from Phillips in this litigation;" (2) "unseal[] Phillips' Answer and Counterclaims without redaction so that Phillips may properly disclose the terms of the Agreement as written and Phillips' own final and binding allocated share as necessary to establish Phillips' right to damages and other relief;" and (3) grant Phillips' summary judgment on its counterclaim for breach of contract.[5]  (Phillips' Mem. 11–15, 25.)

---

[3]  For the reasons discussed *infra* section I.b.i, the Court relies on the redacted versions of Phillips' Answer and Counterclaims and the Agreement that were filed with Phillips' motion for summary judgment, rather than the unredacted versions Phillips filed on December 2, 2024 which are sealed.  (*See* Phillips' Unredacted Answer and Counterclaims, Docket Entry No. 91.)

[4]  (Pl.'s Not. of Mot. for Summ. J. ("Pl.'s Mot."), Docket Entry No. 237; Pl.'s Mem. in Supp. of Pl.'s Mot. ("Pl.'s Mem."), Docket Entry No. 237-1; Pl.'s Reply in Supp. of Pl.'s Mot. and Resp. to Cross-Mots. for Summ. J. ("Pl.'s Reply"), Docket Entry No. 242.)

[5]  (Phillips' Opp'n to Pl.'s Mot. and Cross-Mot. for Summ. J. ("Phillips' Mot."), Docket Entry No. 240; Phillips' Mem. in Supp. of Phillips' Mot. and in Opp'n to Pl.'s Mot. ("Phillips'

Puget Sound opposes Brooklyn Union's motion on the grounds that it is a premature motion *in limine* and the New York City Transit Authority and the Metropolitan Transportation Authority (together with the New York City Transit Authority, the "Transit Defendants") oppose Brooklyn Union's motion on the grounds that the Court should not determine whether certain aspects of the Agreement are confidential at this stage of the litigation.[6]  On September 24, 2025, the Court heard oral argument from the parties.[7]  (*See* Tr. of Sep. 24, 2025 Oral Argument ("Sep. 24 O.A. Tr."), Docket Entry No. 272.)

---

Mem."), Docket Entry No. 240-1; Phillips' Reply in Supp. of Phillips' Mot. ("Phillips' Reply"), Docket Entry No. 246.)

[6]  (Puget Sound's Limited Opp'n to Pl.'s Mot. ("Puget Sound's Opp'n"), Docket Entry No. 238; Pl.'s Reply to Puget Sound's Opp'n ("Pl.'s Puget Sound Reply"), Docket Entry No. 243; Transit Defendants' Opp'n to Pl.'s Mot. ("Transit Defs.' Opp'n"), Docket Entry No. 239; Pl.'s Reply to Transit Defs.' Opp'n ("Pl.'s Transit Defs.' Reply"), Docket Entry No. 244.)

[7]  The "Ballantyne Defendants" (which include Defendants Ballantyne Legacy Holdings, LLC, The Brink's Company, Dun & Bradstreet, Inc., The Kraft Heinz Company, MRC Holdings, Inc., Northville Industries Corp., Rexam Beverage Can Company, Stauffer Management Company LLC, and Verizon New York Inc.) also opposed Brooklyn Union's motion and cross-moved for summary judgment.  (Ballantyne Defendants' Not. of Cross-Mot. for Summ. J. and Opp'n to Pl.'s Mot. ("Ballantyne Defs.' Mot."), Docket Entry No. 241; Ballantyne Defs.' Mem. in Supp. of Ballantyne Defs.' Mot. ("Ballantyne Defs.' Mem."), appended to Ballantyne Def.'s Mot., Docket Entry No. 241-1; Puget Sound's Qualified Opp'n to Ballantyne Defs.' Mot. ("Puget Sound's Ballantyne Defs.' Opp'n"), Docket Entry No. 245; Ballantyne Defs.' Reply in Supp. of Ballantyne Defs.' Mot. ("Ballantyne Defs.' Reply"), Docket Entry No. 247.)  Specifically, the Ballantyne Defendants requested the Court (1) "deny [Brooklyn Union's] motion for partial summary judgment" and (2) find "[Brooklyn Union's] action seeking cost recovery or contribution against [Ballantyne Defendants] is barred by the terms of [s]ection 10(j) of the Agreement."  (Ballantyne Defs.' Mem. 4.)

Following oral argument, Brooklyn Union notified the Court that it was engaging in settlement negotiations with the Ballantyne Defendants, excluding defendants The Kraft Heinz Company, Stauffer Management Company LLC, and Northville Industries Corp., who were previously dismissed from the action (*see infra* footnotes 14, 16).  (*See* Status Ltr. dated Oct. 1, 2025, Docket Entry No. 264; *see also* Status Ltr. dated Oct. 15, 2025, Docket Entry No. 266; Status Ltr. dated Nov. 14, 2025, Docket Entry No. 267; Status Ltr. dated Dec. 15, 2025, Docket Entry No. 270; Status Ltr. dated Jan. 29, 2026, Docket Entry No. 273.)  According to the status letter filed by Brooklyn Union on March 2, 2026, Brooklyn Union is currently finalizing settlement agreements with the remaining Ballantyne Defendants.  (Status Ltr. dated Mar. 2, 2026, Docket Entry No. 276.)  In view of the anticipated settlement agreements comprising all

For the reasons discussed below, the Court grants in part and denies in part Brooklyn

Union's motion and grants in part and denies in part Phillips' cross-motion.

## I. Background

### a. Factual background

The following facts are undisputed unless otherwise noted.[8]

_____

remaining Ballantyne Defendants, the Court does not address Ballantyne Defendants' cross-motion nor their arguments made in opposition to Brooklyn Union's motion.

[8] (Pl.'s Rule 56.1 Stmt. of Undisputed Material Facts ("Pl.'s 56.1"), appended to Pl.'s Mot., Docket Entry No. 237-2; Phillips' Resp. to Pl.'s 56.1 ("Phillips' 56.1 Resp.") and Counterstmt. of Undisputed Material Facts ("Phillips' 56.1"), appended to Phillips' Mot., Docket Entry No. 240-2; Decl. of Jamie F. Thompson in Supp. of Phillips' Mot. ("Thompson Decl."), Docket Entry No. 240-3; Letter from Jamie F. Thompson, Partner at Shook, Hardy & Bacon, to Brian E. Carr, Assistant Regional Counsel, EPA (May 8, 2019) ("Thompson Letter"), annexed to Thompson Decl. as Ex. C, Docket Entry No. 240-6; E-mail from Brian E. Carr, Assistant Regional Counsel, EPA, to Jamie F. Thompson, Partner at Shook, Hardy & Bacon (Apr. 5, 2019, at 12:54 P.M.) ("Carr E-mail"), annexed to Thompson Decl. as Ex. F, Docket Entry No. 240-9; Ballantyne Defs.' Resp. to Pl.'s 56.1 ("Ballantyne Defs.' 56.1 Resp.") and Counterstmt. of Undisputed Material Facts ("Ballantyne Defs.' 56.1"), appended to Ballantyne Def.'s Mot., Docket Entry No. 241-2; Pl.'s Resp. to Ballantyne Defs.' 56.1 ("Pl.'s Ballantyne Defs. 56.1 Resp."), appended to Pl.'s Reply, Docket Entry No. 242-1; Pl.'s Resp. to Phillips' 56.1 ("Pl.'s Phillips 56.1 Resp."), appended to Pl.'s Reply, Docket Entry No. 242-2.)

In the parties' responses to their opponents' 56.1 statements, they occasionally admit that certain statements are, for example, "[u]ncontroverted with additional explanation," (Phillips' 56.1 Resp. ¶ 9), but fail to dispute the facts in the statement itself. Unless actually disputed or contradicted by the record, the Court considers these facts uncontested. _See Oji v. Collins_, No. 22-CV-276, 2025 WL 2624975, at *2 n.3 (E.D.N.Y. Sep. 11, 2025) ("Plaintiff's '[r]esponses . . . which do not point to any evidence in the record that may create a genuine issue of material fact, do not function as denials, and will be deemed admissions of the stated fact.'" (alteration in original) (quoting _Senno v. Elmsford Union Free Sch. Dist._, 812 F. Supp. 2d 454, 458 n.1 (S.D.N.Y. 2011))), _appeal docketed sub. nom._, _Oji v. Denis McDonough_, No. 25-2508 (2d Cir. Oct. 10, 2025); _Blue Castle (Cayman) Ltd. v. Miller,_ 772 F. Supp. 3d 416, 421 n.2 (S.D.N.Y. 2025) ("Responses of this nature, which do not point to any evidence in the record that may create a genuine issue of material fact, do not function as denials, and will be deemed admissions of the stated fact." (quoting _Johnson v. City of New York_, No. 15-CV-6915, 2019 WL 294796, at *10 n.8 (S.D.N.Y. Jan. 23, 2019))); _McCarthy v. Motorola Sols. Inc._, No. 21-CV-4020, 2024 WL 3965950, at *1 (E.D.N.Y. Aug. 28, 2024) ("Likewise, 'responses that do not point to any evidence in the record that may create a genuine issue of material fact do not function as denials, and will be deemed admissions of the stated fact.'" (quoting _Baity v. Kralik_, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014))); _Cui v. Fed. Bureau of Investigation_, 551 F. Supp. 3d 4, 15 (E.D.N.Y. 2021) ("Generally, plaintiff['s] failure to respond or contest the facts set forth by the defendants

### i.   The Gowanus Canal Superfund Site

In 2010, the United States Environmental Protection Agency (the "EPA") declared the Canal and its surrounding area a "Superfund site" (the "Gowanus Canal Superfund Site") and listed it on the EPA's National Priorities List. (Phillips' 56.1 Resp. ¶ 1; Pl.'s Phillips 56.1 Resp. ¶ 1.) The National Priorities List sites are areas the EPA has determined are the highest priority for cleanup. (Phillips' 56.1 Resp. ¶ 2.)

### ii.   The EPA's 2013 Record of Decision and subsequent administrative orders

In 2013, the EPA issued a Record of Decision for the Canal describing the components of the cleanup. (Pl.'s Ballantyne Defs. 56.1 Resp. ¶ 2.)

On March 20, 2014, the EPA issued a Unilateral Administrative Order for Remedial Design for the Canal (the "RD UAO") to twenty-nine parties, including Brooklyn Union and numerous Defendants, including Phillips and Puget Sound.[9]  *See* EPA, Administrative Order for

---

in their . . . 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." (internal quotation marks omitted) (quoting *Exeter Holdings, Ltd. v. Haltman*, No. 13-CV-5475, 2020 WL 4587533, at *2 n.3 (E.D.N.Y. Apr. 21, 2020)); *Angulo v. Nassau Cnty.*, 89 F. Supp. 3d 541, 545 n.1 (E.D.N.Y. 2015) ("Generally, a party's failure to respond or contest the facts set forth by the [moving party] in [its] Rule 56.1 statement as being undisputed constitutes an admission of those facts, and those facts are accepted as being undisputed." (internal quotation marks omitted) (quoting *Jessamy v. City of New Rochelle,* 292 F. Supp. 2d 498, 504 (S.D.N.Y. 2003))).

[9]  The RD UAO names as a potentially responsible party ("PRP"): Brooklyn Union Gas Co. doing business as National Grid New York; Beam Inc.; Beazer East, Inc.; Brink's Inc.; CBS Corp.; Citigroup, Inc.; Consolidated Edison Co. of New York, Inc.; Dun and Bradstreet Corp.; ExxonMobil Oil Corp.; Hauck Manufacturing Co.; Hess Corp.; Honeywell International Inc.; Kraft Foods Global, Inc.; MCIZ Corp., Fifteen Second Avenue LLC, 36-2nd-J Corp., and 107 Sixth Street LLC; MRC Holdings, Inc.; NL Industries, Inc.; Northville Industries Corp.; Patterson Fuel Oil Co., Inc.; *Phillips; Puget Sound*; Rexam Beverage Can Co.; SPX Corp.; Stauffer Management Company, LLC; TDA Industries, Inc.; The Brooklyn Improvement Co.; The Union Oil Company of California; and Verizon New York Inc. *See* EPA, *In the Matter of the Gowanus Canal Superfund Site*, Administrative Order for Remedial Design, No. CERCLA-02-2014-2001 (Mar. 20, 2014).

Remedial Design, *In the Matter of the Gowanus Canal Superfund Site*, Index No. CERCLA-02-2014-2001 (Mar. 20, 2014).  (Phillips' 56.1 Resp. ¶¶ 4, 6; Pl.'s Phillips 56.1 Resp. ¶ 1.)  The RD UAO required parties "to undertake the [r]emedial [d]esign [("RD")] [s]tatement of work" (i.e., the design of the cleanup) for the remedial action ("RA") work (i.e., the implementation of the cleanup) at the Canal, and holds the parties "jointly and severally liable for this work."  (Phillips' 56.1 Resp. ¶¶ 7, 8, 11.)  Phillips disputes whether it was properly named as a PRP in the RD UAO.  (*Id.* ¶¶ 4, 6.)

On March 28, 2014, the EPA named the City of New York in a separate Administrative Order for Remedial Design (the "NYC UAO").  (*Id.* ¶ 5.)

### iii.   The Agreement

In 2015, most of the parties to the RD UAO, along with the City of New York, negotiated and entered into the Agreement.[10]  (Phillips' 56.1 Resp. ¶ 9; Pl.'s Phillips 56.1 Resp. ¶ 5.)  The purpose of the Agreement is to "control the manner and means by which the [p]arties will . . . [p]rovide for interim funding" and "the cost of performing the [RD w]ork" until "the completion of that work as approved by the EPA."  (Agreement sections 2(f), 3(a); *see also* Pl.'s Phillips'

---

This group includes the following defendants, or their predecessors: Beazer East, Inc.; The Brink's Company; Consolidated Edison Co. of New York, Inc; Dun and Bradstreet Corp.; Hess Corporation; The Kraft Heinz Company; MCIZ Corp; 15 Second Avenue, LLC; 36-2nd J Corp.; 107 Sixth Street LLC; MRC Holdings, Inc.; NL Industries, Inc.; Northville Industries, Inc.; *Phillips; Puget Sound*; Rexam Beverage Can Company; SPX Technologies, Inc.; Stauffer Management Company; TDA Industries, Inc.; Brooklyn Improvement Company; The Union Oil Company of California; and Verizon New York, Inc.  (Phillips' 56.1 Resp. ¶ 6.)

[10]  The parties to the Agreement that are also parties to this lawsuit include: Brooklyn Union; Consolidated Edison Company of New York, Inc.; The City of New York; Ballantyne Legacy Holdings, LLC; The Brink's Company; Brooklyn Improvement Company; Dun and Bradstreet Corp.; Hess Corp.; The Kraft Heinz Company; MCIZ Corp.; 36-2nd J Corp.; 15 Second Avenue LLC; 107 Sixth Street LLC; MRC Holdings, Inc.; Northville Industries Corp.; *Phillips; Puget Sound*; Rexam Beverage Can Company; Stauffer Management Company; TDA Industries, Inc.; and Verizon New York Inc.  (Phillips' 56.1 Resp. ¶ 10 n.6; Ballantyne Defs.' 56.1 Resp. ¶ 10 n.7.)

56.1 Resp. ¶ 5 ("Brooklyn Union entered into the Agreement with Phillips and [twenty-three] other parties to fund the work required by EPA under the RD UAO.").)  In the Agreement, the parties agreed to participate in a binding allocation of remedial design costs relating to the Gowanus Canal Superfund Site.  (Phillips' 56.1 Resp. ¶ 10; Pl.'s Phillips 56.1 Resp. ¶ 5.)  Under the Agreement, and following a confidential and binding alternative dispute resolution ("ADR") process conducted by an allocator, each party was allocated a percentage share of the RD costs related to the Gowanus Canal Superfund Site.  (Phillips' 56.1 Resp. ¶¶ 10, 12.)  The Agreement also provides a method by which the parties can request a vote to apply their RD percentage allocation to RA costs and other response costs.  (Agreement section 10(j); Phillips' 56.1 Resp. ¶¶ 9, 10.)

Section 10(a) of the Agreement provides:

> The [p]arties agree to participate in good faith in a process to develop a final and binding [a]llocation of RD [c]osts, the [g]roup [a]llocation [c]osts and all other costs authorized pursuant to [s]ection 1(b)[11] of this Agreement.  The results of the [a]llocation described herein shall be considered binding on the [p]arties, but not an arbitration award under federal or state law.  The results of the [a]llocation may be entered into evidence by any of the [p]arties to this Agreement in any subsequent proceeding to the extent necessary to enforce this Agreement.  The [p]arties may also offer the results of the [a]llocation in a future allocation proceeding among the [p]arties undertaken prior to the initiation of (and/or subsequent to the conclusion of) cost recovery or contribution litigation involving one or more of the [p]arties that is related to the [s]ite.  However, the [p]arties are prohibited from offering the results of the [a]llocation in any future contribution or cost recovery litigation proceeding, or allocation proceeding undertaken after the initiation of litigation, involving one or more of the [p]arties while

---

[11] Section 1(b) provides that "[f]rom time to time, any [w]ork [p]arty may propose additional activities reasonably and directly related to the RD [phase] for inclusion and funding under this Agreement.  Failing agreement of all [w]ork [p]arties, any [p]arty or [p]arties may perform such activities at their own expense and are not required to share the results of such activities with [p]arties that are not funding such activities."  (Agreement section 1(b).)  No party argues that any costs authorized pursuant to section 1(b) are at issue in the motions currently before the Court.

such litigation is still pending.  The [a]llocation results shall not be binding in any future allocation proceeding.  The [p]arties shall enter into an [a]llocation process agreement and retain an allocator(s) within three (3) months after the effective date of this [a]greement.  The [a]llocation process agreement may include the participation of PRPs . . . , that are not [p]arties to this Agreement.

(Agreement section 10(a); Phillips' 56.1 Resp. ¶ 11; Pl.'s Phillips 56.1 Resp. ¶ 6.)  The parties agreed that "[a]ny modification of this Agreement shall occur only through a unanimous vote of the [p]arties, memorialized in writing and signed by the [p]arties."  (Agreement section 15; Phillips' 56.1 Resp. ¶ 11.)  Further, under section 27, the parties agreed that "[n]either this Agreement, nor any of its terms, shall be disclosed to any person, except that the Agreement and its terms may be disclosed . . . in any action or proceeding between the [p]arties where the existence or terms of the Agreement are at issue."  (Agreement section 27(b); Phillips' 56.1 Resp. ¶ 11.)  Moreover, section 13(a) provides that the "draft [and] final reports from the allocator" are confidential "except that a [p]arty may share the final [a]llocation results, pursuant to and in accordance with [section] 10(a) and may orally share the final allocation percentage for itself with [the] EPA."  (Agreement section 13(a); Pl.'s Phillips 56.1 Resp. ¶¶ 28–30.)

In 2019, the allocator completed the ADR process and issued a 95-page final allocation decision assigning percentage shares of RD costs to the participants.  (Pl.'s Phillips 56.1 Resp. ¶ 10; *see also id.* ¶¶ 11–16 (describing the allocator's decision and the ADR process generally).)  The parties understood that there would be RA costs to clean up the Canal but "were not fully aware of the complete nature and extent of RA or other response costs" at the time they signed the Agreement.  (Pl.'s Ballantyne Defs. 56.1 Resp. ¶ 18.)  "At no time before, during, or after" negotiating the Agreement "was there unanimous agreement among the parties to the Agreement to include remedial investigation, feasibility study, or remedial actions costs in the scope of the allocated costs."  (Phillips' 56.1 Resp. ¶ 12.)

Section 10(j) of the Agreement states that:

> If the [a]llocation process does not include RA costs, the [p]arties agree that the [a]llocation of RD [c]osts for any [p]arty that is allocated a percentage of [REDACTED] or less may, upon the request of such [p]arty and the vote of 65% of the number of all [p]arties completing the RD [a]llocation process, be applied to the remedial action (RA) costs or other response costs that such [p]arty becomes obligated to pay by any future agreement among some or all [p]arties concerning such costs.  Nothing in this Agreement is intended or shall be construed to require any [p]arty to participate in any other allocation process for the RD, RA or any other purpose.

(Agreement section 10(j); Phillips' 56.1 Resp. ¶ 11.)  It is undisputed that Phillips' allocation percentages are below the redacted threshold (the "Threshold").  (Pl.'s Phillips 56.1 Resp. ¶ 16.) In May of 2019, after the parties received their allocations, "Phillips and twelve other parties that received either a zero percent allocation or a positive numerical percentage share below the [T]hreshold percentage in [section] 10(j), requested a vote that each such party 'may apply its respective RD allocation percentage to the [RA] costs or other response costs that such [p]arty becomes obligated to pay by any future agreement among some or all [p]arties concerning such costs'" (the "May 2019 Vote").  (Pl.'s Phillips' 56.1 Resp. ¶ 18 (citation omitted).)  Brooklyn Union voted against the requests, but the requests "were approved by an affirmative vote of more than 80% of the signatories to the Agreement, including signatories whose allegations were above the redacted threshold percentage in [s]ection 10(j)."[12]  (Pl.'s Ballantyne Defs. 56.1 Resp.

---

[12]  Brooklyn Union objects to Phillips' statements that the May 2019 Vote was "approved by an affirmative vote of more than 80% of the signatories to the Agreement," (Pl.'s Phillips 56.1 Resp. ¶ 19), but does not rely on any facts to support this argument.  *See Blue Castle (Cayman) Ltd.,* 772 F. Supp. 3d at 421 n.2 ("Responses . . . which do not point to any evidence in the record that may create a genuine issue of material fact, do not function as denials, and will be deemed admissions of the stated fact.").  Brooklyn Union argues that Phillips' statements about the May 2019 Vote are "not material," "in direct violation of the confidentiality provisions of the Agreement," and "irrelevant to the interpretation of the Agreement," (Pl.'s Phillips 56.1 Resp. ¶ 19), but Brooklyn Union does not dispute the parties' statements that more than 80% of the signatories to the Agreement approved the May 2019 Vote.  As discussed *supra* footnote 8, the

¶¶ 13, 14; Phillips' 56.1 Resp. ¶ 19.)  Because Brooklyn Union "has not entered into a settlement agreement with Phillips for the allocation of remedial action or other response costs," Brooklyn Union disputes whether the May 2019 Vote was a "valid vote . . . under which Phillips became obligated to pay remedial action or other costs."  (Pl.'s Phillips 56.1 Resp. ¶ 24; *see also* Sep. 24 O.A. Tr. 18:4–20:9.)

Brooklyn Union subsequently entered into agreements with "certain entities who participated in the allocation process for the allocation of costs related to the RD UAO and who are not parties to this litigation, including Honeywell."  (Pl.'s Phillips 56.1 Resp. ¶ 23.)  Brooklyn Union did not "enter[] into a settlement agreement with Phillips for the allocation of remedial action or other response costs."  (*Id.* ¶ 24; *see* Phillips' 56.1 Resp. ¶ 13.)  The parties dispute Phillips' allegation that Brooklyn Union "did not allow Phillips to join the settlement agreement with Honeywell or the other [entities]" — "Brooklyn Union does not dispute that it has not entered into a settlement agreement with Phillips . . . but disputes that Phillips attempted to join such settlements and was 'not allowed.'"  (Pl.'s Phillips 56.1 Resp. ¶ 24.)

### b.    This action

Brooklyn Union commenced the above-caption action on October 3, 2024, against Defendants Consolidated Edison Company of New York, Inc., The City of New York, The United States of America, The United States Department of Defense, The United States Department of the Navy, The United States Department of the Army, The United States Coast Guard, The Federal Maritime Commission, The United States Postal Service, The United States

---

Court "accept[s] as being undisputed" any facts that a party does not directly respond to or contest. *See, e.g.*, *Cui*, 551 F. Supp. 3d at 15.

12

General Services Administration,[13] Astoria Generating Company, L.P., Ballantyne Legacy

Holdings, LLC, Bayside Fuel Oil Corporation, Beazer East, Inc., The Brink's Company,

Brooklyn Improvement Company, Dun and Bradstreet Corp., Hess Corp., The Kraft Heinz

Company,[14] MCIZ Corp., 36-2nd J Corp., 15 Second Avenue LLC, 107 Sixth Street LLC,

*Metropolitan Transportation Authority*, MRC Holdings, Inc., New York City Economic

Development Corp., New York City Industrial Development Agency, *New York City Transit

Authority*, NL Industries, Inc.,[15] Northville Industries Corp.,[16] *Phillips*, Power Authority of the

State of New York, *Puget Sound*, Rexam Beverage Can Company, SPX Technologies, Inc.,[17]

---

[13]  The Court refers to Defendants The United States of America, The United States Department of Defense, The United States Department of the Navy, The United States Department of the Army, The United States Coast Guard, The Federal Maritime Commission, The United States Postal Service, and The United States General Services Administration collectively as the "Federal Government Defendants."

[14]  On October 13, 2025, Plaintiff Brooklyn Union and Defendant and Cross-Plaintiff NL Industries, Inc., *see infra* footnote 15, filed a stipulation of dismissal as to The Kraft Heinz Company and Stauffer Management Company.  (Stip. of Dismissal, Docket Entry No. 265.)  The Court approved the dismissal on October 14, 2025.  (Order dismissing parties dated Oct. 14, 2025.)

[15]  On December 2, 2024, NL Industries, Inc. filed its answer, a counterclaim against Brooklyn Union, and cross-claims against all other Defendants.  (NL Industries' Answer, Counterclaim, and Crossclaims, Docket Entry No. 95.)  As to its cross-claims, NL Industries, Inc. alleged that to the extent it "is held responsible for the alleged injury and harm, the injury was the proximate result of the acts and/or omissions of the [Brooklyn Union] and [other D]efendants" and thus NL Industries, Inc. "is entitled to contribution from [Brooklyn Union] and [other D]efendants for their proportionate share of the response costs incurred and to be incurred in connection with the work performed at the [Gowanus] Canal."  (*Id.* at 19.)

[16]  On September 22, 2025, Plaintiff Brooklyn Union and Defendant and Cross-Plaintiff NL Industries, Inc., filed a stipulation of dismissal as to Northville Industries Corp.  (Stip. of Dismissal, Docket Entry No. 263.)  The Court approved the dismissal on September 23, 2025.  (Order dismissing parties dated Sep. 23, 2025.)

[17]  On December 11, 2024, Brooklyn Union filed a stipulation of dismissal as to SPX Technologies, Inc., (Stip. of Dismissal, Docket Entry No. 124), and the Court approved the dismissal, (Order dismissing parties dated Dec. 11, 2024).  On December 19, 2024, Cross-Plaintiff, NL Industries, Inc., filed a stipulation of dismissal as to SPX Technologies, Inc., as

Stauffer Management Company,[18] TDA Industries, Inc.,[19] Texaco, Inc., Union Oil Company of California, and Verizon New York Inc. (Compl. ¶¶ 38–69 (emphasis added).) Brooklyn Union alleges claims for (1) cost recovery under CERCLA against each Defendant; (2) contribution under CERCLA against Defendants The Brink's Company, Brooklyn Improvement Company, The City of New York, Consolidated Edison Company of New York, Inc., Dun and Bradstreet Corp.,[20] Hess Corp., The Kraft Heinz Company, MCIZ Corp., 36-2nd J Corp., 15 Second Avenue LLC, 107 Sixth Street LLC, MRC Holdings, Inc., Northville Industries Corp., *Phillips*, *Puget Sound*, Rexam Beverage Can Company, SPX Technologies, Inc., Stauffer Management Company, TDA Industries, Inc., and Verizon New York, Inc.; (3) contribution under New York Navigation Law § 176(8) against all Defendants except the Federal Government Defendants; (4) strict liability under New York Navigation Law § 181 against all Defendants except the Federal Government Defendants; and also seeks (5) declaratory judgment for recovery of further response costs against all Defendants. (*Id.* ¶¶ 199–235 (emphasis added); *see also* Phillips' 56.1 Resp. ¶¶ 17–18; Pl.'s Phillips' 56.1 Resp. ¶¶ 2–3.)

---

cross-defendant. (Stip. of Dismissal, Docket Entry No. 140.) The Court approved the dismissal on December 23, 2024. (Order dismissing parties dated Dec. 23, 2024.)

[18] *See supra* footnote 14.

[19] On July 28, 2025, TDA Industries, Inc. ("TDA") moved to dismiss the Complaint for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, arguing it is entitled to the *de micromis* exemption under CERCLA section 107(o) (42 U.S.C. 9607(o)), and Brooklyn Union opposed the motion. (Def.'s Notice of Mot. to Dismiss, Docket Entry No. 251; Def.'s Mem. in Supp. of Def.'s Mot. to Dismiss, appended to Def.'s Mot. to Dismiss, Docket Entry No. 251-1; Pl.'s Opp'n to Def.'s Mot. to Dismiss, appended to Def.'s Mot. to Dismiss, Docket Entry No. 251-13; Def.'s Reply in Supp. of Def.'s Mot. to Dismiss, appended to Def.'s Mot. to Dismiss, Docket Entry No. 251-14.) On March 29, 2026, the Court denied the motion to dismiss. (Order denying TDA's Motion to Dismiss, Docket Entry No. 278.)

[20] Ballantyne Defendants note that Brooklyn Union "improperly pled" Dun and Bradstreet, Inc. as Dun and Bradstreet Corp. (Ballantyne Defs.' Mem. 1 n.1.) For consistency, the Court refers to the parties as they are identified in the Complaint.

Phillips filed its Answer and Counterclaims on December 2, 2024.  (Phillips' Unredacted Answer and Counterclaims.)  Phillips' Answer and Counterclaims included an unredacted copy of the Agreement.  (Unredacted Agreement, annexed to Phillips' Unredacted Answers and Counterclaims as Ex. A, Docket Entry No. 91-1.)

### i. Motions to seal the Agreement

On December 3, 2024, Brooklyn Union filed an emergency motion to seal Phillips' Unredacted Answer and Counterclaims and the Unredacted Agreement because the parties "dispute whether a document and certain related information should be treated as confidential and not publicly disclosed."[21]  On December 4, 2024, Magistrate Judge Lara K. Eshkenazi granted Brooklyn Union's motion to seal on an interim basis without taking a "position on the merits of permanently sealing the documents."  (Order dated Dec. 4, 2024, Docket Entry No. 104.)

On December 9, 2024, Brooklyn Union and Phillips filed a joint status report stating that "Phillips agreed to the removal of a page of [the Agreement] that was filed along with its [Unredacted] Answer" and that the "[Unredacted] Answer and [Agreement] will continue to remain under seal until the final resolution" of the parties' confidentiality dispute.  (Joint Status Report dated Dec. 9, 2024, Docket Entry No. 118.)  In accordance with the joint status report, Phillips filed a motion to substitute the filed Agreement to exclude the page the parties agreed to remove,[22] and Judge Eshkenazi granted the motion on December 13, 2024.  (Order dated Dec. 13, 2024.)

---

[21] (Pl.'s Emergency *Ex Parte* Mot. to Seal and for Related Interim Relief ("Pl.'s Mot. to Seal"), Docket Entry No. 103; Pl.'s Mem. in Supp. of Pl.'s Mot. to Seal ("Pl.'s Seal Mem.") 1, annexed to Pl.'s Mot. to Seal as Ex. 1, Docket Entry No. 103-1.)

[22] (Phillips' Mot. for Leave to File Sealed Documents, Docket Entry No. 123; Phillips' Mot. to Substitute Exhibit to Answer and Counterclaim, Docket Entry No. 123-1; Agreement,

On January 10, 2025, Brooklyn Union and Phillips submitted a joint status report which identified the parties' "remaining dispute over confidentiality" as related to Brooklyn Union's "request for redactions of certain specific numerical percentages [in the Agreement]." (Joint Status Report dated Jan. 10, 2025 2–3, Docket Entry No. 154.) Specifically, Brooklyn Union argued that the "percentage thresholds and allocations coming out of the parties' process to fund the remedial design should be redacted and should not be disclosed in any court filing at this time." (*Id.* at 6.) Phillips opposed the request arguing it did "not believe that the additional alterations [Brooklyn Union] [wa]s now requesting . . . [were] warranted." (*Id.* at 3.) A group of Defendants[23] filed a letter with the Court indicating that they "strongly believe that the Threshold [p]ercentage is not confidential under the terms of the Agreement, and it is *highly relevant* to these proceedings." (Ltr. dated Jan. 10, 2025; Ltr. dated Jan. 14, 2025.) Judge Eshkenazi held a status conference on January 21, 2025, at which the parties agreed to unseal the relevant motions while the Agreement would remain sealed.[24] Judge Eshkenazi directed the parties to inform the Court about their respective positions regarding redacting the Agreement.[25] (Jan. 21 Hr'g Tr. 7:3–17.)

---

annexed to Phillips' Mot. to Substitute Exhibit to Answer and Counterclaim as Ex. A, Docket Entry No. 123-2.)

[23] The Defendants who submitted the letter are: Ballantyne Legacy Holdings, LLC; The Brink's Company; Dun & Bradstreet, Inc.; The Kraft Heinz Company; MRC Holdings, Inc.; Northville Industries Corp.; Puget Sound; Rexam Beverage Can Company; Stauffer Management Company LLC; TDA; and Verizon New York Inc. (Ltr. dated Jan. 10, 2025, Docket Entry No. 152; Ltr. dated Jan. 14, 2025, Docket Entry No. 157.)

[24] (Tr. of Jan. 21, 2025 Hr'g ("Jan. 21. Hr'g Tr.") 1:6–14, Docket Entry No. 178; Order dated Jan. 21, 2025; Min. Entry dated Jan. 22, 2025.)

[25] On January 22, 2025, Phillips moved to file a sealed version of the Agreement, requesting that the Agreement "continue to remain under seal until the final resolution of confidentiality issues" Brooklyn Union raised. (Phillips' Second Mot. for Leave to File Sealed Documents, Docket Entry No. 166; Agreement, annexed to Phillips' Second Mot. for Leave to File Sealed Documents, Docket Entry No. 166-1.)

### ii. Pre-motion conference and oral argument

On January 31, 2025, Brooklyn Union filed a letter reiterating its position that the Court should allow it to "brief and argue why the percentage allocations are not relevant and should not be included in the case record, even if submitted only *in camera*, before allowing" Defendants "to inject this information into the case record." (Ltr. dated Jan. 31, 2025 3, Docket Entry No. 185.) Brooklyn Union argued that the Court can "determine[] the legal effect of the Agreement to this litigation" by "reading the four corners of the Agreement," and, after doing so, "either the Agreement should be struck completely from the record or should become part of the public case file without redaction." (*Id.* at 8.)

On February 11, 2025, the Court held a pre-motion conference to discuss the parties' anticipated motions for summary judgment and to discuss their respective arguments with regard to the confidentiality of the Agreement. The Court concluded that the parties should submit redacted copies of the Agreement with their summary judgment briefing. (Tr. of Feb. 11, 2025 Oral Argument ("Feb. 11 O.A. Tr.") 27:6–16, Docket Entry No. 203.) On June 11, 2025, Brooklyn Union filed its motion for partial summary judgment and Phillips filed its cross-motion for summary judgment.[26] (Pl.'s Mot; Phillips' Mot.)

On September 24, 2025, the Court heard oral argument on Brooklyn Union's motion for summary judgment and Phillips' cross-motion for summary judgment. (Min. Entry dated Sep. 24, 2025; *see* Sep. 24 O.A. Tr.) During oral argument, the Court heard arguments from Brooklyn Union, Phillips, and Puget Sound on: (1) whether the motion for summary judgment is properly before the Court; (2) whether the introduction of the Agreement or the allocation results are barred by the Agreement's confidentiality clauses, sections 13(a) and/or 27; (3) the parties'

---

[26] As discussed *supra* footnote 7, the Ballantyne Defendants also filed a cross-motion for summary judgment. (Ballantyne Def.s' Mot.)

differing interpretations of section 10(j) of the Agreement; and (4) the parties' differing interpretations of section 10(a) of the Agreement.  (*See generally* Sep. 24 O.A. Tr.)

## II.  Discussion

### a.  Standard of review

Summary judgment is proper only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Chislett v. N.Y.C. Dep't of Educ.*, 157 F.4th 172, 183 (2d Cir. 2025) (quoting Fed. R. Civ. P. 56(a)); *Capitol Recs., LLC v. Vimeo, Inc.*, 125 F.4th 409, 418 (2d Cir.) (quoting same), *amended on reh'g in part*, 151 F.4th 13 (2d Cir. 2025).  The court must "constru[e] the evidence in the light most favorable to the nonmoving party," *Radwan v. Manuel*, 55 F.4th 101, 113 (2d Cir. 2022) (alteration in original) (quoting *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 358 (2d Cir. 2011)), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought," *Koral v. Saunders*, 36 F.4th 400, 408 (2d Cir. 2022) (quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).  *See Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 122 (2d Cir. 2024) ("In determining whether there is a genuine dispute as to a material fact, we must resolve all ambiguities and draw all inferences against the moving party." (quoting *Garcia v. Hartford Police Dep't*, 706 F.3d 120, 127 (2d Cir. 2013))).

The role of the court "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Lara-Grimaldi v. Cnty. of Putnam*, 132 F.4th 614, 633 (2d Cir. 2025) (quoting *Porter v. Dartmouth-Hitchcock*, 92 F.4th 129, 147 (2d Cir. 2024)); *Kee v. City of New York*, 12 F.4th 150, 167 (2d Cir. 2021) (quoting *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010)).  A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the [nonmoving party]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *see Chislett*, 157 F.4th at

18

183 ("A dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" (quoting *Anderson*, 477 U.S. at 248)). "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Chislett*, 157 F.4th at 183 (quoting *Anderson*, 477 U.S. at 248). The "mere existence of a scintilla of evidence" is not sufficient to defeat summary judgment. *Anderson*, 477 U.S. at 252; *see Solid 21, Inc. v. Breitling U.S.A., Inc.*, 96 F.4th 265, 276 (2d Cir. 2024) ("The mere existence of a scintilla of evidence in support of the non-movant's position will be insufficient; there must be evidence on which the trier of fact could reasonably find for the non-movant." (quoting *Sports Auth., Inc. v. Prime Hosp. Corp.*, 89 F.3d 955, 960 (2d Cir. 1996))). "The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000); *see Miller v. N.Y. State Police*, No. 20-3976, 2022 WL 1133010, at *1 (2d Cir. Apr. 18, 2022) (summary order) (The court's function is to decide whether, "after resolving all ambiguities and drawing all inferences in favor of the nonmovant, a reasonable jury could return a verdict for the nonmovant." (first citing *Anderson*, 477 U.S. at 248; and then citing *Garcia*, 706 F.3d at 127, 129)). "Summary judgment should be granted only if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Chislett*, 157 F.4th at 183 (quoting Fed. R. Civ. P. 56(a)); *see Capitol Recs.*, 125 F.4th at 418 ("[A] genuine dispute as to a material fact precludes summary judgment 'where the evidence is such that a reasonable jury could decide in the non-movant's favor.'" (quoting *Lucente v. County of Suffolk*, 980 F.3d 284, 296 (2d Cir. 2020))).

When there are cross-motions for summary judgment, the court is not required to grant judgment as a matter of law for either side. *Ricci v. DeStefano*, 530 F.3d 88, 109–10 (2d Cir.

19

2008). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Id.* at 110 (quoting *Schwabenbauer v. Bd. of Ed. of the City Sch. Dist. of the City of Olean*, 667 F.2d 305, 314 (2d Cir. 1981)).

### b.    Brooklyn Union's motion is not a premature motion *in limine*

The Court first addresses Puget Sound's argument that the Court should deny Brooklyn Union's motion because it is a premature motion *in limine*.  As the Court noted at oral argument, the motion is properly before the Court.  (Sep. 24 O.A. Tr. 14:18–20.)

Puget Sound argues that Brooklyn Union "impermissibly seeks to limit the admissibility of the Agreement."  (Puget Sound's Opp'n 2.)  In support, it argues that by requesting that the Court "hold that the Agreement cannot be asserted as a basis for a claim or defense in this lawsuit" and grant Brooklyn Union summary judgment "against any other defendant in this action who asserts the Agreement as a defense to liability or a cap on liability," impermissibly "seeks to exclude evidence — the Agreement — or to limit the use or application of that evidence in the future by or against all parties in the action."  (*Id.* at 2–3; *see also* Sep. 24 O.A. Tr. 14:2–10 (arguing Brooklyn Union's "motion for summary judgment is a thinly veiled motion *in limine*" and requesting "the Court not exclude the [A]greement for all purposes because . . . there will be legitimate reasons why it will be relevant in this case").)

Brooklyn Union argues that its motion is not a premature motion *in limine*.  First, it argues Puget Sound did not identify a "hypothetical future matter" for which any defendant would rely on the Agreement in asserting "a future claim, defense, or legal or factual issue in the litigation."  (Pl.'s Puget Sound Reply 2.)  Brooklyn Union also argues that Puget Sound has not "filed an affidavit under [Federal Rule of Civil Procedure] 56(d) to request discovery for unresolved factual issues" related to Brooklyn Union's motion for summary judgment.  (*Id.* at 5.)

Second, it argues that Puget Sound's request is inconsistent with the law of the case doctrine "because it implies that the Court's decision regarding the Agreement's relevance in this proceeding would be narrowly confined, necessitating a reevaluation if any of the [thirty-eight] other Defendants in this litigation make a claim or defense based on the Agreement." (*Id.* at 3.) Therefore, Brooklyn Union contends that Puget Sound's request to limit Brooklyn Union's motion would "waste judicial resources" because "the Court would have to revisit the Agreement every time a party sought to rely on it for a claim or defense." (*Id.*) Finally, Brooklyn Union argues its motion is a motion for summary judgment because it asks the Court to interpret the Agreement "as a matter of law, and summary judgment is appropriate." (*Id.* at 4.)

The Court denies Puget Sound's motion because Brooklyn Union's motion is properly before the Court as a motion for summary judgment. "Under New York law, which governs the Agreement, 'the initial interpretation of a contract,' including 'whether the terms of the contract are ambiguous,' is 'a matter of law for the court to decide.'" *Golden Unicorn Enters., Inc. v. Audible, Inc.*, No. 23-7407, 2024 WL 5182671, at *1 (2d Cir. Dec. 20, 2024) (summary order) (quoting *Alexander & Alexander Servs., Inc. v. These Certain Underwriters at Lloyd's*, 136 F.2d 82, 86 (2d Cir. 1998)); *see Outlogic, LLC v. Advan Rsch. Corp.*, 682 F. Supp. 3d 407, 410 (S.D.N.Y. 2023) (explaining that "whether plaintiff should be permitted, as a matter of law, to terminate the contract" is "an entirely legal question appropriate for resolution on summary judgment"). Brooklyn Union argues that the terms of the Agreement "prohibit[] any [D]efendant, including Phillips, from asserting the results of the [allocation] as the basis for a claim or defense in this litigation, which addresses how to fund the next phase of work at the Canal, the remedial action phase." (Pl.'s Mem. 1.) In support, Brooklyn Union argues "[t]he plain, unambiguous language of the [Agreement] supports Brooklyn Union's position that the parties agreed to address and settle only RD costs in the ADR process and the results of that

21

process are therefore irrelevant to the current litigation." (*Id.* at 3.) Stated differently, Brooklyn Union requests that the Court interpret the language of the Agreement to determine whether the Agreement and the allocations "can[] be asserted as a basis for a claim or defense in this lawsuit," including "as a defense to liability or cap on liability in this litigation." (*Id.* at 1.) It is settled law that such questions of contract interpretation are appropriate for the Court to resolve on summary judgment. *See Aurelius Cap. Master, Ltd. v. Republic of Argentina*, No. 24-1200, 2025 WL 1949968, at *4 (2d Cir. July 16, 2025) (summary order) (affirming a district court's summary judgment decision while explaining that "whether [a contractual provision] bars this suit is a purely legal question of contract interpretation, not a fact-sensitive issue in need of additional discovery"); *Hughes Commc'ns India Priv. Ltd. v. The DirecTV Grp., Inc.*, 71 F.4th 141, 144 (2d Cir. 2023) (reviewing a district court's decision to grant summary judgment on a district court's interpretation of a contract); *Fischer & Mandell, LLP v. Citibank, N.A.*, 632 F.3d 793, 799 (2d Cir. 2011) ("Summary judgment is appropriate if the terms of the contract are unambiguous."); *White Oak Glob. Advisors LLC v. Clarke*, 793 F. Supp. 3d 490, 497 (S.D.N.Y. 2025) (explaining the "parties' disputes . . . are, at bottom, matters of contract interpretation" contesting "how the [contract] should be interpreted in relation to other relevant documents" and accordingly reviewing the motion as a motion for summary judgment because "[t]here are no disputed material facts"); *cf. GuideOne Nat'l Ins. Co. v. Sys. 2000 Plumbing Serv., Inc.,* No. 22-CV-5018, 2025 WL 1919393, at *5 (S.D.N.Y. July 11, 2025) ("When the language of a contract is ambiguous and there is relevant extrinsic evidence regarding the actual intent of the parties, an issue of fact is presented for a jury to resolve, thereby precluding summary judgment." (quoting *Scholastic, Inc. v. Harris*, 259 F.3d 73, 83 (2d Cir. 2001))).

None of the cases Puget Sound cites supports its argument that Brooklyn Union's motion is a premature motion *in limine.* (Puget Sound's Opp'n 4 (citing *Senior by Senior v. Eihab Hum.*

*Servs.*, No. 15-CV-1009, 2019 WL 8128563 (E.D.N.Y Oct. 10, 2019); *Castle v. United States*, No. 15-CV-197, 2017 WL 6459514 (N.D.N.Y. Dec. 18, 2017); *Torah Soft Ltd. v. Drosnin*, No. 00-CV-676, 2003 WL 22024074 (S.D.N.Y. Aug. 28, 2003).)  In *Senior by Senior v. Eihab Human Services, Inc.*, the court refused to grant summary judgment because the defendants were attempting to use their summary judgment motion to "exclude certain evidence from trial," including, "[c]opies or excerpts of audio recordings" and testimony from expert and lay witnesses.  2019 WL 8128563, at *4.  The court in *Castle v. United States* similarly denied the plaintiff's motion to exclude a toxicology report at the summary judgment stage because the evidence was "not relevant or necessary for the adjudication of the current summary judgment motions" and "it would be more prudent to consider such a motion *in limine* before trial."  2017 WL 6459514, at *16.  The court in *Torah Soft Ltd. v. Drosnin* concluded the defendant's motion *in limine* was "effectively [a motion for] partial summary judgment in the guise of a motion *in limine*," rather than, as Puget Sound argues, denying the moving party's motion because "evidentiary issues . . . [were] premature at the summary judgment stage."  2003 WL 22024074, at *4.  (Puget Sound's Opp'n 4.)  All three of these cases are easily distinguishable from Brooklyn Union's motion, which does not seek "to exclude certain evidence from trial," *Senior by Senior*, 2019 WL 8128563, at *4, but rather requests that the Court determine, as a matter of law, whether and how the parties can use the Agreement in this litigation.  As discussed above, district courts routinely interpret unambiguous contractual language at the summary judgment stage.  *See, e.g.*, *Stoneline Grp., LLC v. Liberty Mut. Ins. Co.*, No. 23-CV-8115, 2025 WL 934871, at *5 (S.D.N.Y. Mar. 27, 2025) (interpreting a contract under New York law at the summary judgment stage); *Berkley Ins. Co. v. FG-PH Corp.*, No. 22-CV-2109, 2025 WL 929469, at *7 (E.D.N.Y. Mar. 26, 2025) ("A motion for summary judgment may be granted in a

23

contract dispute 'when the contractual language on which the moving party's case rests is found to be wholly unambiguous and to convey a definite meaning.'" (citation omitted)).

Accordingly, the Court rejects Puget Sound's argument that Brooklyn Union's motion "should be denied as premature at this stage of the litigation." (Puget Sound's Opp'n 3.)

### c. The unambiguous language of the Agreement does not prevent the parties from introducing the Agreement in this litigation but the parties are prevented from introducing their RD allocation percentages

In construing the Agreement, as a contract, "the court's general objective should be to determine . . . the intention of the parties . . . from the language employed." *Flynn v. McGraw Hill LLC*, 120 F.4th 1157, 1164 (2d Cir. 2024) (internal quotation marks omitted) (quoting *Hartford Accident & Indemnity Co. v. Wesolowski*, 33 N.Y.2d 169, 171–72 (1973)); *In re World Trade Ctr. Disaster Sit Litig. (In re WTC)*, 754 F.3d 114, 122 (2d Cir. 2014) (explaining that the role of the court is to construe a contract "in accordance with the parties' intent" (quoting *Greenfield v. Philles Recs., Inc.*, 98 N.Y.2d 562, 569 (2002))); *Williams v. Buffalo Pub. Schs.*, No. 22-2810, 2024 WL 1460134, at *1 (2d Cir. Apr. 4, 2024) (summary order) ("[I]t is well-settled that a court's role 'is to ascertain the intention of the parties at the time they entered into the contract.'" (quoting *Evans v. Famous Music Corp.*, 1 N.Y.3d 452, 458 (2004)). "The best evidence of what the parties intended 'is what they say in their writing.'" *In re WTC*, 754 F.3d at 122 (quoting *Greenfield*, 98 N.Y.2d at 569); *Trez Cap. (Fl.) Corp. v. Noroton Heights & Co.*, No. 20-CV-9622, 2022 WL 2437905, at *3 (S.D.N.Y. July 5, 2022) (quoting *Tomhannock, LLC v. Roustabout Res., LLC*, 33 N.Y.3d 1080, 1082 (2019)) (same). "'[T]he key inquiry at the initial stage of interpreting a contract' is therefore 'whether it is ambiguous with respect to the issue disputed by the parties.'" *Glob. Reins. Corp. of Am. v. Century Indem. Co.*, 22 F.4th 83, 94 (2d Cir. 2021) (alteration in original) (quoting *Bank of N.Y. v. First Millennium, Inc.*, 607 F.3d 905, 914 (2d Cir. 2010)); *Gary Friedrich Enters. v. Marvel Characters, Inc.*, 716 F.3d 302, 313 (2d

Cir. 2013) ("At the outset, the court must determine whether the language the parties have chosen is ambiguous, after giving all 'words and phrases . . . their plain meaning.'" (alteration in original and citations omitted)). "A contract is unambiguous if its language has 'a definite and precise meaning,' providing 'no reasonable basis for a difference of opinion.'" *Revitalizing Auto Cmtys. Env't Response Tr. v. Nat'l Grid USA*, 92 F.4th 415, 441 (2d Cir. 2024) (quoting *Greenfield*, 98 N.Y.2d at 569); *Lockheed Martin Corp. v. Retail Holdings, N.V.*, 639 F.3d 63, 69 (2d Cir. 2011) (recognizing that a contract provision is unambiguous "if the language it uses has a definite and precise meaning, as to which there is no reasonable basis for a difference of opinion" (citing *White v. Cont'l Cas. Co.*, 9 N.Y.3d 264, 267 (2007))). "The language of a contract is not made ambiguous simply because the parties urge different interpretations." *Glob. Reins.*, 22 F.4th at 94 (quoting *Seiden Assocs., Inc. v. ANC Holdings, Inc.,*, 959 F.2d 425, 428 (2d Cir. 1992)). Rather, a contract term is ambiguous if it "suggest[s] more than one meaning when viewed objectively by a reasonably intelligent person." *In re WTC*, 754 F.3d at 122 (quoting *L. Debenture Tr. Co. of N.Y. v. Maverick Tube Corp.*, 595 F.3d 458, 466 (2d Cir. 2010)); *see also Glob. Reins.*, 22 F.4th at 94 ("[A]n ambiguity exists where the . . . contract could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade or business." (second alteration in original and internal quotation marks omitted) (quoting *Morgan Stanley Grp. Inc. v. New Eng. Ins. Co.*, 225 F.3d 270, 275 (2d Cir. 2000))); *Lockheed Martin*, 639 F.3d at 69 ("[T]he language of a contract is ambiguous if it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement." (citing *Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138–39 (2d Cir. 2000))). In determining whether a contract provision is unambiguous, a

court must consider the contract as a whole. *See Flynn*, 120 F.4th at 1166–67 ("The contract should be 'read as a whole,' with every part 'interpreted with reference to the whole' in order, *inter alia*, 'to give effect to its general purpose,' 'to safeguard against adopting an interpretation that would render any individual provision superfluous,' and to ensure that particular words and phrases do not receive 'undue emphasis.'" (citations omitted)); *Glob. Reins.*, 22 F.4th at 95 ("When ascertaining the meaning of contractual language, 'it is important for the court to read the integrated agreement as a whole.'" (internal quotation marks omitted) (quoting *Lockheed Martin*, 639 F.3d at 69)). "If the document as a whole 'makes clear the parties' over-all intention, courts examining isolated provisions should then choose that construction which will carry out the plain purpose and object of the agreement.'" *Glob. Reins.*, 22 F.4th at 95 (quoting *Lockheed Martin*, 639 F.3d at 69); *see also Westmoreland Coal Co. v. Entech, Inc.*, 100 N.Y.2d 352, 358 (2003) (stating contracts should be read "as a harmonious and integrated whole" and each part should be "interpreted with reference to the whole . . . to give effect to its general purpose" (quoting *Empire Props. Corp. v. Mfrs. Tr. Co.*, 288 N.Y. 242, 248 (1942))).

As a preliminary matter, the Court concludes that the Agreement as a whole and the specific provisions at issue in the parties' motions are unambiguous. The parties agree that the disputed provisions are unambiguous, but present differing interpretations of the provisions. (Pl.'s Mem. 3, 12; Phillips' Reply 7–8; Sep. 24 O.A. Tr. 14:21–15:6.) *See DAOL Rexmark Union Station LLC v. Union Station Sole Member, LLC*, 772 F. Supp. 3d 373, 400 (S.D.N.Y. 2025) ("The language of a contract . . . is not made ambiguous simply because the parties urge different interpretations." (alteration in original) (quoting *Oppenheimer & Co. v. Trans Energy, Inc.*, 946 F. Supp. 2d 343, 348 (S.D.N.Y. 2013))); *Trireme Energy Holdings, Inc. v. RWE Renewables Americas, LLC*, 757 F. Supp. 3d 445, 491 (S.D.N.Y. 2024) (explaining that the "[l]anguage whose meaning is otherwise plain does not become ambiguous merely because the

parties urge different interpretations in litigation," and the "[c]ourt's finding of ambiguity does not turn on the fact that the parties disagree" (citations omitted and first alteration in original)), *appeal docketed*, No. 24-3190 (2d Cir. Dec. 10, 2024); *StandardAero Aviation Holdings, Inc. v. Signature Aviation Ltd.*, No. 22-CV-7515, 2024 WL 125574, at *2 (S.D.N.Y. Jan. 11, 2024) ("A contract is not ambiguous 'simply because the parties urge different interpretations.'" (quoting *Novartis Pharma AG v. Incyte Corp.*, 520 F. Supp. 3d 514, 525 (S.D.N.Y. 2021))).  The Court will accordingly enforce the contract according to a plain reading of its terms.  *See Hughes Commc'ns India Priv. Ltd.*, 71 F.4th at 148 ("We agree with the parties that the contract is clear and unambiguous, and therefore 'must be enforced according to the plain meaning of its terms.'" (quoting *Abdullayeva v. Attending Homecare Servs. LLC*, 928 F.3d 218, 222 (2d Cir. 2019))).

i.    **The confidentiality provisions of the Agreement, sections 27 and 13(a), do not individually bar use of the Agreement or the RD allocation percentages**

Brooklyn Union argues that the Agreement and its terms are protected "from disclosure with a robust confidentiality clause."  (Pl.'s Mem. 18.)  First, Brooklyn Union argues that section 27 bars the disclosure of the Agreement and its terms because no exception applies.  (*Id.*)  Instead, it argues that Phillips "unilaterally put the claims of the Agreement at issue by bringing a meritless breach of contract counterclaim against Brooklyn Union" and this does not "justify Phillips' breach of the confidentiality clause."  (*Id.*)  Second, Brooklyn Union argues that "[e]ven if a limited exception to the general confidentiality provisions were to be invoked, the Agreement separately protects the . . . allocation percentages contained in the allocator's reports from disclosure" under section 13(a).  (*Id.*)

Phillips argues that the "Agreement's confidentiality language is inapplicable to Phillips' counterclaim."  (Phillips' Mem. 19.)  First, Phillips contends that "Brooklyn Union [ ] put the existence and terms of the Agreement and Phillips' allocation at issue in this litigation, not only

27

by referring to and relying on the Agreement itself, but also by filing this suit." (*Id.*)  Thus, the exception to section 27 applies.  (*Id.* at 20–24.)  Second, it argues that section 13(a) of the Agreement does not bar the disclosure of Phillips' allocation percentage.  (*Id.* at 24–25.)

> **1.    Section 27 of the Agreement does not bar the parties from asserting the Agreement as a claim, defense, or limitation to liability because the exception applies**

Brooklyn Union argues that under section 27, the Agreement and its terms are protected "from disclosure with a robust confidentiality clause." (Pl.'s Mem. 18.)  First, Brooklyn Union argues that none of the exceptions to the confidentiality provision permit Phillips to include the Agreement in this litigation.  (*Id.*)  Second, Brooklyn Union argues Phillips incorrectly asserts that Brooklyn Union "put the existence and terms of the [A]greement at issue in this litigation," therefore "justifying Phillips' blatant violation of the Agreement by introducing the Agreement in this litigation." (*Id.* at 16–17.)  According to Brooklyn Union, "[t]o accept Phillips' position would mean that any party would be able to invoke th[e] limited exception to the Agreement's confidentiality clause by inserting the terms of the Agreement where they are otherwise irrelevant," rendering "the confidentiality clause meaningless." (*Id.* at 18; *see also* Sep. 24 O.A. Tr. 15:7–17:4 (arguing that Phillip's argument is "circular" and the Court must make a threshold determination first whether a party has properly asserted a claim or defense under 10(j)).)

Phillips argues that the Agreement and the allocation percentages are not confidential. First, it argues section 27 of the Agreement "does not preclude, but in fact authorizes, the disclosure of the Agreement, without redaction, in this lawsuit." (Phillips' Mem. 20.)  First, Phillips argues that "[t]here is no question that the Agreement and its terms are at issue and relevant, and thus properly disclosed as authorized in [section] 27(b)" of the Agreement.  (*Id.* at 21.)  Second, Phillips argues (i) Brooklyn Union refers "to the existence of the Agreement" in the Complaint and (ii) Brooklyn Union "relies on the Agreement's tolling provisions to justify

the timing of Brooklyn Union's contribution claim against Phillips and other parties to the Agreement." (*Id.* at 20–21.) Third, Phillips argues that the Agreement's confidentiality language "provides no basis for Brooklyn Union to redact relevant terms of the Agreement or conceal important factual allegations from this Court." (*Id.* at 19.) Fourth, Phillips notes that "[t]he only allocation percentage identified in Phillips' pleading is its own," which was a "limited and necessary disclosure" for Phillips' counterclaim, and which Phillips is authorized to disclose under section 10(a) of the Agreement. (*Id.* at 21–24.)

The Court finds that the exception to the confidentiality provision applies in this case because the terms of the Agreement are "at issue." The Agreement's confidentiality provision in section 27 provides in relevant part:

> Neither this Agreement, nor any of its terms, shall be disclosed to any person, except that the Agreement and its terms may be disclosed . . . in any action or proceeding between the [p]arties where the existence or terms of the Agreement are at issue.

(Agreement section 27(b).) Brooklyn Union introduced the existence of the Agreement and its terms in the Complaint, and argues, without legal support, that its reference to the Agreement as a "confidential agreement" in one section of the Complaint does "not in any way 'put the existence and terms of the Agreement' at issue." (Pl.'s Mem. 17 (citing Compl. ¶ 189 and quoting Agreement section 27(b).) However, Brooklyn Union refers to the Agreement in the Complaint more than once — including when Brooklyn Union describes the Agreement, (Compl. ¶ 189), and when it asserts that its claim is timely "[b]y agreement among the Defendants against whom this claim is asserted," (*id.* ¶ 216.)

In section 26 of the Agreement, the parties agreed that "any and all statutes of limitations applicable to any [p]arty's past, present, or future claims related to the [Canal], including . . . [Brooklyn Union's] past costs . . . , against any other [p]arty are hereby tolled as of March 24, 2014." (Agreement section 26.) Brooklyn Union appears to rely on this provision of the

29

Agreement in the Complaint and therefore puts the Agreement and its terms "at issue."  Phillips disputes Brooklyn Union's assertion "in paragraph 216 of its Complaint that the parties to the [Agreement] agreed to extend the statute of limitations on [Brooklyn Union's] purported CERCLA contribution claim against them."  (Phillips' Answer and Counterclaims, Phillips' Counterclaims ¶ 37.)  Brooklyn Union cannot base its claims in this lawsuit on the tolling provision in section 26 of the Agreement and then argue that the Court is barred from interpreting the remainder of the Agreement in assessing Brooklyn Union's claims or any counterclaims.  *See Fed. Ins. Co. v. MSC Mediterranean Shipping Co. S.A.*, 784 F. Supp. 3d 570, 578 (S.D.N.Y. 2025) ("Obviously, [the p]laintiff cannot pick and choose which . . . terms and conditions are applicable and which are not.  [The p]laintiff is bound by all the terms and conditions of the contracts . . . upon which its lawsuits are based." (citation omitted)); *U.S. Bank, Nat'l Assoc. v. UBS Real Estate Sec., Inc.*, 205 F. Supp. 3d 386, 413 (S.D.N.Y. 2016) ("A party 'may not pick and choose which provisions suit its purposes . . . . A contract should be read to give effect to all its provisions.'" (quoting *God's Battalion of Prayer Pentecostal Church, Inc. v. Miele Assocs.*, 6 N.Y.3d 371, 374 (2006))).

In addition, Phillips' breach-of-contract counterclaim is based on Brooklyn Union's alleged violations of the Agreement by (1) "excluding Phillips from the [separate] agreement [Brooklyn Union] reached" with other parties "regarding costs for remedial action and other work"; (2) "failing in bad faith to honor Phillips' [Threshold] percent allocation regarding such costs as required by vote of no less than 80% of the parties" to the Agreement; (3) "suing to hold Phillips jointly and severally liable for those costs"; and (4) "pursuing a baseless claim for contribution against Phillips for other costs that were specifically covered" in the Agreement.[27]

---

[27]  As discussed *infra* section II.d, Phillips' breach-of-contract counterclaim is not meritless, and the Court therefore disregards Brooklyn Union's argument that Phillips "insert[ed]

(Phillips' Answer and Counterclaims, Phillip's Counterclaims ¶ 61.)  In other words, resolving Phillips' counterclaim depends on interpreting several key provisions of the Agreement, and the terms of the Agreement are thus "at issue" and can be disclosed in this litigation pursuant to section 27(b) of the Agreement.

The Court therefore concludes that section 27's confidentiality provision does not prevent the parties from relying on the Agreement or its terms as a claim, defense, or limitation to liability in this litigation.  *See PaySys Int'l, Inc. v. Atos Se*, No. 14-CV-10105, 2018 WL 6067232, at \*6–7 (S.D.N.Y. Nov. 20, 2018) (declining to adopt a party's interpretation of a contract provision that "strain[ed] the ordinary reading" of the provision); *see also CVS Pharmacy, Inc. v. Press Am., Inc.*, 377 F. Supp. 3d 359, 373 (S.D.N.Y. 2019) ("In cases of contract interpretation, it is well settled that when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms." (alteration in original) (quoting . *Rd. Assocs. v. IBM*, 4 N.Y. 3d 272, 277 (2005)).

### 2.   Section 13(a) of the Agreement does not separately bar disclosure of the RD allocation percentages in this litigation

Brooklyn Union contends that "the Agreement separately protects the . . . allocation percentages contained in the allocator's reports from disclosure" under section 13(a).[28]  (Pl.'s Mem. 18.)  First, Brooklyn Union argues the Agreement only "permits a party to 'orally share' its own final allocation percentage" with the EPA, but "otherwise prohibits a party from sharing

---

the terms of the Agreement where they are otherwise irrelevant," which renders the "confidentiality clause meaningless." (Pl.'s Mem. 18.)

[28]  Brooklyn Union conceded at oral argument that section 10(a), which is specifically referenced in 13(a), only speaks to the ability to introduce the allocation result percentage, not the Agreement. (Sep. 24 O.A. Tr. 34:5–15, 36:15–22.)  As a result, the Court disposed of any argument that the "shared information provision would prohibit the introduction of the [A]greement." (*Id.* at 36:15–22 ("I think we can dispose of 13(a), which is another argument you make as to why the shared information provision would prohibit the introduction of the agreement . . . [because] 13(a) refers you back to 10(a) . . . .").)

31

the report, or even the justification for the final result." (*Id.* at 18–19.)  Second, Brooklyn Union argues that "Phillips' prior disclosure of its allocation share to EPA does not justify its public disclosure of the Agreement in this litigation." (*Id.* at 19.)

Phillips contends that its allocation percentage has been "a matter of public record . . . long before Brooklyn Union filed this suit" and there are "no grounds for Brooklyn Union to claim Phillips' allocation share is confidential." (Phillips' Mem. 24–25; Phillips' Reply 9–10.)

Contrary to Brooklyn Union's claims, section 13(a) of the Agreement addresses the use of "Shared Information" but does not "separately protect[] the interim and final allocation percentages . . . from disclosure." (Pl.'s Mem. 18.)  Section 13(a) provides:

> "Shared Information" means any confidential information potentially subject to the joint defense privilege, "common interest" doctrine, or other applicable doctrines or privileges to the greatest extent allowed by law, that is shared by and among the [p]arties, or any of them, as provided in this Agreement to facilitate the common interest of the [p]arties in defending against claims by EPA for RD [w]ork or RD [c]osts arising from or relating to the UAO.  Shared Information includes all communications among the [p]arties relating to draft documents and other materials circulated for review and comment under this Agreement. *Any draft or final reports from the allocator selected under [section] 10 shall also be considered "Shared Information," except that a [p]arty may share the final [a]llocation results, pursuant to and in accordance with [section] 10(a) and may orally share the final allocation percentage for itself with [the] EPA.*  Shared Information does not include (a) any communication or information that properly becomes public or is otherwise properly disclosed to any non-party to this Agreement (that is not otherwise bound by a confidentiality agreement), (b) any communication or information that is required by law to be disclosed, or (c) documents submitted to EPA relating to the UAOs or any communications to EPA in connection with those submitted documents.

(Agreement section 13(a) (emphasis added).)  Brooklyn Union only cites the portion of section 13(a) that "states that '[a]ny draft or final reports from the allocator . . . shall also be considered 'Shared Information,' which is protected as 'confidential information,'" but omits the remainder of section 13(a) and makes no arguments as to how the provision, when read in its entirety,

32

supports Brooklyn Union's argument that the Agreement "separately protects the interim and final allocation percentages . . . from disclosure." (Pl.'s Mem. 18.) Nothing in the language of section 13(a) prohibits a party from sharing the terms of the Agreement or its RD allocation percentage; section 13(a) only makes confidential (1) information shared among the parties to "facilitate the common interest of the [p]arties in defending against claims by EPA"; (2) communications "relat[ed] to draft documents and other materials circulated for review and comment under th[e] Agreement"; and (3) the allocator's draft or final reports.[29] (Agreement section 13(a).)

The plain language of section 13(a) does not prevent Phillips from "introduc[ing] the terms of the Agreement"[30] or from "introduc[ing] the[ir] RD [a]llocation into this cost recovery litigation." (Pl.'s Mem. 18.) By its terms, the parties are permitted to disclose "confidential information," including a party's own allocation percentage, (1) pursuant to section 10(a) of the Agreement and (2) orally to the EPA.[31] Thus, section 13(a) authorizes Phillips' disclosure of its

---

[29] During the confidential and binding ADR process conducted by an allocator, the allocator allocated a percentage share of the RD costs related to the Gowanus Canal Superfund Site to each party. (Phillips' 56.1 Resp. ¶¶ 10, 12.) The allocator's final report finalized each party's RD percentage share and are incorporated into the Agreement. (*Id.* ¶¶ 10–16.)

[30] Section 13(a) does not speak to the use of the Agreement. (Agreement section 13(a).) Instead, it discusses if and when a party may discuss or share the allocation results as permitted by section 10(a). (*Id.*) The Court finds *infra* section 2.c.ii that section 10(a) does not bar the introduction of the Agreement itself. Brooklyn Union conceded this point at oral argument, *see supra* footnote 28 and *infra* footnote 34. (Sep. 24 O.A. Tr. 34:5–15 (agreeing that "10(a) only refers to whether or not the parties can actually introduce the percentage, the result of the allocation; not whether or not they can introduce the agreement itself").) Therefore, section 13(a) provides no further basis for preventing the use of the Agreement in this litigation and does not affect the Court's interpretation of section 10(a). (*See id.* at 36:15–22 ("The Court disposed of any argument that the "shared information provision would prohibit the introduction of the agreement.").)

[31] Phillips properly shared its allocation with the EPA, both orally and pursuant to the EPA's requests regarding the RD UAO, as authorized by section 13(a). (*See* Carr E-mail ("Good speaking with you earlier regarding your client Phillips 66 and their [REDACTED]% RD

own allocation percentage to the EPA, but otherwise authorizes it only to the extent permitted under section 10(a).[32]

The Court concludes that section 13(a) does not prevent the parties from asserting the RD allocation as a claim, defense, or limitation to liability in this litigation, but instead refers the Court to section 10(a) for a determination. *See Town & Country Linen Corp. v. Ingenious Designs LLC*, 556 F. Supp. 3d 222, 286–87 (S.D.N.Y. 2021) (denying summary judgment where the court concluded the plain language of the contract defeated the defendant's proposed interpretation of the contract); *KT Grp. Ltd. v. NCR Corp.*, No. 15-CV-7482, 2018 WL 11213091, at *17 (S.D.N.Y. Sep. 29, 2018) (denying summary judgment where the defendant's proposed interpretation of the contract was contrary to its "unambiguous . . . definition of covered materials" that are "defined in the contract" (quoting *Sit-Up Ltd. v. IAC/InterActiveCorp.*, No. 05-CV-9292, 2008 WL 463884, at *7 (S.D.N.Y. Feb. 20, 2008))).[33]

---

allocation share."); Thompson Letter 2 ("In our telephone call on April 5, 2019, I advised you of the outcome Phillips justly received in the prior allocation process.").)

In addition, section 13(a) also excludes from "Shared Information" any information that "properly becomes public or is otherwise properly disclosed to any non-party to th[e] Agreement" and documents or related communications with the EPA "relating to the UAOs." (Agreement section 13(a).) While the Court determines that Phillips' disclosure to the EPA was permitted under section 13(a), there is no evidence before the Court to conclude that Phillips' disclosure to the EPA rendered Phillips' allocation "public." (*Id.*; *see* Phillips' Mem. 24–25; Phillips' Reply 9–10.) Phillips has not otherwise explained its argument that its allocation was made public before the commencement of this lawsuit.

[32] The Court, as discussed *infra* section 2.c.ii, finds that under section 10(a), Phillips, and other parties, are permitted only to disclose the Agreement, but not their individual allocation percentages in this proceeding.

[33] Transit Defendants argue that the Court should "*not* decide . . . whether any of the amounts paid, shares assigned, or rationale for those shares are or are not confidential." (Transit Defs.' Mem. 1.) In support, they argue that "[e]xactly what shares the allocator assigned" and "exactly what [T]hreshold the . . . Agreement applied . . . should not matter to the disposition of" Brooklyn Union's motion. (*Id.* at 2.) Because the Transit Defendants were not parties to the Agreement, they plan to "discover and, as appropriate, to use at trial" the "amounts paid by each party for any response action," "amounts paid by each party . . . toward the remedial design," and

34

### ii. Defendants are not prohibited from asserting the Agreement as a claim or defense in this litigation, but are prohibited from asserting their RD allocations as a claim or defense

Brooklyn Union argues that the Agreement prohibits any party from "assert[ing] the Agreement and the RD [a]llocation as a defense or limitation to liability" to Brooklyn Union's claims. (Pl.'s Mem. 17.) First, Brooklyn Union argues sections 10(a) and 10(j) of the Agreement "unequivocally permits Brooklyn Union to bring this lawsuit to recover remedial action costs," and provides no "basis for Phillips' [c]ounterclaim" for breach of contract. (*Id.* at 15–16; *see also* Pl.'s Reply 18–19.) Second, Brooklyn Union argues it has not breached a covenant of good faith and fair dealing "merely by . . . fil[ing] the present cost recovery action." (Pl.'s Reply 19.)

Phillips argues that both the Agreement and the RD allocation may be used as a basis for

---

the "allocator's rationale . . . to evaluate [Brooklyn Union's] claim that it is entitled to equitable credit." (*Id.*) Transit Defendants request that the Court "defer the dispute" regarding the confidentiality of the RD allocation because it "does not matter for the purpose of resolving the . . . Agreement's effect what share any party was allocated or actually paid or what the allocator's rationale was in assigning the allocations." (*Id.* at 3.) Brooklyn Union argues that "[s]ince no disclosure of the Agreement or the percentages allocated to each party . . . is necessary to do an accounting of amounts paid," the redacted portions of the Agreement and the allocation "are not only irrelevant to the current proceedings, but are confidential under the Agreement and must remain confidential." (Pl.'s Transit Defs.' Reply 2–4.)

The Court discusses the parties' arguments regarding the confidentiality of "the share[s] allocated to any party under the . . . Agreement," (Transit Defs.' Mem. 3), *infra* section II.c.ii.

Brooklyn Union does not move, nor does any other party, including the Transit Defendants, for summary judgment on the confidentiality of (1) "the amounts paid by any party toward the costs of the remedial design" nor (2) "the rationale of the allocator for those assigned shares." (*Id.*) The Court accordingly declines to address those arguments because they are not currently before the Court. *See GuideOne Nat'l Ins. Co. v. Sys. 2000 Plumbing Serv., Inc.*, No. 22-CV-5018, 2025 WL 1919393, at *3 n.4 (S.D.N.Y. July 11, 2025) (disregarding briefing where no party moved for summary judgment on the issue in the briefing and the court concluded that the briefing "d[id] not include any novel arguments not already covered in depth elsewhere in the parties' briefs, affirmations, and statements."); *Birch v. Town of New Milford*, No. 20-CV-1790, 2023 WL 4684720, at *40 (D. Conn. July 21, 2023) (explaining that because the defendants "have not affirmatively moved for summary judgment" the claim is "preserved for trial"), *appeal dismissed*, No. 23-1153, 2024 WL 3083385 (2d Cir. June 21, 2024) (summary order).

35

a claim or defense in this litigation.  First, Phillips argues that section 10(a) explicitly allows "Phillips to disclose its own [RD] allocation" because Phillips's "compulsory counterclaim" against Brooklyn Union seeks to "enforce the contractual terms" of the Agreement.  (Phillips' Mem. 20, 22.)  In support, Phillips contends that "the third sentence quoted from paragraph 10(a) does not override the first, which expressly recognizes that the allocation may be entered into evidence in 'any subsequent proceeding' as necessary to enforce the Agreement."  (*Id.* at 22 (quoting Agreement section 10(a)).)  Second, Phillips contends that section 10(j) allows Phillips to apply its RD allocation percentage to RA costs as it has previously satisfied the other conditions to do so as outlined in the section.  (*Id.* at 5–11.)  Specifically, Phillips argues that a "common-sense interpretation" of section 10(j) requires "the reference to a future agreement [ ] be read to apply only with respect to 'other response costs,' not to costs for [RA] work undertaken to implement the [RD work]."  (*Id.* at 2.)  Third, Phillips argues that Brooklyn Union violated both the Agreement to "cooperate fully . . . to effectuate the purposes of this Agreement" and the "implied covenant of good faith and fair dealing" by "refusing to recognize Phillips' allocation and suing Phillips after settling with others for costs expressly covered by that allocation."  (*Id.* at 11–17; Phillips' Reply 6.)

> **1.    Section 10(a) prohibits the parties from asserting their RD allocation as a defense or limitation to liability in this action**

Brooklyn Union argues section 10(a) bars Phillips from entering the allocation percentage into evidence in this litigation.[34]  First, it argues section 10(a) "prevents the participating parties from disclosing or using the allocator's RD [a]llocation in subsequent litigation over other future cleanup costs."  (Pl.'s Mem. 15.)  Brooklyn Union argues that section

---

[34]  At oral argument held on September 24, 2025, Brooklyn Union conceded that section 10(a) does not speak to the ability to introduce the Agreement, only the allocation result percentage.  (Sep. 24 O.A. Tr. 34:5–15.)

10(a) "does no work to answer the threshold question of whether the limited conditions under [section] 10(j) have been satisfied."[35]  (*Id.* at 16; *see also* Sep. 24 O.A. Tr. 17:5–30:22.) Brooklyn Union argues that "satisfy[ing] the limited conditions of [section] 10(j) . . . is the only possible way that the allocation results could come into evidence under [section] 10(a), as that provision permits evidence of the Agreement to come into evidence in a subsequent proceeding 'to the extent necessary to enforce' the Agreement." (Pl.'s Mem. 16.)  Second, Brooklyn Union argues that Phillips' interpretation of section 10(a) would render it meaningless.  (Pl.'s Reply 4–7.)  It argues that "when considering the relevant provisions of the [section] all together," section 10(a) provides that "once cost recovery or contribution litigation has commenced, parties cannot enter the results of the [a]llocation" in the ongoing litigation.  (*Id.* at 6.)

Phillips argues that section 10(a) does not bar it from entering its allocation percentage. First, it argues that Brooklyn Union's interpretation of section 10(a) "leapfrogs over the second quoted sentence" and that section 10(a) does not permit Brooklyn Union "to violate the contract with impunity by the simple expedient of filing cost-recovery litigation." (Phillips' Mem. 22, 24.)  Second, Phillips contends that section 10(a) does not preclude Phillips "from disclosing its own allocation in a compulsory counterclaim to show that Brooklyn Union breached the Agreement by suing Phillips for costs that were already covered, and fully satisfied, by that allocation." (*Id.* at 24.)  Third, Phillips argues that "it is essential for Phillips to disclose its own allocated share" in support of its breach-of-contract counterclaim to "hold Brooklyn Union

---

[35]  The pertinent part of section 10(j) states that "[i]f the [a]llocation process does not include RA costs, the [p]arties agree that the [a]llocation of RD Costs for any [p]arty that is allocated a percentage of [REDACTED] or less may, upon the request of such [p]arty and the vote of 65% of the number of all [p]arties completing the RD [a]llocation process, be applied to the remedial action (RA) costs or other response costs that such [p]arty becomes obligated to pay by any future agreement among some or all [p]arties concerning such costs." (Agreement section 10(j).)

accountable for its breach and [to] enforce the terms of the Agreement." (*Id.* at 22.)

Section 10(a) of the Agreement provides, in relevant part:

> The results of the [a]llocation may be entered into evidence by any of the [p]arties to this Agreement in any subsequent proceeding to the extent necessary to enforce this Agreement. The [p]arties may also offer the results of the [a]llocation in a future allocation proceeding among the [p]arties undertaken prior to the initiation of (and/or subsequent to the conclusion of) cost recovery or contribution litigation involving one or more of the [p]arties that is related to the [s]ite. However, the [p]arties are prohibited from offering the results of the [a]llocation in any future contribution or cost recovery litigation proceeding, or allocation proceeding undertaken after the initiation of litigation, involving one or more of the [p]arties while such litigation is still pending.

(Agreement section 10(a).) Section 10(j) provides, in relevant part:

> If the [a]llocation process does not include RA costs, the [p]arties agree that the [a]llocation of the RD [c]osts for any [p]arty that is allocated a percentage of [REDACTED] or less may, upon the request of such [p]arty and the vote of 65% of the number of all [p]arties completing the RD [a]llocation process, be applied to the remedial action (RA) costs or other response costs that such [p]arty becomes obligated to pay by any future agreement among some or all [p]arties concerning such costs. Nothing in this Agreement is intended or shall be construed to require any [p]arty to participate in any other allocation process for the RD, RA or any other purpose.

(Agreement section 10(j).)

### A.   Section 10(a)

The Court reads section 10(a) to allow for two circumstances when the RD allocation results can be used: (1) to enforce the contract — the results can be entered into evidence in any subsequent proceeding to enforce the Agreement (the "First Sentence"); and (2) in a future allocation proceeding — the results can be offered in any future allocation proceeding among the parties prior to or subsequent to cost recovery or contribution litigation involving the parties and the Gowanus Canal Superfund Site (the "Second Sentence"). (Agreement section 10(a).) The exception to these provisions, the "however sentence," prohibits the parties from offering the

38

allocation results in any future contribution or cost recovery litigation proceeding involving one or more of the parties (the "However Sentence").[36] (*Id.*)

First, as to use of the Agreement, the plain language of section 10(a) does not prohibit Defendants from entering the Agreement in this litigation as the provision does not reference or otherwise speak to the use of the Agreement as a whole.  Brooklyn Union conceded at oral argument that section 10(a) does not prohibit the parties from introducing the Agreement itself into this litigation.  (Sep. 24 O.A. Tr. 34:5–15.)

Second, as to use of the RD allocation percentages, the plain language of section 10(a), on its own, prohibits Phillips from entering the results of the allocation in this litigation. Brooklyn Union asks the Court to give effect to the However Sentence of section 10(a).  (*Id.* at 32:7–15.)  The Court finds that the exception does apply in this case — the parties do not dispute that this is a cost recovery and contribution litigation or that the RD allocation percentages are the "results of the [a]llocation." (*Id.* at 30:18–22, 31:13–32:5; 36:4–11, 37:18–21.)  Thus, by its plain terms, section 10(a) prohibits Phillips from entering the RD allocation percentages in this ongoing cost recovery litigation.

Phillips' arguments that section 10(a) does not bar the introduction of the RD percentages into this cost recovery litigation are unavailing.  It argues that the First Sentence of section 10(a) authorizes Phillips to enter its RD percentages into evidence in this litigation because it is seeking to enforce the Agreement, and the However Sentence, which prohibits parties "from offering the results of the [a]llocation in any future contribution or cost recovery litigation proceeding," does not apply when a party seeks to enforce the Agreement.  (Agreement section 10(a); Phillips' Mem. 22–24; *see* Sep. 24 O.A. Tr. 39:18–25.)  Specifically, it contends the

---

[36] No party at oral argument disputed the Court's interpretation of section 10(a) of the Agreement.  (*See generally* Sep. 24 O.A. Tr.)

However Sentence "does not override the" First Sentence and instead the Second Sentence and However Sentence "provide an *additional* avenue — even when enforcement of the Agreement is not at issue — in which the parties 'may also offer the results of the [a]llocation' in any future allocation proceeding, but not in cost recovery or contribution litigation." (Phillips' Mem. 22–23.)  In other words, Phillips asks the Court to limit the However Sentence only to the Second Sentence, "any future allocation proceeding," and not to the First Sentence, "subsequent proceedings" to enforce the Agreement. (*Id.*; Sep. 24 O.A. Tr. 40:1–22, 44:11–45:2 (reading the First Sentence in 10(a) as separate from the Second and However Sentences and arguing that the However Sentence only applies to the Second Sentence under 10(a).)  Therefore, Phillips argues that because it is enforcing the Agreement in this action and this is not a "future allocation proceeding," Phillips should be allowed to enter the RD allocation results. (Phillips' Mem. 23.)  However, the plain text of section 10(a) does not limit the parties from entering the results of the allocation to only future allocation proceedings.  In addition, it also prohibits the parties from entering the results of the allocation into evidence "in any future contribution or cost recovery litigation proceeding, or allocation proceeding undertaken after the initiation of litigation, involving one or more of the [p]arties while such litigation is still pending." (Agreement section 10(a).)  Ultimately, the plain text of section 10(a) does not limit the However Sentence to only the Second Sentence but also applies to the First Sentence.  The Court is required to enforce unambiguous contractual language according to its plain terms. *See Town of Harrietstown v. Westchester Fire Ins. Co.*, No. 24-CV-1184, 2025 WL 2391758, at *10 (N.D.N.Y. Aug. 18, 2025) ("Unambiguous provisions in an agreement are interpreted according to their plain and ordinary meaning" and "[i]f a provision is unambiguous, courts are to enforce it as written." (citations and internal quotation marks omitted)), *appeal docketed*, No. 25-2253 (2d Cir. Sep. 18, 2025); *see also Weeks Marine, Inc. v. Am. S.S. Owners Mut. Prot. & Indem. Ass'n*, 511 F. App'x

40

78, 80 (2d Cir. 2013) ("Where the plain language of a contract is unambiguous, that language alone indicates the parties' intent." (citing *Ment Bros. Iwon Works Co. v. Interstate Fire & Cas. Co.*, 702 F.3d 118, 121 (2d Cir. 2012))). Moreover, the Court refuses to adopts Phillips' interpretation which would limit the However Sentence's applicability and ultimately section 10(a)'s enforcement. *See Trustpilot Damages LLC v. Trustpilot Inc.*, No. 21-2837, 2022 WL 2124865, at *1 (2d Cir. June 13, 2022) (summary order) (refusing to "read into the contract a requirement that its plain language does not support"); *Rubinstein v. Vivid Seats Inc.*, No. 24-CV-1387, 2025 WL 2773161, at *6 (E.D.N.Y. Sep. 29, 2025) (declining to "imply. . . or engraft additional terms" into a broad provision "that would artificially limit its scope").

The Court therefore concludes that section 10(a) does not prevent Phillips or other parties from asserting the Agreement as a claim, defense, or limitation to liability in this litigation, but section 10(a) does prohibit Phillips and other parties from asserting their respective RD allocation results as a claim, defense, or limitation to liability in this litigation.

### B.    Section 10(j) does not limit section 10(a)

Brooklyn Union argues that sections 10(a) and 10(j) are interrelated — section 10(a) discusses the use of allocation results in future litigation and allocation proceedings while section 10(j) discusses how parties may carry forward their RD allocation percentages to RA costs and other response costs. (Pl.'s Mem. 15–16; Pl.'s Reply 19–20.) As discussed below, the Court is not persuaded by Brooklyn Union's argument that sections 10(a) and 10(j) are somehow interrelated and therefore prevents the use of the Agreement or impacts the admissibility of the RD allocation percentages, as otherwise permitted or prohibited under section 10(a).

First, section 10(a) does not indicate that a party must satisfy the "limited conditions under [section] 10(j)" to be permitted to enter "[t]he results of the [a]llocation . . . into evidence" in "any subsequent proceeding to the extent necessary to enforce th[e] Agreement." (Agreement

section 10(a).)  Nor would such a requirement logically follow from reading section 10, "Agreement to Allocate," as a whole.  Section 10 includes nine subsections that all address different issues of the allocation, including, for example, how the parties will choose an allocator, (*id.* section 10(b)), and the materials the allocator will have access to in determining the allocation for each party, (*id.* section 10(d)).  The subsections of section 10 occasionally refer to other subsections,[37] but section 10(a) does not refer to section 10(j) as a prerequisite for entering the allocation percentages into evidence.  *See Walmart Inc. v. Cap. One. Nat'l Ass'n*, 725 F. Supp. 3d 450, 467 (S.D.N.Y. 2024) (observing that other provisions of the contract demonstrated that the "drafters knew how to refer to a specific" requirement and "[t]he fact that the drafters chose not to include" a reference to a specific requirement in the disputed provision "is most naturally understood as a deliberate effort to avoid imposing such a limitation").

Second, interpreting section 10(a) and section 10(j) as governing separate issues related to the allocation — namely, 10(a), when the results of the allocation may be entered into evidence in future proceedings, and 10(j), how and when the parties can apply the RD allocation to RA costs and other response costs, respectively — gives effect to every provision in the contract.  *See Flynn*, 120 F.4th at 1167 ( "consider[ing the] contract as a whole," the court interpreted a contractual provision "in conjunction with other parts of the [c]ontract' because of the first provision's "plain" "implications" on the second provision); *TileBar v. Glazzio Tiles*, 723 F. Supp. 3d 164, 183 (E.D.N.Y. 2024) (explaining that a court should construe a contract "so as to give full meaning and effect to all of its provisions" (internal quotations and citations omitted)).

---

[37] (*See, e.g.*, Agreement section 10(c) ("[Brooklyn Union] will narrow the list of potential allocators responding to the request for proposal issued in accordance with [s]ection 10(b) above . . . ."); *id.* section 10(e) ("If the allocator considers and relies upon any of the prohibited subjects described in [s]ection 10(d)(i)-(v) of this Agreement . . .").)

The Court therefore finds that section 10(j) does not impact its analysis on the admissibility, or lack thereof, of the Agreement or RD allocation percentages under section 10(a).

### iii. Defendants are not prohibited from applying their RD allocation to RA costs and, as incurred by a future agreement, other response costs under section 10(j)

Brooklyn Union argues that the Agreement "permits the parties to agree to apply the RD [a]llocation to remedial action costs — either through a unanimous agreement prior to or during the ADR process, or via settlement agreements after the ADR process and prior to the initiation of cost recovery litigation that obligate a party to pay RA costs" — and neither has occurred to allow Phillips to apply its respective RD allocation to RA costs and other response costs.  (Pl.'s Mem. 3; *see also id.* at 19–24.)  First, Brooklyn Union contends that "[t]he Agreement [e]explicitly [l]imits the RD [a]llocation to [RD] [c]osts, [u]nless [t]here is a [u]nanimous [p]arty [v]ote, [w]hich [n]ever [o]ccurred."  (*Id.* at 19.)  In support, Brooklyn Union argues the "scope of the Agreement applies only 'to the funding and implementation of the RD [w]ork,'" and not RA work, and at the time the parties negotiated the Agreement, "[the parties] did not know the complete nature, amount, or method" of RA costs and other response costs, and "applying RD [allocation] to RA costs without a formal agreement to do so would be impractical."  (*Id.* at 19 (quoting Agreement section 1(a)); Pl.'s Reply 12.)  Instead, the Agreement "contemplates the possibility of applying the RD [a]llocation to remedial action costs, but only if the parties" unanimously agree to do so — which Brooklyn Union contends that the parties never did.  (Pl.'s Mem. 19 (quoting Agreement section 10(j)); Pl.'s Reply 7–8.)  Second, Brooklyn Union argues Phillips cannot apply their RD allocations to RA costs by invoking the remainder of section 10(j) of the Agreement, which "gives a party below the specified [T]hreshold the right to apply the RD [a]llocation to any settlement under which that party becomes obligated to pay RA [c]osts, so

long as 65% of all participating parties agree." (Pl.'s Mem. 20; Pl.'s Reply 8–10.) According to Brooklyn Union, that portion of section 10(j) is "triggered only by a future agreement for each singular [p]arty that enters into such an agreement" — therefore, "unless and until there is a 'future agreement' that obligates the party seeking to apply a share under the [T]hreshold. . . this portion of [section] 10(j) has no effect." (Pl.'s Mem. 20–21.) Since Phillips is "not a party to Brooklyn Union's settlements with other parties," Brooklyn Union argues the "[p]lain language of [section] 10(j)" prohibits Phillips from applying their RD allocation percentage to RA costs. (*Id.* at 21; Pl.'s Reply 8, 11–12.) In response to Phillips' interpretation of section 10(j), that "no future agreement is needed for the RD [a]llocation to apply to RA costs" and is only needed for "other response costs," Brooklyn Union argues that such interpretation would "raise[] the question of which contractual terms should govern this application" and also "result in a perplexingly incongruous situation where two out of three categories of costs — RD costs and 'other response costs' — would require underlying agreements" but RA costs would not. (Pl.'s Reply 9.) Brooklyn Union argues that the canon of construction and rules of grammar Phillips cite are inapposite because the plain language of the Agreement is "unambiguous." (*Id.* at 13–18.) However, Brooklyn Union contends that the "series-qualifier canon" supports Brooklyn Union's argument that section 10(j), "when read in harmony with" section 10(a), "clearly requires the parties to come to an agreement on RA costs before RD shares can be applied to a party's RA allocation." (*Id.* at 14, 16.) Third, Brooklyn Union makes several arguments as to why the Court should adopt its interpretation of the Agreement, arguing: (1) the Agreement "recognizes that no party will be forced into applying the RD [a]llocation to any other bucket of costs," that "each party expressly reserved its right to sue the other parties for contribution," and that the parties did not "waive any rights, defenses, claims or privileges against any other [p]arty," (Pl.'s Mem. 21–22); (2) that "forc[ing] Brooklyn Union to accept the RD [a]llocation

44

for the RA costs would render those limits meaningless because there would be no 'agreement'" as required by section 10(j), (*id.* at 22); (3) its interpretation of section 10(j) "both encourages parties to engage in good faith settlement negotiations and accords with the reality" that parties subject to EPA administrative orders, PRPs, "regularly negotiate *agreements* to resolve liabilities and allocate costs," (Pl.'s Reply 10); and (4) because "[a]lmost half of the [D]efendants in this litigation were" not parties to the Agreement, and a "party cannot be bound to a contract to which it is not a signatory," the Court "would have to bind all parties" to an agreement they did not sign if the Court applies Phillips' RD allocation to the RA costs, (Pl.'s Mem. 23; *see* Pl.'s Reply 19–20). Ultimately, Brooklyn Union contends Phillips did not fulfill the conditions of section 10(j), either because the vote was procedurally improper or because Phillips was not a party to a "future agreement," and as such Phillips cannot apply its RD allocation to its RA costs and other response costs. (Sep. 24 O.A. Tr. 17:5–31:22.)

Phillips argues that the voting provision, as drafted, allows a nominal party to apply the RD allocation to RA costs *or* other response costs that the party "becomes obligated to pay by any future agreement."[38] (Phillips' Mem. 2.) First, it argues the Agreement does not require unanimous consent of all parties to apply the RD allocation percentages to RA costs. (*Id.* at 2–3.) In support, Phillips argues that section 10(j) allows Phillips and other parties "whose allocations were below the specified percentage [T]hreshold to petition for a vote to have their allocations carry forward without unanimous consent," and that "[a]lmost six years ago,

---

[38] Phillips appears to concede: (1) the parties to the Agreement did not unanimously agree, prior to or during the ADR process, to apply the RD allocation to RA costs; and (2) a party's RD allocation percentage may be applied to "other response costs" incurred as a result of a future agreement. (*See generally* Phillips' Mem.) Phillips' main arguments involve the voting provision and whether a future agreement is required to apply its RD allocation percentage to RA costs. (*Id.* at 2.) Therefore, the Court limits its analysis to whether a future agreement is required to apply Phillips' RD allocation percentage to RA costs, without addressing "future response costs" incurred as a result of a future agreement.

Phillip[s] and certain other parties . . . requested a vote to extend their particular allocations to remedial action costs" and other response costs.  (*Id.* at 6.)  Phillips argues the vote carried by 80%, exceeding the 65% voting requirement for Phillips' allocation to apply to RA costs.  (*Id.*; Phillips' Reply 5–6.)  Second, Phillips contends that "[a]pplying basic rules of grammar and contract construction," "the language requiring a future agreement among some or all [p]arties applies only to 'other response costs,' not 'remedial action costs.'"  (Phillips' Mem. 6–7; Phillips' Reply 7–10.)  Phillips argues that if the Court were to accept Brooklyn Union's interpretation requiring a future agreement to apply the RD allocation percentage to both RA costs and other response costs, Brooklyn Union's "unilateral[] cho[ice] not to enter a subsequent agreement with Phillips regarding remedial action costs" would effectively allow Brooklyn Union to "veto [the] proper vote under [section] 10(j)."  (Phillips' Mem. 6–7; Phillips' Reply 5–7.)  Third, Phillips argues "there are many indications the parties intended" "the language requiring a future agreement among some or all [p]arties" to apply only to "other response costs."  (Phillips' Mem. 7, 11.)  In support, Phillips contends (i) "the parties knew [RA] costs were coming," and it "makes sense that the vote would apply automatically to remedial actions costs"; (ii) the parties "separately designat[ed] the types and categories of costs," distinguishing between "remedial action costs" and "any other response costs," "express[ing] their intent that the allocation assigned to an extremely small or zero-share party would apply without further action to the remedial action costs after a proper vote, while recognizing that resolution of responsibility as to 'other response costs' for which the party might become obligated in the future would require further evaluation and agreement"; (iii) Brooklyn Union's interpretation of section 10(j) is "nonsensical" because it would allow any party, including "a party with a share as low as zero to request a vote for its allocation to apply to" RA costs; and (iv) "if [section] 10(j) required . . . nominal or zero-share parties to reach a settlement with Brooklyn Union

46

before their allocations could ever apply to remedial action costs, there would be no reason to have a vote at all." (*Id.* at 9–11.) Fourth, Phillips argues that it does not attempt to bind "any other party that did not participate in the allocation process . . . [to] the Agreement or the allocation." (Phillips' Reply 10.) Finally, Phillips argues that none of the other provisions Brooklyn Union relies on in support of its argument gives Brooklyn Union "the unfettered right to disregard the authorized vote of the parties under [section] 10(j)" or to bar the "use or admissibility of any subsequent settlement among two or more parties in future litigation for breach of the Agreement." (Phillips' Mem. 15–17.)

The Court concludes that a plain reading of the Agreement permits the parties to apply their RD allocation to RA costs and, as incurred by a future agreement, other response costs. Section 10(j) provides in relevant part:

> The [p]arties agree that the process to develop the [a]llocation of RD [c]osts may, upon agreement of all [p]arties, include remedial action (RA) costs or other response costs, . . . If the [a]llocation process does not include RA costs, the [p]arties agree that the [a]llocation of the RD [c]osts for any [p]arty that is allowed a percentage of [REDACTED] or less may, upon the request of such [p]arty and the vote of 65% of the number of all [p]arties completing the RD [a]llocation process, *be applied to the remedial action (RA) costs or other response costs that such [p]arty becomes obligated to pay by any future agreement among some or all [p]arties concerning such costs*.

(Agreement section 10(j) (emphasis added).) The parties' disagreement is based on whether the phrase "becomes obligated to pay by any future agreement among some or all [p]arties concerning such costs" applies to "remedial action (RA) costs." [39] (Pl.'s Mem. 14; Phillips'

---

[39] In reviewing the parties' briefing and arguments made during the September 24, 2025 oral argument, it does not appear that Brooklyn Union nor Phillips dispute that section 10(j) allows Phillips to apply its RD allocation percentage to RA costs or other response costs, as long as Phillips has fulfilled the voting and other conditions outlined in section 10(j) of the Agreement. (Agreement 10(j); *see generally* Pl.'s Mem.; Phillips' Mem.; Pl.'s Reply; Phillips' Reply; Sep. 24 O.A. Tr.) The parties' dispute whether another future agreement is required to

Mem. 6–7.)  Specifically, Brooklyn Union argues that for a party with a below-Threshold percentage allocation for RD costs to apply that percentage to RA costs, the party must not only request and receive a vote of 65% or more of all parties *but also* enter into a "future agreement" concerning RA costs and other response costs.  (Pl.'s Mem. 14.)  Phillips, on the other hand, argues that a party with a below-Threshold percentage allocation for RD costs need only receive a vote of 65% or more of all parties to apply their RD percentage to RA costs.  (Phillips' Mem. 6–7.)  Phillips argues that a party must only enter into a "future agreement" for its RD allocation percentage to apply to "other response costs" — not for RA costs.  (Phillips' Reply 8–9.)

Evaluating the language of section 10(j) and the Agreement as a whole, the Court concludes "that such [p]arty becomes obligated to pay by any future agreement among some or all [p]arties concerning such costs" qualifies *only* "other response costs."  (Agreement section 10(j).)  Stated differently, a party who receives a below-Threshold percentage allocation for RD costs may apply that percentage to RA costs upon a vote of 65% of the parties to the Agreement and are not required to enter a separate "future agreement."

The text of section 10(j) and the Court's reading of the Agreement as a whole support the Court's conclusion that a future agreement is only needed to apply a party's RD percentage to "other response costs" and not to RA costs.  The rule of the last antecedent "provides that 'a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows." *Lockhart v. United States*, 577 U.S. 347, 351 (2016) (alteration in original)  (quoting *Barnart v. Thomas*, 540 U.S. 20, 26 (2003)); *see Verizon Commc'ns Inc. v. Fed. Commc'ns Comm'n*, 156 F.4th 86, 95 n.7 (2d Cir. 2025) (quoting *id.*), *cert. granted sub*

---

apply Phillips' RD allocation percentage to RA costs.  As discussed *supra* footnote 38, Phillips does not dispute that a future agreement is required for other response costs.

*nom. Verizon Commc'ns Inc. v. FCC*, No. 25-567, 2026 WL 73090 (U.S. Jan. 9, 2026).  "The rule reflects the basic intuition that when a modifier appears at the end of a list, it is easier to apply that modifier only to the item directly before it.  That is particularly true where it takes more than a little mental energy to process the individual entries in the list, making it a heavy lift to carry the modifier across them all."  *Lockhart*, 577 U.S. at 351; *see Facebook, Inc. v. Duguid*, 592 U.S. 395, 411 (2021) (Alito, J. concurring) (quoting *id.*); *Drennen v. Certain Underwriters at Lloyd's of London*, No. 23-CV-3385, 2024 WL 4476067, at *15 (S.D.N.Y. Oct. 11, 2024) (quoting *Lockhart*, 577 U.S. at 351), *aff'd sub nom. In re Residential Cap., LLC*, No. 25-118, 2026 WL 278142 (2d Cir. Feb. 3, 2026).  Applying this longstanding rule to section 10(j), a party with a below-Threshold percentage need only receive a vote of 65% of the parties to apply that percentage to RA costs.  *See, e.g.*, *Am. Int'l Grp. v. Bank of Am. Corp.*, 712 F.3d 775, 781–82 (2d Cir. 2013) ("Where there is no comma, . . . the subsequent modifier is ordinarily understood to apply only to its last antecedent."); *Kaneka Corp. v. Cocrystal Tech. (Jiaxing) Co.*, No. 23-CV-7483, 2025 WL 788977, at *4 (E.D.N.Y. Mar. 12, 2025) ("[R]eferential and qualifying words and phrases, where no contrary intention appears, refer solely to the last antecedent, which consists of the last word, phrase, or clause that can be made an antecedent without impairing the meaning of the sentence[.]" (alterations in original) (quoting *Finisar Corp. v. DirecTV Grp.*, 523 F.3d 1323, 1336 (Fed. Cir. 2008))); *Drennen*, 2024 WL 4476067, at *15 (applying the last antecedent rule and recognizing that the "Supreme Court has used it since the Founding" and the "rule is foundational in the proper grammatical interpretation of legal text"); *Chachkes v. David*, No. 20-CV-2879, 2021 WL 101130, at *8 (S.D.N.Y. Jan. 12, 2021) ("It is not a general principle of grammar that the language at the end of a sentence modifies everything that precedes it.").

Section 10(j) does not include other "indicia of meaning" that overcomes the Court's application of the last antecedent rule.  As the Supreme Court suggested in *Lockhart*, the last

49

antecedent rule does not apply in a list of words "often cited together," where the "listed items are simple and parallel without unexpected internal modifiers or structure." *Lockhart*, 577 U.S. at 352. "[R]emedial action (RA) costs or other response costs" are not words that are "often cited together" or that "readers are used to seeing" in conjunction with the qualifier "that such [p]arty becomes obligated to pay by any future agreement among some or all [p]arties concerning such costs." (*See* Agreement section 10(j).) *Lockhart*, 577 U.S. at 352 (noting that the last antecedent rule does not apply to "the laws, the treaties, and the constitution of the United States" because it is a list of documents "often cited together" and because "readers are used to seeing 'of the United States' modify each of them" (citation omitted)). Nor is the phrase "remedial action (RA) costs or other response costs" the type of "single, integrated list" that courts usually exclude from the last antecedent rule. *Lockhart*, 577 U.S. at 355. In those cases, the list more commonly includes three or more categories to which the qualifier applies, separated by commas or semi-colons, and/or the listed words are "simple and parallel." *Lockhart*, 577 U.S. at 352. Many of the cases Brooklyn Union cites in support of its argument that "remedial action (RA) costs or other response costs" represents a "single, integrated clause" follow that pattern.[40] The Supreme Court has recently noted that "several leading treatises

---

[40] (Pl.'s Reply 16–17 (citing *Facebook, Inc. v. Duguid*, 592 U.S. 395, 402 (2021) (explaining that the series qualifier rule directs the court to conclude that the clause "using a random or sequential number generator" modifies both verbs in the clause "to store or produce telephone numbers to be called, using a random or sequential number generator" because the word "or" connects "two verbs that share a common direct object" and the comma placement separated the qualifying phrase from the antecedents (citations omitted)); *Jones v. United States*, 529 U.S. 848, 853, 857 (2000) (applying the series qualifier rule rather than the last antecedent rule to "any building, vehicle, or other real or personal property used in interstate or foreign commerce" because otherwise, "hardly a building in the land would fall outside the federal statute's domain"); *United States v. Bass*, 404 U.S. 336, 337, 339–41 (1971) (applying the series qualifier rule rather than the last antecedent rule to the clause "receives, possesses, or transports in commerce or affecting commerce" because "the statute would have a curious reach" if "in commerce or affecting commerce" applied only to "transports" since "virtually all transportations, whether interstate or intrastate, involve an accompanying possession or receipt, it

explain [that] '[a] qualifying phrase separated from antecedents by a comma is evidence that the qualifier is supposed to apply to all the antecedents instead of only to the immediately preceding one.'" *Facebook, Inc.*, 592 U.S. at 403–04 (second alteration in original) (internal quotation marks and citations omitted).  In section 10(j), there is no comma after "other response costs" nor is the sentence's construction "simple" or "parallel" which would indicate that the "future agreement" clause should apply to both RA costs and other response costs.  *Cf. Silver v. Nissan-Infiniti LT, LLC*, 724 F. Supp. 3d 217, 224 (S.D.N.Y. 2024) (declining to apply the last antecedent rule where "the carve-out sentence contain[ed] a comma after 'excessive wear and use,' indicating that the clause that follows ('including collection or payment disputes') is meant to modify the prior clause), *recons. denied*, No. 23-CV-1019, 2024 WL 2055252 (S.D.N.Y. May 7, 2024); *Penske Truck Leasing Co., L.P. v. Safeco Ins. Co. of Ill.*, 457 F. Supp. 3d 148, 154 (D. Conn. 2020) (declining to apply the last antecedent rule because "the punctuation here parses the contractual language in a manner indicating that the qualifying language *does* apply to each of the previous antecedent parts."); *N.Y. Univ. v. Factory Mut. Ins. Co.*, 374 F. Supp. 3d 315, 327–28 (S.D.N.Y. 2019) (declining to apply the last antecedent rule where "the modifying phrase is set off from the list that it follows" by a semi-colon), *aff'd*, No. 20-1093-CV, 2021 WL 3136078 (2d Cir. July 26, 2021) (summary order).

The language of section 10(j) and the Agreement as a whole are not to the contrary. Brooklyn Union argues that the Agreement (1) "recognizes that no party will be forced into applying the RD [a]llocation to any other bucket of costs," (Pl.'s Mem. 21 (citing Agreement section 10(j))); (2) "reserved [each party's] right to sue the other parties for contribution," (*id.* (citing Agreement sections 20, 25)); and (3) included a "trumping clause" that prevents parties

---

is odd indeed to argue that on the one hand the statute reaches all possession and receipts, and on the other hand outlaws only interstate transportations.").)

from "waiv[ing] their rights under the Agreement, particularly the right to file a cost recovery action," (*id.* at 22 (citing Agreement sections 20, 25)).  None of these provisions are at odds with the Court's interpretation of section 10(j).  First, section 10(j) provides that "[n]othing in th[e] Agreement is intended or shall be construed to require any [p]arty to participate in any other allocation process for the RD, RA or any other purpose."  (Agreement section 10(j).)  The plain language of this section does not, as Brooklyn Union argues, "recognize[] that no party will be forced into applying the RD [a]llocation to any other bucket of costs."  (Pl.'s Mem. 21.)  Rather, section 10(j) provides, by its terms, that no party to the Agreement will be required to participate in any future allocation proceeding.  Second, the Court's interpretation of section 10(j) has no bearing on the sections of the Agreement that preserves the parties' rights to sue other parties for contribution or initiate a cost recovery action.  (Agreement sections 20, 25.)  All parties to the Agreement, including Brooklyn Union, remain entitled to pursue cost recovery litigation if a party or parties do not, for example, contribute their fair share of RD costs according to their allocated percentage.  Brooklyn Union has made no argument to persuade the Court that "structural or contextual evidence . . . 'rebut[s] the last antecedent inference.'"  *Lockhart*, 577 U.S. at 355 (quoting *Jama v. Immigr. and Customs Enf't*, 543 U.S. 335, 344 n.4 (2005)); *Silver*, 724 F. Supp. 3d at 224 (applying the last antecedent rule and noting that "interpretation is supported by an evaluation of the [agreement] in its entirety"); *cf. Trireme Energy Holdings, Inc.*, 757 F. Supp. 3d at 486 ("[C]ontract interpretation is an exercise in 'common sense' and so 'words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby.'" (quoting *RCJV Holdings, Inc. v. Collado Ryerson, S.A. de C.V.*, 18 F. Supp. 3d 534, 545 (S.D.N.Y. 2014))).

Brooklyn Union's remaining arguments to the contrary are unpersuasive.  First, Brooklyn Union incorrectly argues that the Agreement requires the parties' unanimous consent to apply the

52

RD allocation percentage to RA costs.  The first sentence of section 10(j) contemplates a circumstance in which the parties unanimously agree to apply their RD allocation percentages to RA costs, but the second sentence proposes an alternative scenario in which the parties who received an allocation percentage below the Threshold can apply that percentage to RA costs, so long as the party receives a 65% vote of all other parties to the Agreement.  (Agreement section 10(j).)

Second, Brooklyn Union also misstates the law by arguing that the last antecedent rule does not apply because the parties agree that the language of the contract is unambiguous.  (Pl.'s Mem. 13–14.)  As the Supreme Court has recognized, the last antecedent rule is a "grammatical rule," *Barnhart v. Thomas*, 540 U.S. 20, 26 (2003) (internal quotation marks omitted), and courts use such grammatical rules in deciphering even unambiguous language.  *See Allard K. Lowenstein Int'l Hum. Rts. Project v. Dep't of Homeland Sec.*, 626 F.3d 678, 681 (2d Cir. 2010) (applying the last antecedent rule to interpret unambiguous statutory language); *In re Enron Creditors Recovery Corp.*, 380 B.R. 307, 319–23 (S.D.N.Y. 2008) (applying the last antecedent rule to interpret unambiguous statutory language).

Third, Brooklyn Union cites no law in support of its argument that it "is contrary to typical CERCLA practice" to "assert that an underlying agreement concerning RA costs is not necessary."  (Pl.'s Reply 3, 10.)  The Court, as a result, will not consider this aspect of Brooklyn Union's argument because Brooklyn Union has not met its burden on summary judgment.  *See Sharif v. Fischer*, No. 05-CV-6504, 2025 WL 1220295, at *6 (W.D.N.Y. Apr. 28, 2025) (denying summary judgment where the defendant "lacks any legal analysis"); *Heiden v. N.Y.C. Health & Hosps. Corp.*, No. 20-CV-10288, 2023 WL 171888, at *19 (S.D.N.Y. Jan. 11, 2023) (denying summary judgment where the defendants "d[id] not cite any facts or legal authority to support their contention" and thus failed to "me[e]t their burden on summary judgment").

Finally, contrary to Brooklyn Union's argument, Phillips does not seek to bind non-parties to the Agreement.  (Pl.'s Mem. 21–22; *see generally* Phillips' Mem.; Phillips' Reply.)  Rather, Phillips' briefing explicitly states that it only seeks to enforce the Agreement, and the application of the RD allocation to RA costs, against Brooklyn Union and other signatories.  (Phillips' Reply 10 ("Phillips has never claimed that any other party that did not participate in the allocation process is bound by the Agreement or the allocation.  Nor has Phillips asserted the Agreement as an affirmative defense or basis for dismissal of the blanket crossclaim NL Industries, Inc. filed against all other defendants.").)  Brooklyn Union provides no legal support explaining how applying the RD allocation to RA costs as authorized in the Agreement would bind non-signatories to the Agreement.  The Court therefore declines to further address this aspect of Brooklyn Union's argument.  *See DoubleLine Cap. LP v. Construtora Norberto Odebrecht, S.A.*, No. 17-CV-4576, 2025 WL 1951864, at *7 (S.D.N.Y. July 16, 2025) (rejecting the defendants' argument where they "cite no legal authority for the[ir] proposition"); *Cea v. Access 23 TV*, No. 11-CV-3791, 2015 WL 5474070, at *2 (S.D.N.Y. Sep. 15, 2015) (declining to "conduct[] the initial legal analysis" for the defendant's motion for summary judgment where the motion "cites no legal authority in support of any of his contentions" (citation omitted)).

Therefore, the Court finds that Phillips and other parties with a percentage below the Threshold amount may, upon a vote of at least 65% of the parties, apply their respective RD allocation to: (1) RA costs; and (2) as agreed to by Brooklyn Union and Phillips, to other response costs as incurred by a future agreement among some or all of the parties.

### iv.    The May 2019 Vote applied the RD percentage to RA costs and to other response costs that Phillips becomes obligated to pay by any future agreement

The May 2019 Vote satisfied the requirements of section 10(j) for the parties with below-Threshold percentage allocations to apply their RD allocation to RA costs and other response

costs that are the result of a "future agreement among some or all [p]arties." (Agreement section 10(j).) On May 1, 2019, Phillips, "having received an allocated percentage of [REDACTED]% or less in the RD allocation, request[ed] pursuant to [section] 10(j) of the [Agreement], that such [p]arty may apply its respective RD allocation percentage to the remedial action (RA) costs or other response costs that such [p]arty becomes obligated to pay by any future agreement among some or all [p]arties concerning such costs." (E-mail of Steven M. Jawetz (May 1, 2019, at 12:50 P.M.), annexed to Thompson Decl. as Ex. B, Docket Entry No. 240-5.) The e-mail initiate[d] a vote by email on the . . . request under [p]aragraph 10(j)," and "request[ed] votes within seven (7) calendar days." (*Id.*) As noted, section 10(j) of the Agreement provides that a party "that is allocated a percentage of [REDACTED]% or less may, upon the request of such [p]arty and the vote of 65% of the number of all [p]arties completing the RD [a]llocation process, be applied to the remedial action (RA) costs" and "other response costs" resulting from "future agreement[s] among some or all [p]arties." (Agreement section 10(j).) Although Brooklyn Union "vote[d] no on th[e] current vote" and noted that it believed the parties were "prohibited from discussing or disclosing (i) [section] 10(j) related to the vote on parties allocated less than [REDACTED]%, or (ii) the outcome of any vote with EPA pursuant to [section] 27 of [the A]greement," (E-mail of Bradley S. Rochlen (May 1, 2019, at 3:51 P.M.), annexed to Thompson Decl. as Ex. D, Docket Entry No. 240-7), it is undisputed that the vote passed with more than 80% of the parties to the Agreement voting in favor.[41] The Court therefore finds that Phillips fulfilled the requirements of section 10(j) by requesting and

---

[41] As discussed *supra* footnote 12, because Brooklyn Union's objections to the statements regarding the outcome of the May 2019 Vote did "not dispute the accuracy of the assertion," *Johnson*, 2019 WL 294796, at *10 n.8 (quoting *Geoghan v. Long Island R.R.*, No. 06-CV-1435, 2009 WL 982451, at *5–6 (E.D.N.Y. Apr. 9, 2009)), the Court deems admitted Phillips' statement that more than 80% of the Agreement signatories approved the May 2019 Vote. (Pl.'s Phillips 56.1 Resp. ¶ 19.)

receiving a vote to apply its RD allocation to RA costs and other response costs that are the result of a future agreement.

Phillips seeks a ruling "as a matter of law that Phillips' prior allocation under the Agreement applies to remedial design, remedial action, and other costs Brooklyn Union is seeking from Phillips in this litigation." (Phillips' Mem. 25.)  The Court grants Phillips' cross-motion to the extent that it requests the Court to conclude that Phillips sought and received a vote under section 10(j) of the Agreement to apply its RD percentage allocation to RA costs, and other response costs it becomes later "obligated to pay by any future agreement among some or all [p]arties." (Agreement section 10(j).)  *See supra* section II.c.iii.  However, the Court declines to make a determination about whether any party incurred "other response costs" as a result of a "future agreement among some or all [p]arties concerning such costs, (*id.*). [42]  At this stage, the Court is only determining whether the Agreement and RD allocation percentages can be introduced into this litigation and when a party can apply its RD allocation percentage to either its RA costs or "other response costs."

Accordingly, the Court grants in part and denies in part Brooklyn Union's motion for summary judgment.  The Court holds, as a matter of law, that Phillips and other parties may use the Agreement as the basis for a claim or defense in this lawsuit, and also holds, as a matter of

---

[42]  In addition, Phillips argues that Brooklyn Union "impermissibly seeks certain pre-design costs covered by the prior allocation" and "other response costs beyond the costs for remedial action." (Phillips' Mem. 2–3, 17–19.)  In support, Phillips points to the Complaint and Brooklyn Union's 56.1 Statement.  (*See* Compl. ¶ 218; Pl.'s 56.1 ¶ 18.)  Brooklyn Union counters that it "has not asserted any claim for RD costs against parties to the RD [a]llocation" but does seek costs it "incurred in settling with US EPA." (Pl.'s Reply 12 n.3; Compl. ¶ 218.)

The Court declines to make any determination at this stage of the litigation as to what costs Brooklyn Union seeks to recover in this litigation.  The parties have presented no evidence on this motion for summary judgment as to whether Brooklyn Union seeks recovery for RD costs, RA costs, or other response costs.  The Court only addresses the parties' motions for summary judgment as to the interpretation of the Agreement and its admissibility in this litigation.

law, that the RD allocation percentages cannot be entered into this cost recovery litigation.  The Court grants in part and denies in part Phillips' cross-motion and (1) holds, as a matter of law, that Phillips' RD allocation percentage under the Agreement applies to RA costs and, as incurred by a future agreement, other response costs, and (2) denies Phillips' request to re-file its Answer and Counterclaims and Agreement without redaction.  (Phillips' Mem. 25.)

### d.    The Court denies Brooklyn Union's motion and Phillips' cross-motion for summary judgment on Phillips' breach-of-contract counterclaim

Brooklyn Union contends that it is entitled to summary judgment because Phillips's breach of contract claim is meritless.  (Pl.'s Mem. 18.)  First, Brooklyn Union argues Phillips "attempt[ed] to unilaterally put the claims of the Agreement at issue by bringing a meritless breach of contract counterclaim against Brooklyn Union."  (*Id.*)  In support, Brooklyn Union contends that Phillips' counterclaim fails as a matter of law because "[t]he [p]arties did not agree to include RA costs in the RD [a]llocation, nor did Brooklyn Union enter into an agreement under which any defendant, including Phillips, became obligated to pay RA costs."  (*Id.* at 13.)  Brooklyn Union argues that "[e]stablishing one of these is an absolute requirement for the Agreement to apply to RA costs and Phillips cannot point to any language in the Agreement otherwise."  (*Id.*)  Second, Brooklyn Union argues that Phillips "has violated a covenant of good faith by publicly filing the Agreement with its Answer, and by referring to final RD shares in its Answer, in violation of the confidentiality provisions of the Agreement."  (Pl.'s Reply 19.)  Third, Brooklyn Union argues that it has not breached a covenant of good faith and fair dealing "merely by exercising [Brooklyn Union's] rights to enter into settlement agreements which impose no obligations upon Phillips."  (*Id.* at 18–19.)

Phillips contends that the Court should deny Brooklyn Union's motion for summary judgment on Phillips' counterclaim and instead grant Phillips summary judgment.  First, Phillips argues that its "breach-of-contract claim" was "a compulsory counterclaim in this action" and

57

that the "Agreement specifically contemplates that any party can bring a claim to enforce the contractual terms, which are binding, against any breaching party." (Phillips' Mem. 20–21.) Second, Phillips contends its counterclaim is "directly based on Brooklyn Union's violation of the Agreement's terms." (*Id.* at 21.) Third, as to Phillips's argument that Brooklyn Union is suing Phillips for costs covered by the Agreement and the vote, Phillips argues that Brooklyn Union "seeks certain pre-design costs expressly covered by the Agreement and prior allocation, even without the need for any further consent or vote of the parties." (*Id.* at 17.) Fourth, Phillips contends that "based on its allocation, [it] has satisfied all obligations and owes nothing to Brooklyn Union for any work." (*Id.* at 18–19; Phillips' Reply 4–5.) Fifth, Phillips cross-moves for summary judgment on its counterclaim, arguing that Brooklyn Union breached the Agreement by refusing to "cooperate fully" and violated its "contractual duty of good-faith cooperation" by (i) "refusing to abide by the vote of the parties under [section] 10(j) of the Agreement"; (ii) "systematically excluding Phillips from settlements it reached with others"; and (iii) "suing Phillips for costs that were covered by the Agreement and the parties' vote." (Phillips' Mem. 11–15, 17; Phillips' Reply 6.)

"Under New York law, to make out a viable claim for breach of contract, a plaintiff must prove (1) 'the existence of a contract,' (2) 'adequate performance of the contract by [the plaintiff],' (3) 'breach of the contract by [the defendant],' and (4) 'damages.'" *N.A. Photon Infotech Ltd. v. ZoomInfo LLC*, Nos. 22-1979, 22-2074, 2024 WL 4799843, at *1 (2d Cir. Nov. 15, 2024) (summary order) (alterations in original) (quoting *24/7 Recs., Inc. v. Sony Music Ent., Inc.*, 429 F.3d 39, 41–42 (2d Cir. 2005)); *see Up State Tower Co., LLC v. Town of Cheektowaga*, No. 24-165, 2025 WL 444207, at *1 (2d Cir. Feb. 10, 2025) (summary order) ("A breach of contract claim under New York law has four elements: '(i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv)

58

damages.'" (quoting *Johnson v. Nextel Commc'ns, Inc.*, 660 F.3d 131, 142 (2d Cir. 2011)));

*Hernandez v. Kwiat Eye and Laser Surgery, PLLC*, No. 23-7679, 2024 WL 5116365, at *5 (2d

Cir. Dec. 16, 2024) (summary order) ("To sustain a breach-of-contract claim under New York

law, a plaintiff must show: (1) a valid contract; (2) adequate performance of the contract by the

plaintiff; (3) breach of contract by the defendant; and (4) damages." (citing *Eternity Glob.*

*Master Fund Ltd. v. Morgan Guar. Trust Co. of N.Y.*, 375 F.3d 168, 177 (2d Cir. 2004))).

"Under New York law, 'implicit in every contract is a covenant of good faith and fair

dealing[,] which encompasses any promises that a reasonable promisee would understand to be

included.'" *JN Contemp. Art LLC v. Phillips Auctioneers LLC*, 29 F.4th 118, 128 (2d Cir. 2022)

(quoting *Spinelli v. Nat'l Football League*, 903 F.3d 185, 205 (2d Cir. 2018)); *see also Aquino v.*

*Alexander Cap. LP*, Nos. 23-1109, 23-1164, 2024 WL 2952497, at *4 (2d Cir. June 12, 2024)

(summary order) (quoting same). "'[N]either party to a contract shall do anything [that] has the

effect of destroying or injuring the right of the other party to receive the fruits of the contract,' or

to violate the party's 'presumed intentions or reasonable expectations.'" *Spinelli*, 903 F.3d at

205 (alterations in original) (quoting *M/A-COM Sec. Corp. v. Galesi*, 904 F.2d 134, 136 (2d Cir.

1990)). The covenant of good faith and fair dealing "only impose[s] an obligation consistent

with other mutually agreed upon terms in the contract. It does not add [ ] to the contract a

substantive provision not included by the parties." *Woodard v. Reliance Worldwide Corp.*, 819

F. App'x 48, 49 (2d Cir. 2020) (alterations in original) (quoting *Broder v. Cablevision Sys.*

*Corp.*, 418 F.3d 187, 198–99 (2d Cir. 2005)); *see Gravitas Search Partners LLC v. Deutsch*, No.

24-CV-2683, 2025 WL 2243720, at *12 (S.D.N.Y. Aug. 6, 2025) ("The implied covenant of

good faith and fair dealing 'does not add obligations beyond those set forth in the agreement;

rather, it protects a party to a contract from improper conduct that subvert[s] the contract itself.'"

(alteration in original) (quoting *Hard Rock Café Int'l, (USA), Inc. v. Hard Rock Hotel Holdings,*

59

*LLC*, 808 F. Supp. 2d 552, 567 (S.D.N.Y. 2011))); *Sec. Plans, Inc. v. CUNA Mut. Ins. Soc.*, 261 F.R.D. 4, 9 (W.D.N.Y. 2009) ("The covenant, however, only protects the bargained-for terms of the agreement and is not 'designed to enlarge or create new substantive rights between the parties.'" (quoting *Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455, 479 (S.D.N.Y. 2007))); *D & L Holdings, LLC v. RCG Goldman Co.*, 734 N.Y.S.2d 25, 31 (App. Div. 2001) ("The covenant of good faith and fair dealing cannot be used to add a new term to a contract, especially to a commercial contract . . . ."); *see also LightSquared Inc. v. Deere & Co.*, Nos. 13-CV-8157, 13-CV-5543, 2015 WL 585655, at \*11 (S.D.N.Y. Feb. 5, 2015) ("The implied covenant of good faith and fair dealing 'is not a means to add new terms to the agreement; it merely requires that the parties behave fairly and reasonably in the performance and enforcement of the contract.'" (quoting *C & E Servs., Inc. v. Ashland Inc.*, 601 F. Supp. 2d 262, 275 (D.D.C. 2009))), *aff'd sub nom.*, *Harbinger Cap. Partners LLC v. Deere & Co.*, 632 F. App'x 653 (2d Cir. 2015). "Furthermore, the implied covenant 'does not extend so far as to undermine a party's general right to act on its own interests in a way that may incidentally lessen the other party's anticipated fruits from the contract.'" *Woodard*, 819 F. App'x at 49 (quoting *M/A-COM*, 904 F.2d at 136); *see also LJL 33rd St. Assocs., LLC v. Pitcairn Props. Inc.*, 725 F.3d 184, 195 (2d Cir. 2013) ("[T]he implied covenant of good faith cannot create duties that negate explicit rights under a contract."); *Banco San Juan Internacional, Inc. v. Fed. Rsrv. Bank of N.Y.*, 762 F. Supp. 3d 247, 285 (S.D.N.Y. 2025) (quoting *LJL 33rd St. Assocs., LLC*, 725 F.3d at 195), *appeal docketed*, No. 25-1144 (2d Cir. May 5, 2025).

The parties do not dispute the existence of a contract but dispute the remaining elements of a breach-of-contract claim and whether either party breached the covenant of good faith and fair dealing.

First, Brooklyn Union argues that Phillips has not performed under the Agreement

because Phillips filed a public version of the Agreement and referred to its final RD percentage in their Answer and Counterclaims. (Pl.'s Reply 19.) As the Court concluded *supra* section II.c.i, Phillips did not violate the confidentiality provisions under sections 27 and 13(a) in the Agreement by filing a public version of the Agreement and disclosing its RD allocation percentage because neither of those sections bar the parties from disclosure of the Agreement or the RD allocation percentages in this litigation. Nevertheless, as the Court determined *supra* section II.c.ii.1, section 10(a) prohibits Phillips from disclosing its RD allocation percentage *in this litigation*. As a result, the Court finds Phillips violated section 10(a) of the Agreement by publicly disclosing its RD allocation percentage when it filed its unredacted Answer and Counterclaims.

Second, Brooklyn Union argues that Phillips has violated the covenant of good faith and fair dealing by publicly "referring to final RD shares in its [a]nswer, in violation of the confidentiality provisions of the Agreement." (Pl.'s Opp'n 19.) While the Court finds that Phillips has breached the Agreement, Brooklyn Union has failed to satisfy its burden of proof — that no rational jury could find that Phillips did not violate the covenant of good faith and fair dealing by including its RD allocation percentage in its unredacted Answer and Counterclaims. Other than several sentences included in Brooklyn Union's briefing, Brooklyn Union offers no other argument or any evidence to persuade the Court that Phillips's breach was in bad faith.

Third, Phillips cross-moves for summary judgment on its counterclaim arguing that Brooklyn Union breached the Agreement and violated the covenant of good faith and fair dealing by (i) "refusing to abide by the vote of the parties under [section] 10(j) of the Agreement"; (ii) "systematically excluding Phillips from settlements it reached with others"; and (iii) "suing Phillips for costs that were covered by the Agreement and the parties' vote." (Phillips' Mem. 11–15, 17; Phillips' Reply 6.) In response, Brooklyn Union argues it did not breach the

61

Agreement nor the covenant of good faith and fair dealing, because (i) Phillips has not established that the parties agreed to apply the Agreement to RA costs and other response costs, (ii) Brooklyn Union's agreements with other entities concerning their RA costs and other response costs have "no bearing on this litigation," and (iii) Brooklyn Union "simply . . . exercis[ed] a right it was entitled to under the Agreement — namely, filing a lawsuit seeking cost recovery from Phillips." (Pl.'s Mem. 9; Pl.'s Reply 18–19; *see also* Agreement section 6 (recognizing the ability for any party to sue another party "to enforce the terms of this Agreement . . . in connection with RD Work or RD Costs or any other response costs or response actions relating to the [Gowanus Canal Superfund] Site").) As discussed *supra* sections II.c.iii and II.c.iv, the Court concludes that Phillips properly sought and received a vote to apply its RD percentage allocation to RA costs per the May 2019 Vote. While the Court agrees that Brooklyn Union is entitled to "enter into settlement agreements" with other parties regarding RA costs and other response costs that "impose no obligations upon Phillips," (Pl.'s Reply 18–19), Phillips has failed to demonstrate that a reasonable jury could not find in Brooklyn Union's favor — holding that Brooklyn Union did not violate the Agreement and/or breach the covenant of good faith and fair dealing by (i) refusing to abide by the results of the May 2019 vote and (ii) suing Phillips and other defendants for recovery and contribution of RA costs and other costs.[43] (Phillips' Mem. 11–15; Phillips' Answer and Counterclaims, Phillips' Counterclaims ¶ 61.)

Because both parties have failed to show that there is no dispute of material fact as to (1) whether Phillips breached the covenant of good faith and fair dealing by disclosing its RD allocation percentage in court filings, (2) whether Brooklyn Union performed under the

---

[43] As discussed *supra* section II.c.iv, the Court makes no determination at this stage of the litigation as to what costs Brooklyn Union seeks to recover in this litigation. *See supra* footnote 42.

Agreement, and (3) whether Brooklyn Union breached the covenant of good faith and fair dealing by failing to abide by the results of the May 2019 vote and bringing this lawsuit, the Court accordingly denies both Brooklyn Union's motion and Phillips' cross-motion for summary judgment on Phillips' breach-of-contract counterclaim. *See Prompt Apparel LA, Inc. v. Chic Home Design LLC*, No. 24-CV-279, 2024 WL 4882203, at *4 (S.D.N.Y. Nov. 25, 2024) (denying summary judgment where the court could not "determine as a matter of law whether or not [the d]efendants breached the [a]greement" and could not "determine as a matter of law whether or not [the p]laintiff breached the [a]greement"); *ICR, LLC v. Neptune Wellness Sols., Inc.*, No. 22-CV-933, 2024 WL 1675679, at *4 (D. Conn. Mar. 25, 2024) (denying summary judgment on a breach-of-contract claim where "[t]he issue of whether a party ha[d] substantially performed" was not "certain") (quoting *Merrill Lynch & Co. v. Alegheny Energy, Inc.*, 500 F.3d 171, 185–86 (2d Cir. 2007))), *reconsideration denied*, 2024 WL 1769304 (D. Conn. Apr. 22, 2024); *Access Bus. Grp. Int'l, LLC v. Refresco Beverages US Inc.*, 699 F. Supp. 3d 246, 249–50 (S.D.N.Y. 2023) (denying summary judgment where "[g]enuine disputes remain over whether [the party] breached").

## III. Conclusion

For the foregoing reasons, the Court grants in part and denies in part Brooklyn Union's motion for summary judgment and grants in part and denies in part Phillips' cross-motion for summary judgment. The Court (1) finds as a matter of law, that Phillips and other parties may use the Agreement as the basis for a claim or defense in this lawsuit; (2) finds as a matter of law, that Phillips and other parties are prohibited from entering the results of the RD allocation in this litigation; (3) finds that Phillips' RD allocation under the Agreement applies to RA costs and, as incurred by a future agreement, other response costs that it becomes obligated to pay; (4) denies Phillips' request to re-file its Answer and Counterclaims and the Agreement without redactions;

and (5) denies Brooklyn Union's motion and Phillips' cross-motion for summary judgment on

Phillips' breach-of-contract counterclaim.

Dated: March 30, 2026
       Brooklyn, New York

                                    SO ORDERED:


                                    _____/s/MKB_____
                                    MARGO K. BRODIE
                                    United States District Judge